CT Corporation

**Service of Process Transmittal**
09/25/2020
CT Log Number 538304300

TO: Brian Alexander
Hard Rock Cafe
5701 STIRLING RD
DAVIE, FL 33314-7429

RE: **Process Served in Florida**

FOR: Hard Rock Cafe International (USA), Inc.  (Domestic State: FL)

---

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | MOAC Mall Holdings LLC, ETC., AND MOA Entertainment Company LLC, ETC., PLTFS. vs. Hard Rock Caf International (USA), Inc., DFT. |
| **DOCUMENT(S) SERVED:** | - |
| **COURT/AGENCY:** | None Specified<br>Case # NONE |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Plantation, FL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 09/25/2020 at 04:04 |
| **JURISDICTION SERVED :** | Florida |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/25/2020, Expected Purge Date: 09/30/2020 |
| | Image SOP |
| | Email Notification,  Erica Pallaron  erica_pallaron@hardrock.com |
| | Email Notification,  Michele Giger  Michele_Giger@hardrock.com |
| | Email Notification,  Brian Alexander  brian.alexander@hardrock.com |
| | Email Notification,  Candice Pinares-Baez  candice.pinares-baez@hardrock.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 1209 N Orange St<br>Wilmington, DE 19801-1120 |
| **For Questions:** | 866-401-8252<br>EastTeam2@wolterskluwer.com |

Page 1 of  1 / CM

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



# PROCESS SERVER DELIVERY DETAILS

**Date:**              Fri, Sep 25, 2020

**Server Name:**       Eric Deal


Entity Served          Hard Rock Cafe International (USA), Inc.

Agent Name

Case Number            NONE

Jurisdiction           FL



STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type: Breach of Contract

---

MOAC Mall Holdings LLC,
a Delaware limited liability company and
MOA Entertainment Company LLC, a
Delaware limited liability company,

               Plaintiffs,

v.

Hard Rock Café International (USA), Inc.,

               Defendant.

Court File No:

**SUMMONS**

Date: 9-25-20 Time: 2:16

Eric Deal      S.P.S. 336

---

TO:   DEFENDANT ABOVE-NAMED:

    **YOU ARE BEING SUED.** The Plaintiffs have started a lawsuit against you. The Plaintiffs' Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

    2.    **YOU MUST REPLY WITHIN \*\*20\*\* DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this Summons a **written response** called an Answer within \*\*20\*\* days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons located at:

<div align="center">

Bradley D. Hauswirth, Esq.
Aaron Ferguson Law
2700 Snelling Avenue N, Suite 460
Roseville, Minnesota 55113

</div>

    3.    **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiffs' Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

<div align="center">Page 1 of 2</div>

4.     **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within **20** days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiffs everything asked for in the complaint. If you do not want to contest the claims stated in the complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the complaint.

5.     **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6.     **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolutions process under Rule 114 or the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: _9/25/2020_

AARON FERGUSON LAW

Bradley D. Hauswirth, Esq. (#219836)
brad@aafonfergusonlaw.com
2700 Snelling Avenue N, Suite 460
Roseville, MN 55113
Tel: (612) 242-7709
ATTORNEYS FOR PLAINTIFF

**STATE OF MINNESOTA**

**COUNTY OF HENNEPIN**

**DISTRICT COURT**

**FOURTH JUDICIAL DISTRICT**
Subject Matter: Contract

---

Court File No.: _____
Judge: _____

MOAC Mall Holdings LLC,
a Delaware limited liability company and
MOA Entertainment Company LLC, a
Delaware limited liability company,

Plaintiffs,

**COMPLAINT**

v.

Hard Rock Café International (USA), Inc.,

Defendant.

---

Comes now Plaintiffs MOAC Mall Holdings LLC, a Delaware limited liability company and MOA Entertainment Company LLC, a Delaware limited liability company (jointly referred to as "Plaintiff", and for its claims and causes of action against Defendant state and allege as follows:

## PARTIES

1. At all times material herein, MOAC Mall Holdings LLC, is a Delaware limited liability company, and the landlord of Mall of America, a premises located in the City of Bloomington, County of Hennepin, State of Minnesota, Fourth Judicial District, the address of which is 2131 Lindau Lane, Suite 500, Bloomington, Minnesota 55425-5550 ("the Mall"), and Plaintiff MOA Entertainment Company LLC is an assignee of a certain lease involving Defendant.

2. At all times material herein, Defendant is a Florida corporation, with its Registered Office Address of 5701 Stirling Road, Davie, Florida 33314. At all times material herein, Defendant is a tenant at the Mall. Defendant has a presence in approximately 70 countries or more, has approximately 180 restaurants, 24 hotels and 11 casinos.

## GENERAL ALLEGATIONS

3. Plaintiff and Defendant entered a non-residential lease dated February 19, 2014 [Ex. A].

4. The Lease Commencement Date was March 1, 2014 for a period of 10 years.

5. Pursuant to the Lease, rent, including all rental obligations under the Lease, was due and payable on the first day of each month. [Ex. A at Art. I, Section 1.1(g) and Art. IV., Section 4.1]

6. On June 8, 2020, Plaintiff served Defendant with a Notice of Anticipatory Default advising that, among other things, its rental account was delinquent in the aggregate sum of $236,140.52. [Ex. B].

7. On July 21, 2020, Plaintiff served Defendant with a Notice of Continuing Default advising that, among other things, its rental account was delinquent in the aggregate sum of $318,172.51. [Ex. C].

8. The current amount due for past rental obligations under the Lease through September 30, 2020, exclusive of amounts due pursuant to Article VIII, Section 8.2, is the aggregate sum of $493,916.94.

9. Pursuant to the Lease, upon default by Defendant for failure to promptly occupy and use the premises, said default having occurred, Plaintiff is entitled to additional damages of an increase by twenty-five percent (25%) of the Gross Annual Rent, prorated on a daily basis, said additional damages amounting to $64,102.08 for the time period from June 10, 2020 through September 30, 2020. [Ex. A at Art. VIII, § 8.2]

10. Pursuant to the lease, including a year-end electric adjustment/reduction of $7,440.73 and a year-end gas adjustment/reduction of $2,514.72, Defendant is liable for past rent expenses in the total sum of $548,063.57 through September 30, 2020, said amount ongoing.

11. Pursuant to the Lease, upon default by Defendant, said default having occurred, Defendant remains liable for ongoing obligations arising during the remainder of the term of the Lease as if the Lease remained in full force and effect. [Ex. A at Art. XVIII, § 18.2.]

12. Pursuant to the Lease, Plaintiff is entitled to recover all attorney's fees, costs and disbursements arising out of Defendant's default under the Lease and incurred in bringing this action. [Ex. A at Art. XVIII, § 18.2.]

13. That Defendant has not occupied and used the space since March 17, 2020.

14. That Defendants failure to occupy and use the space from June 10, 2020 to the present constitutes a breach of the lease pursuant to Article VIII, Section 8.2 of the lease.

15. Plaintiff has not terminated the lease.

16. Defendant has not terminated the lease.

### COUNT I – BREACH OF LEASE

17. Plaintiff realleges all allegations and incorporates them herein by reference.

18. Defendant is in default under the Lease for failure to pay rental obligations and failure to occupy and use the space.

19. Despite knowledge of default under the Lease for failure to pay rental obligations and failure to occupy and use the space, Defendant has refused, failed and/or neglected to make payment of the amount due and owing and has refused to enter, occupy and use the space.

20. Pursuant to the Lease, Defendant is liable to Plaintiff for all past due rental obligations in the amount of $548,063.57.

21. Pursuant to the Lease, Defendant is liable to Plaintiff for a late payment service charge.

22. Pursuant to the Lease, Defendant is liable to Plaintiff for attorney's fees, costs and disbursements arising out of Defendant's default under the Lease and incurred in bringing this action.

23. Plaintiff has incurred and will continue to incur attorney's fees, costs and disbursements in enforcing the terms of the Lease and recovering the amount due and owing under the Lease.

24. Additional damages may accrue under the Lease and Plaintiff reserves the right to request and prove additional damages at trial.

25. Defendant is liable to Plaintiff on a breach of lease theory.

## COUNT II– SPECIFIC PERFORMANCE

26. Plaintiff realleges all allegations and incorporates them herein by reference.

27. Notwithstanding that Plaintiff has provided the leased space, Defendant has refused to occupy and use the space as required in the lease.

28. In addition to other damages requested herein, Plaintiff seeks specific performance by Defendant to comply with occupying and using the space pursuant to the lease.

WHEREFORE, Plaintiff demands judgment against Defendant for damages in a reasonable sum greater than $548,063.57, said sum continuing to increase, together with attorney's fees, costs, disbursements, interest, any other damages allowed pursuant to the lease and for such other and further relief as the Court deems just and equitable.

Dated: _9/25/2020_

AARON FERGUSON LAW

Bradley D. Hauswirth, Esq. (#219836)
brad@aaronfergusonlaw.com
2700 Snelling Avenue N, Suite 460
Roseville, MN 55113
Phone: (612) 242-7709
Fax: (651) 493-3843

## ACKNOWLEDGEMENT

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney and witness fees may be awarded pursuant to Minn. Stat. § 549.21, Subd. 2, to the party against whom the allegations in this pleading are asserted.

Bradley D. Hauswirth, Esq. (#219836)

LEASE

BY AND BETWEEN

MOAC MALL HOLDINGS LLC,

a Delaware limited liability company

AND

HARD ROCK CAFÉ INTERNATIONAL (USA), INC.,

a Florida corporation

**EXHIBIT**

**A**

026767.000127 602929037.2

TABLE OF CONTENTS

| ARTICLE | | PAGE |
|---|---|---|
| I | BASIC LEASE INFORMATION AND DEFINITIONS | 1 |
| | Section 1.1 Basic Lease Information | 1 |
| | Section 1.2 Definitions | 3 |
| II | LEASED PREMISES AND TERM | 3 |
| | Section 2.1 Leased Premises | 3 |
| | Section 2.2 ~~Roof and Walls~~ *Landlord's Work; Reserved Rights* | 3 |
| | Section 2.3 Lease Term | 4 |
| | Section 2.4 Lease Year Defined | 4 |
| | Section 2.5 Relocation of Premises *Intentionally Deleted* | 4 |
| | Section 2.6 Modifications to the Center | 5 |
| III | TENANT'S WORK | 5 |
| | Section 3.1 Tenant's Work | 5 |
| | Section 3.2 Tenant's Obligations Before Commencement Date | 6 |
| | Section 3.3 Failure of Tenant to Perform | 6 |
| | Section 3.4 Condition of Premises | 6 |
| | Section 3.5 Certification | 7 |
| IV | RENT | 7 |
| | Section 4.1 Gross and Percentage Rent | 7 |
| | Section 4.2 Miscellaneous Rent Provisions | 7 |
| | Section 4.3 Percentage Rent | 7 |
| | Section 4.4 Gross Sales and Adjusted Gross Sales Defined | 8 |
| | Section 4.5 Taxes | 9 |
| | Section 4.6 Additional Rent | 9 |
| | Section 4.7 Sprinkler System | 9 |
| | Section 4.8 Landlord's Expenses | 10 |
| V | PARKING AND COMMON AREAS AND FACILITIES | 10 |
| | Section 5.1 Common Areas | 10 |
| | Section 5.2 Use of Common Areas | 10 |
| VI | MAINTENANCE OF COMMON AREAS | 10 |
| | Section 6.1 Operating and Maintenance the Common Facilities | 10 |
| | Section 6.2 Tenant's Fixed Rate Charge *Intentionally Deleted* | 10 |
| VII | UTILITIES AND SERVICES | 11 |
| | Section 7.1 Utilities | 11 |
| | Section 7.2 Air Conditioning of Premises | 12 |
| | Section 7.3 ~~Enforcement and Termination~~ *Interruption of Utilities* | 12 |
| | *Section 7.4 Abatement Event* | *12* |
| VIII | CONDUCT OF BUSINESS BY TENANT | 13 |
| | Section 8.1 Use of Premises | 13 |
| | Section 8.2 Prompt Occupancy and Use | 13 |
| | Section 8.3 Conduct of Business | 13 |
| | Section 8.4 Operation by Tenant | 14 |
| | Section 8.5 Emissions and Hazardous Materials | 14 |
| | Section 8.6 Painting, Decorating, Displays, Alterations, Signage | 15 |
| | Section 8.7 Other Operations | 16 |
| | Section 8.8 Sales and Dignified Use | 16 |
| | Section 8.9 Rules and Regulations | 17 |
| IX | MAINTENANCE OF PREMISES | 17 |
| | Section 9.1 Maintenance by Landlord | 17 |
| | Section 9.2 Maintenance by Tenant | 18 |
| | Section 9.3 Surrender of Premises | 18 |
| X | ALTERATIONS AND TENANT'S LIENS | 18 |
| | Section 10.1 Remodeling | 18 |
| | Section 10.2 Removal and Restoration by Tenant | 18 |
| | Section 10.3 Tenant's Liens | 19 |

i

| | | |
|---|---|---|
| XI | INSURANCE | 19 |
| | Section 11.1 By Landlord | 19 |
| | Section 11.2 By Tenant | 19 |
| | Section 11.3 *Mutual* Waiver of Subrogation Rights | 20 |
| | Section 11.4 Waiver | 20 |
| | Section 11.5 Insurance – Tenant's Operation | 20 |
| | Section 11.6 Indemnification | 21 |
| | *Section 11.7 Dramshop Insurance* | *21* |
| XII | OFFSET STATEMENT, ATTORNMENT, SUBORDINATION | 21 |
| | Section 12.1 Offset Statement | 21 |
| | Section 12.2 Attornment | 21 |
| | Section 12.3 Subordination | 21 |
| | Section 12.4 Failure to Execute Instruments | 22 |
| XIII | ASSIGNMENT, SUBLETTING AND CONCESSIONS | 22 |
| | Section 13.1 Consent Required | 22 |
| | Section 13.2 Change in Ownership *Intentionally Deleted* | 23 |
| | Section 13.3 Right of Recapture | 24 |
| | *Section 13.4 Permitted Transfers* | *24* |
| XIV | MARKETING FUND AND ADVERTISING | 24 |
| | Section 14.1 Provisions Relating to Marketing Fund *Intentionally Deleted* | 24 |
| | Section 14.2 Advertising *Intentionally Deleted* | 24 |
| | Section 14.3 Media Fund | 25 |
| | Section 14.4 Mall of America® Servicemark | 25 |
| XV | SECURITY DEPOSIT | 25 |
| | Section 15.1 Amount of Deposit *Intentionally Deleted* | 25 |
| XVI | DAMAGE AND DESTRUCTION | 25 |
| | Section 16.1 Damage and Destruction of Premises | 25 |
| | Section 16.2 Damage and Destruction of Center | 26 |
| | Section 16.3 Obligations of Landlord to Rebuild Conditional | 26 |
| XVII | EMINENT DOMAIN | 26 |
| | Section 17.1 Condemnation | 26 |
| | Section 17.2 Damages | 27 |
| XVIII | DEFAULT BY TENANT | 27 |
| | Section 18.1 Right to Re-Enter | 27 |
| | Section 18.2 Right to Relet | 28 |
| | Section 18.3 Default under Another Lease in Center *Intentionally Deleted* | 29 |
| | Section 18.4 Counterclaim | 29 |
| | Section 18.5 Waiver of Rights of Redemption *Consequential Damages* | 29 |
| | Section 18.6 Waiver of Trial by Jury | 29 |
| | Section 18.7 Bankruptcy | 29 |
| XIX | DEFAULT BY LANDLORD | 30 |
| | Section 19.1 Default Defined, Notice | 30 |
| | Section 19.2 Notice to First Mortgagee | 30 |
| XX | TENANT'S PROPERTY | 31 |
| | Section 20.1 Taxes on Leasehold | 31 |
| | Section 20.2 Assets of Tenant *Intentionally Deleted* | 31 |
| | *Section 20.3 Waiver of Lien* | *31* |
| XXI | ACCESS BY LANDLORD | 31 |
| | Section 21.1 Right of Entry | 31 |
| XXII | HOLDING OVER, SUCCESSORS | 31 |
| | Section 22.1 Holding Over | 31 |
| | Section 22.2 Successors | 31 |
| XXIII | QUIET ENJOYMENT | 32 |
| | Section 23.1 Landlord's Covenant | 32 |
| XXIV | MISCELLANEOUS | 32 |
| | Section 24.1 Waiver | 32 |
| | Section 24.2 Accord and Satisfaction | 32 |
| | Section 24.3 Entire Agreement | 32 |
| | Section 24.4 No Partnership | 32 |
| | Section 24.5 Force Majeure | 32 |

2

1210251-3168

| | |
|---|---|
| Section 24.6 Submission of Lease | 32 |
| Section 24.7 Notices | 32 |
| Section 24.8 Captions and Section Numbers | 33 |
| Section 24.9 Number and Gender | 33 |
| Section 24.10 Objection to Statements | 33 |
| Section 24.11 Representation by Tenant *and Landlord* | 33 |
| Section 24.12 Joint and Several Liability | 33 |
| Section 24.13 Limitation of Liability | 33 |
| Section 24.14 Broker's Commission | 33 |
| Section 24.15 Partial Invalidity | 34 |
| Section 24.16 Recording | 34 |
| Section 24.17 Applicable Law | 34 |
| Section 24.18 Mortgagee's Approval | 34 |
| Section 24.19 Reservation of Air Rights | 34 |
| Section 24.20 Unrelated Business Taxable Income | 34 |
| Section 24.21 Anti-Terrorism Law | 35 |
| Section 24.22 Certificates *Intentionally Deleted* | 35 |
| Section 24.23 Time of Essence | 36 |
| Section 24.24 Parties To Have No Liability If Center Not Open | 36 |
| *Section 24.25 Improvement Allowance* | *36* |
| *Section 24.26 Operating Co-Tenancy* | *36* |
| *Section 24.27 Option to Renew* | *36* |
| *Section 24.28 Exclusive Use* | *37* |

EXHIBITS
Exhibit "A"    Floor Plan of Premises
Exhibit "A-1"    Location of Trash Chute
Exhibit "A-2"    Damage and Destruction - Floor Plan of Adjacent Areas
Exhibit "B"    Description of Tenant's Work
*Exhibit "B-3"    Landlord's Work*
Exhibit "C-1"    Food Court – Mall of America *Intentionally Deleted*
Exhibit "C-2"    Approved Menu *Intentionally Deleted*
Exhibit "D"    Form of Tenant Estoppel Letter *Intentionally Deleted*
*Exhibit "E"    License Agreement*

1210251-4.68

MALL OF AMERICA®

LEASE

THIS LEASE made this ___19th___ day of ___February___, 2014, by and between MOAC MALL HOLDINGS LLC, a Delaware limited liability company, FEIN 36-4609812, ("Landlord"), and HARD ROCK CAFÉ INTERNATIONAL (USA), INC., a Florida corporation ("Tenant");

WITNESSETH THAT, in consideration of the rents, covenants and agreements hereinafter set forth, such parties enter into the following agreement:

ARTICLE I

BASIC LEASE INFORMATION AND DEFINITIONS

Section 1.1.    Basic Lease Information.
This Article I is an integral part of this Lease and all of the terms hereof are incorporated into this Lease in all respects. In addition to the other provisions which are elsewhere defined in this Lease, the following, whenever used in this Lease, shall have the meanings set forth in this Section:

(a)    Center: Mall of America®, situated in the City of Bloomington, County of Hennepin, State of Minnesota.

(b)    Premises: Space 5115. Landlord shall have the right to change the space designation upon written notice to Tenant.

(c)    Store Floor Area: *16,383 square feet, consisting of approximately 11,626 square feet of on the first level and 4,757 square feet on the second level of the Center, provided, however, in no event shall the Store Floor Area on the first level exceed Eleven Thousand Five Hundred (11,700) square feet (excluding the patio), nor the Store Floor Area on the second level exceed Five Thousand (5,000) square feet; and provided further that the Store Floor Area for purposes of calculating Gross Rent (Sections 1.1(g) and 4.1) and the Improvement Allowance (Section 24.25) shall be Ten Thousand (10,000) square feet. The first level of the Premises will include a patio as generally depicted on Exhibit "A", the Main Level (Level 1) plan, provided the square footage of the Patio shall not be included for purposes of calculating Gross Rent (Sections 1.1(g) and 4.1) and the Improvement Allowance (Section 24.25).*

(d)    Lease Term: Ten (10) Lease Years, commencing on the Commencement Date and continuing until the last day of the Tenth (10th) Lease Year. *Tenant shall also have the option to renew this Lease for two (2) additional terms of five (5) years each as provided in Section 24.27.*

(e)    Commencement Date: The earlier of (i) the date Tenant opens for business, or (ii) the Required Completion Date.

(f)    Required Completion Date: Two Hundred Ten (210) days after the date *Landlord delivers possession of the Premises in the condition required herein such* that the Premises are ready for commencement of Tenant's Work ("Possession Date"). *The anticipated Possession Date is March 1, 2014. Prior to the Possession Date, Landlord agrees that it will use its commercially reasonable efforts, subject to the needs and requirements of the existing occupants, to allow reasonable access to the Premises so as to facilitate Tenant's development of its architectural and design plans. Subject to delays from Force Majeure (as defined in Section 24.5 below) or delays caused by Tenant (which delays by Tenant shall include failure to timely submit plans and permits or failure to timely execute the Lease), if Landlord is unable to deliver possession of the Premises to Tenant on or before July 1, 2014, for any reason then Tenant, in Tenant's sole and absolute discretion, shall have the option at any time thereafter until possession of the Premises is delivered to Tenant, to notify Landlord of its intent to terminate this Lease in which event this Lease shall terminate and both Landlord and Tenant shall be released from any liability or obligation under this Lease; provided, however, if Landlord delivers possession of the Premises within twenty (20) days following Tenant's notice of termination, Tenant's termination of the Lease shall be nullified and this Lease shall continue in full force and effect.*

(g)    Gross Annual Rent: A Gross Annual Rent of Seventy-Three and 00/100 Dollars ($73.00) per square foot of Store Floor Area, or Seven Hundred Thirty Thousand and 00/100 Dollars ($730,000.00) per annum (based on a Store Floor Area of Ten Thousand (10,000) square feet), payable in equal monthly installments, in advance upon the first day of each and every month commencing upon the Commencement Date and continuing thereafter through and including the last day of the First (1st) Lease Year of the Lease Term. Beginning on the first day of the Second (2nd) full Lease Year, Gross Annual Rent shall be increased at Two and One-Half Percent (2.5%) per annum and shall continue to increase annually on a compounded basis at Two and One-Half Percent (2.5%) on each subsequent anniversary thereafter as follows:

| Lease Year | Gross Annual Rent Per Square Foot | Gross Annual Rent |
|---|---|---|
| 2 | $74.83 | $748,300.00 |
| 3 | $76.70 | $767,000.00 |
| 4 | $78.62 | $786,200.00 |
| 5 | $80.59 | $805,900.00 |
| 6 | $82.60 | $826,000.00 |
| 7 | $84.67 | $846,700.00 |

- 1 -

026767.000127 602929037.2

| 8 | $86.79 | $867,900.00 |
| 9 | $88.96 | $889,600.00 |
| 10 | $91.18 | $911,800.00 |

(h)     Percentage Rent Rate: Six Percent (6%).

(i)     Sales Breakpoint: $13,000,000.00 per annum for each Lease Year from the Commencement Date through and including the expiration of the First (1st) Lease Year. Beginning on the first day of the Second (2nd) full Lease Year, the Sales Breakpoint shall be increased at Two and One-Half Percent (2.5%) per annum and shall continue to increase annually on a compounded basis at Two and One-Half Percent (2.5%) on each subsequent anniversary. The Sales Breakpoint for Lease Years 2 – 10 are as set forth below:

| Lease Year | Sales Breakpoint Per Annum |
|---|---|
| 2 | $13,325,000.00 |
| 3 | $13,658,125.00 |
| 4 | $13,999,578.00 |
| 5 | $14,349,567.00 |
| 6 | $14,708,306.00 |
| 7 | $15,076,014.00 |
| 8 | $15,452,914.00 |
| 9 | $15,839,237.00 |
| 10 | $16,235,218.00 |

(j)     Taxes: *Not Applicable*

(k)     Sprinkler Charge: *Not Applicable*

(l)     Fixed Rate Charge: *Not Applicable*

(m)    Central Plant Charge: *Not Applicable*

(n)     Trade Name: Hard Rock Café *or such other trade name as Tenant may use for a majority of its locations of a similar size and character operating under the "Hard Rock Café" trade name in the United States, provided such name does not conflict with the trade name of another tenant in the Center.*

(o)     Permitted Use: The Premises shall be occupied and used by Tenant solely for the purpose of the operation of a typical Hard Rock Café as operated by Tenant in the United States providing the retail sale of menu items, including the sale of alcoholic beverages for on-premises consumption, consistent with the majority of Hard Rock Café restaurants, and Tenant shall not use or permit to suffer the use of the Premises for any other business or purpose.  Tenant acknowledges that Landlord *has provided Tenant with notice that Landlord* has a selected brand sponsor as its exclusive, carbonated and non-carbonated drink beverage provider; at the present time Landlord's selected brand sponsor is Pepsi®. *Tenant further acknowledges and agrees that its current selected provider of carbonated non-alcoholic drink beverage brand sponsor is Pepsi®, and Tenant agrees that it shall open the Premises for business serving Pepsi® and Pepsi® branded products and shall serve Pepsi® and Pepsi® branded products at the Premises for the first five (5) years of the Lease Term.*

*Notwithstanding anything herein to the contrary, Landlord and Tenant shall enter into a separate license agreement in the form attached hereto as Exhibit "E" ("License Agreement") whereby Landlord shall grant to Tenant during the Term a non-exclusive worldwide license on a royalty-free basis to use its trademarks, designs, trade names, copyrights and logos shown on selected products (as further set forth in the License Agreement), ("LICENSED PROPERTY") in conjunction with the custom manufacture, marketing, advertising and promoting, distribution and sale of Tenant's accessories, apparel and product for sale at its Mall of America retail store only.  Other than the authorized use of the LICENSED PROPERTY by and through the license granted to Tenant, Tenant will not use the LICENSED PROPERTY and Tenant is hereby specifically prohibited from selling, offering for sale, giving away or displaying Mall of America® merchandise or any other merchandise or items that bear the Mall of America® name, trademark, service mark or logo thereon without Landlord's prior written consent thereto which consent may be given or withheld by Landlord in Landlord's sole and absolute discretion and Landlord's failure to give such consent shall not be deemed unreasonable.*

(p)     Insurance Charge: *Not Applicable*

(q)     Marketing Fund Charge: *Not Applicable*

(r)     Media Fund Charge: *Not Applicable*

(s)     Security Deposit: *Intentionally Deleted*

(t)     Notice Address:

1210251-6.68     026767.000127 602929037.2

|  | Landlord | MOAC MALL HOLDINGS LLC<br>60 East Broadway<br>Bloomington, Minnesota 55425-5550 |
|---|---|---|
|  | Tenant | HARD ROCK CAFÉ INTERNATIONAL (USA), INC.<br>6100 Old Park Lane<br>Orlando, Florida 32835<br>Attn: Jay A. Wolszczak, Esq. |
|  | With a Copy To: | Baker & Hostetler LLP<br>200 South Orange Avenue<br>Suite 2300<br>Orlando, Florida 33801<br>Attn: Michael C. Wilde, Esq. |
| (u) | Remittance Address: | MOAC MALL HOLDINGS LLC<br>NW 5826<br>P.O. Box 1450<br>Minneapolis, Minnesota  55485-5826 |
| (v) | Premises Address: | 5115 Center Court<br>Bloomington, MN 55425 |

Section 1.2.    Definitions.

(a)    "Center" shall mean, as the same may be changed from time to time, the land and buildings and other improvements from time to time constituting a mixed use project which Landlord and others have constructed or caused to be constructed, consisting of a retail mall and entertainment center ("Retail Space") and a hotel or hotels ("Hotel Space"), as well as a parking deck or parking decks ("Parking Space").

(b)    "Landlord's Tract" shall mean that portion (or portions) of the land in the Center and the buildings and other improvements thereon which at any time in question Landlord owns or which Landlord leases as tenant under a sale leaseback or under a ground lease or sublease, it being understood that Landlord may not own or control portions of the Center.  Landlord reserves unto itself the unlimited right to modify the configuration of Landlord's Tract at any time for the purpose of incorporating additional Major Tenants and other buildings within the Center.  For purposes of this Lease, a "Major Tenant" is herein defined as a single tenant leasing at least 40,000 contiguous square feet of floor area.  *In exercising its right under this Section 1.2, Landlord shall not materially impair ingress or egress to the Premises, or visibility of the Premises from the enclosed mall area or materially impair the visibility of Tenant's signage, provided, however, that the foregoing shall not, restrict Landlord's right to temporarily close portions of the Commons Areas to make repairs or changes or for other reasonable purposes; provided that, except in the event of an emergency, there shall always be maintained reasonable access to the Premises for Tenant's use.*

## ARTICLE II

## LEASED PREMISES AND TERM

Section 2.1.    Leased Premises.

Landlord hereby leases to Tenant and Tenant hereby rents from Landlord the Premises as depicted on Exhibit "A".  The Store Floor Area shall be measured to the center line of all party or adjacent tenant walls, to the exterior faces of all other walls and to the building line where there is no wall.  ~~The parties agree that Landlord's determination of the Store Floor Area shall be final, binding and conclusive.~~  *Promptly upon the Commencement Date, Tenant may, at Tenant's own expense, direct its architect (or engineer) to determine the actual Store Floor Area of the Premises (based on the method of calculation above) as actually constructed and certify the same to Tenant.  If the determinations of the measurement in question by Tenant's architect (or engineer) differs from Landlord's determination, Tenant's and Landlord's architects (or engineers) shall each be provided with a copy of the other party's determination.  The parties shall have fourteen (14) days from delivery of the other party's determination to agree or to select a mutually agreeable third architect (or engineer).  Such third architect (or engineer) shall have thirty (30) days from the date selected to make such independent measurements and investigation as such architect (or engineer) deems reasonable and necessary and to deliver to the parties a written determination.  The determination of such third architect or engineer will be final, binding and non-appealable.  Each party shall bear the cost and fees of its architect (or engineer), and both parties shall equally divide the costs and fees of the third architect (or engineer).  Upon the final determination of the Store Floor Area of the Premises, Tenant shall immediately pay any amounts which were due and not paid, or Landlord shall credit Tenant's account for any excess amounts previously paid, as the case may require.  Upon final determination of the Store Floor Area of the Premises all calculations in the lease derived from or utilizing such number shall be adjusted proportionally.*

Section 2.2.    ~~Roof and Walls~~ *Landlord's Work; Reserved Rights.*

Landlord *reserves the* ~~shall have the exclusive~~ right to use all *areas behind the* ~~or any part of~~ *the* side and rear walls of the Premises and the roof for any purpose, including but not limited to erecting signs or other structures on or over all or any part of the same, erecting scaffolds and other aids to the construction and installation of the same, and installing, maintaining, using, repairing and replacing pipes, ducts, conduits and wires leading through, to or from the Premises and serving other parts of the Center in locations which do not materially interfere with Tenant's use of the Premises.  Tenant shall have no right whatsoever in the exterior of exterior walls of the Premises or the roof or any portion of the Center outside the Premises, except as provided in Exhibit "B" hereof.  *Landlord's utilization of such areas shall not materially, adversely impact or interfere with Tenant's use or enjoyment of the Premises.  Landlord shall locate such pipes, conduits, ducts and wires below the floor, above Tenant's finished ceiling or abutting or*

adjoining dividing walls. All such facilities shall be concealed and in performing work in connection therewith, and in no event shall any such work performed by Landlord result in a material modification to the design and/or aesthetics of the Premises. Landlord shall provide Tenant with prior notice and shall use commercially reasonable efforts to complete such work as expeditiously as possible under the circumstances, and such work shall be performed in a manner least disruptive to the operation of Tenant's business. With the exception of any work that must be performed on an emergency basis, Landlord shall perform any work described hereinabove before or after Tenant's normal business hours.

In addition to the foregoing, Tenant acknowledges and agrees that the components of the theme park's nightly light show, which are currently located on the exterior of the "roof" of the existing "Caribou Coffee" location shall be relocated to the exterior of the "roof" of the Premises at Tenant's expense, such lighting components to include but not be limited to the fogger, smoker and accent lighting for the light show; provided any additional components added by Landlord in the future shall be added at Landlord's expense.

If at any time during the term of this Lease it is Landlord's intention to demolish, redevelop, reconfigure or substantially renovate all or part of the Center then, notwithstanding any other provision of this Lease, Landlord has the right to change or modify the *structural components of the center* ~~structure~~ within the Premises in order to reinforce such structure (hereinafter "Landlord's Work"). *With the exception of any work which must be performed on an emergency basis, Landlord shall use commercially reasonable efforts to perform any work described hereinabove before or after Tenant's normal business hours and in a manner so as to minimize any disruption to Tenant's use and enjoyment of the Premises. Further, in no event shall any such work performed by Landlord result in a material modification to the design and/or aesthetics of the Premises.* Upon completion of Landlord's Work, Landlord will repair and restore any affected *areas of the* ~~Tenant~~ Premises to be similar, whenever possible, to that condition existing prior to Landlord's Work, *and during the duration of Landlord's Work, Landlord shall use commercially reasonable efforts to repair/restore as work progresses (to the extent reasonably practicable) so as to minimize any aesthetic disruption. If, as is reasonably determined by either Landlord or Tenant,* ~~If, in Landlord's opinion,~~ Landlord's Work in the Premises materially impairs *or interferes with* Tenant's ability to operate its business *in the Premises and Tenant ceases operating* in the Premises, then Gross Rent and *all* other charges under the Lease shall abate until ~~Landlord notifies~~ Tenant *can reasonably resume operation of* ~~that it can once again operate~~ its business in the Premises. In the event Tenant is unable to operate its business in part of the Premises, *as is reasonably determined by either Landlord or Tenant,* ~~in Landlord's opinion,~~ then Gross Rent and other charges under the Lease shall abate until that extent that Tenant is unable to operate its business in the Premises until Landlord notifies Tenant that it can once again operate its business in the Premises.

Section 2.3.     Lease Term.
    The term of this Lease (hereinafter called "Lease Term") shall commence upon the Commencement Date and shall thereafter end on the last day of the number of Lease Years set forth in Article I unless sooner terminated as herein provided.

Section 2.4     Lease Year Defined.
    "Lease Year", as used herein, means a period of twelve (12) consecutive months during the Lease Term. The first full Lease Year shall commence on the Commencement Date if the Commencement Date is the first day of the calendar month. If the Commencement Date is other than the first day of a calendar month, then the first full Lease Year shall commence on the first day of the first full calendar month immediately after the Commencement Date. The first full Lease Year shall expire at the end of the twelfth (12th) full calendar month occurring on or after the Commencement Date. "Partial Lease Year" means that portion of the Lease Term prior to the first full Lease Year or following the last full Lease Year.

Section 2.5.     Relocation of Premises. *Intentionally Deleted*
    ~~A.   In the event Landlord shall add additional buildings to the Center or expand any of the buildings currently contained therein or renovate, redevelop or reconfigure any part of the Center, or demolish, reconfigure or substantially renovate all or part of the Center in connection with the Phase II Development Project, then Landlord shall have the right, subject to Landlord's and Tenant's right of termination as set forth in subparagraph (B), to require Tenant to relocate its operation, at Tenant's expense, to other premises (the "New Premises") in another part of the Center or building in accordance with the following:~~

    ~~(i)    Landlord shall notify Tenant, at least ninety (90) days prior to the proposed relocation date, of Landlord's intention to relocate Tenant's operation to the New Premises;~~

    ~~(ii)   The proposed relocation date and the size, configuration and location of the New Premises shall be set forth in Landlord's notice; and~~

    ~~(iii)  The New Premises shall be substantially the same in size and configuration as the Premises described in the Lease.~~

    ~~B.   With respect to any relocation of Tenant by Landlord pursuant to Section 2.5(A) above, in the event the New Premises described in Landlord's relocation notice are unacceptable to Tenant, Tenant shall have the right, exercisable by written notice to Landlord, given thirty (30) days following receipt of Landlord's relocation notice, to terminate this Lease, such termination to be effective as of the proposed relocation date as set forth in Landlord's notice. Failure by Tenant to timely exercise such right shall be deemed a waiver with respect thereto and confirmation that the New Premises are acceptable to Tenant. In addition, if Tenant fails to exercise such right of termination by written notice to Landlord given within thirty (30) days following receipt of Landlord's relocation notice or to accept the New Premises in writing by written notice to Landlord given within thirty (30) days following receipt of Landlord's relocation notice, then Landlord shall have the right, at any time thereafter, to terminate this Lease effective the later of (a) thirty (30) days following Tenant's receipt of Landlord's notice of termination or (b) the proposed relocation date as~~

~~set forth in Landlord's relocation notice. Tenant shall have the right to accept the New Premises only for the unexpired term of this Lease.~~

~~C. In the event Landlord requires the relocation of Tenant's operation for any other reason, then Landlord reserves the right at any time during the Lease Term hereof to require Tenant to relocate to the New Premises upon the following terms and conditions: (a) the New Premises shall contain a Store Floor Area which shall not vary more than ten percent (10%) from the Store Floor Area contained in the Premises; (b) Landlord shall notify Tenant not less than ninety (90) days prior to the date Tenant is required to surrender possession of the Premises; (c) Landlord shall, at Landlord's cost and expense, complete the leasehold improvements in the New Premises, in accordance with the plans and specifications approved by Landlord with respect to Tenant's original work in the Premises; (d) Tenant shall, within fifteen (15) days after possession of the New Premises has been tendered to Tenant, open for business in the New Premises; and (e) Tenant shall surrender possession of the Premises to Landlord in accordance with the provisions of Section 9.3 within fifteen (15) days after possession of the New Premises has been tendered to Tenant.~~

~~D. The New Premises shall be subject to the same terms, conditions and covenants as the Premises except that if the Store Floor Area of the New Premises differ from the Store Floor Area of the Premises, then the Gross Annual Rent and Sales Breakpoint shall be proportionately adjusted. Upon the occurrence of any relocation pursuant to this Section 2.5, the parties hereto shall promptly execute an amendment to this Lease reflecting such relocation of Tenant and, if applicable, any adjustment to the Gross Annual Rent and Sales Breakpoint.~~

~~E. Landlord has made no representation as to any additional improvements or stores or any existing stores in the Center and this provision does not create any rights of option, first refusal or otherwise with respect to any present or future space in the Center.~~

Section 2.6.    Modifications to the Center.
Notwithstanding anything in this Lease contained, Landlord reserves the right to change or modify and add to or subtract (including vertically) from the size and dimensions of the Center or any part thereof, the number, location and dimensions of buildings and stores, the size and configuration of the parking areas, entrances, exits and parking aisle alignments, dimensions of hallways, malls and corridors, the number of floors in any building, the location, size and number of tenants' spaces and kiosks which may be erected in or fronting on any mall or otherwise, the identity, type and location of other stores and tenants, and the size, shape, location and arrangement of Common Areas (hereinafter defined), including altering the boundaries of the Center by the addition or subtraction of land or the granting of easements or rights and to renovate, re-merchandise, design and decorate any portion of the Center as it desires, but the general character of the Center and the approximate location of the Premises in relation to the existing major department stores shall not be substantially changed. *In exercising its right under this Section 2.6, Landlord shall not materially impair ingress or egress to the Premises, or visibility of the Premises from the enclosed mall area or materially impair the visibility of Tenant's signage, provided, however, that the foregoing shall not, restrict Landlord's right to temporarily close portions of the Commons Areas to make repairs or changes or for other reasonable purposes; provided that, except in the event of an emergency, there shall always be maintained reasonable access to the Premises for Tenant's use.*

If at any time (a) Landlord is required by any laws, ordinances, rules or regulations of any governmental agency having jurisdiction over the Center to provide additional parking on Landlord's Tract, or (b) Landlord proposes to increase the total rentable floor area within the Center which would require additional parking in the Center, Landlord may elect to provide such additional parking by constructing deck or elevated or subterranean parking facilities, hereinafter referred to as "Deck Parking". ~~In the event Landlord so elects, Tenant shall pay its proportionate share of the capital expense of providing such Deck Parking. Tenant's proportionate share shall be determined by (a) multiplying the total capital expense of providing such Deck Parking by a fraction, the numerator of which is the Store Floor Area of the Premises and the denominator of which is the total rentable floor area in Landlord's Tract, either existing or proposed by Landlord, as the case may be, at the time of providing such Deck Parking; and (b) multiplying the figure derived pursuant to the foregoing subsection (a) by a fraction, the numerator of which is the number of full calendar months remaining in the term of the Lease, and the denominator of which shall be the greater of (i) the number of months required to amortize the permanent financing obtained by Landlord to finance the capital expense of providing such Deck Parking, or (ii) fifteen (15) years. Tenant shall pay its proportionate share of the capital expense of providing such Deck Parking in equal monthly installments commencing upon the date the Deck Parking is open for public use and continuing thereafter on the first day of every calendar month during the remaining term hereof, plus interest thereon at the rate of nine percent (9%) per annum.~~

<div align="center">

ARTICLE III

TENANT'S WORK

</div>

Section 3.1.    Tenant's Work.
*Except as expressly set forth herein,* Tenant agrees to accept the Premises in its present "AS IS, WHERE IS" condition, *subject to the provisions of Exhibit "B-3" of this Lease attached hereto and incorporated herein by reference and the language below regarding Hazardous Materials.* Further alterations of this space will be at Tenant's sole expense and deemed to be Tenant's Work, including, but not limited to, all work designated as Tenant's Work in Exhibit "B", and Tenant shall do and perform all Tenant's Work diligently and promptly and in accordance with the following provisions.

*In the event that any time during the Lease Term, any asbestos containing material is found in the Premises that were present prior to the date Tenant took possession or brought onto the Premises by Landlord, Landlord shall, at its sole cost and expense, remove the same, such removal to be in accordance with applicable laws and regulations, and shall furnish Tenant with a certificate executed by the environmental firm performing such removal work to the effect that the work has been completed in accordance with applicable laws and regulations. If such*

*discovery occurs during Tenant's initial Tenant Work in the Premises, the Required Completion Date shall be extended by the number of days Tenant is delayed by virtue of such work by Landlord. Furthermore, in the event any Hazardous Materials are found in the Premises and such Hazardous Materials were placed or installed in the Premises by Landlord or were otherwise present in the Premises prior to Tenant's occupancy thereof ("Pre-Existing Conditions"), Landlord, at its sole cost and expense, shall take such action as required by applicable law or code to remove, remediate, abate or encapsulate such Hazardous Materials placed or installed in the Premises by Landlord or Pre-Existing Conditions. Any such removal, remediation, abatement or encapsulation shall be deemed Landlord's Work and shall be performed in accordance with the requirements relative to Landlord's Work as set forth herein.*

Section 3.2.    Tenant's Obligations Before Commencement Date.

~~As soon as reasonably possible hereafter, Landlord shall deliver to Tenant~~ The Tenant Information Package *is incorporated herein* ~~and the same shall become a part hereof~~ by this reference as Exhibit "B-1" (hereinafter referred to as "Tenant Information Package"). Within forty five (45) days after the date of this Lease or the date of receipt of a drawing of the Premises and Tenant Information Package, whichever is later, Tenant will submit to Landlord one (1) reproducible set (sepia) and three (3) copies of plans and specifications, prepared by a registered architect or engineer, of all Tenant's Work to be done within the Premises (hereinafter called "Tenant's Plans"), prepared in conformity with Exhibit "B" and the Tenant Information Package. Within *fifteen (15)* ~~thirty (30)~~ days after receipt of Tenant's Plans, Landlord shall notify Tenant of any failures of Tenant's Plans to conform to Exhibit "B", the Tenant Information Package or otherwise to meet with Landlord's approval. Tenant shall within fifteen (15) days after receipt of any such notice cause Tenant's Plans to be revised to the extent necessary to obtain Landlord's approval and resubmitted for Landlord's approval. When Landlord has approved the original or revised Tenant's Plans, Landlord shall sign and return (which signature and return may be transmitted electronically) one (1) set of approved Tenant's Plans to Tenant and the same shall become a part hereof by this reference as Exhibit "B-2". Approval of plans and specifications by Landlord shall not constitute the assumption of any responsibility by Landlord for their accuracy or sufficiency or conformity with applicable laws (including but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act), and Tenant shall be solely responsible for such plans and specifications. Tenant shall not commence any of Tenant's Work until Landlord has approved Exhibit "B-2", unless prior Landlord approval has been obtained in writing.

Landlord shall notify Tenant not less than fifteen (15) days in advance of the *Possession Date;* ~~time when Tenant can commence Tenant's Work;~~ and Tenant shall commence such work *after the Possession Date and thereafter pursue completion of Tenant's Work* ~~not later than the date specified in such notice (although Landlord may not have completed Landlord's Work on such date and may be in the Premises concurrently with Tenant), complete the same~~ in strict accordance with Exhibits "B" and "B-2", install all store and trade fixtures, equipment, stock in trade, merchandise and inventory, and open for business therein not later than the Required Completion Date. Tenant hereby releases Landlord and its contractors from any claim whatsoever for damages against Landlord or its contractors for any delay in the date on which the Premises shall be ready for delivery to Tenant. ~~In the event possession of the Premises is not delivered to Tenant within two (2) years of the date of this Lease, then this Lease automatically shall become null and void and neither party shall have any liability or obligation to the other hereunder.~~

Section 3.3.    Failure of Tenant to Perform.

Because of the difficulty or impossibility of determining Landlord's damages resulting from Tenant's failure to open for business fully fixtured, stocked and staffed on *or before the Required Completion Date* ~~the Commencement Date~~, including, but not limited to, damages from loss of Percentage Rent (hereinafter defined) from Tenant and other tenants, diminished saleability, leasability, mortgageability or economic value of the Center or Landlord's Tract, if Tenant fails to ~~commence Tenant's Work within the time provided above and proceed with the same diligently, or to~~ open for business fully fixtured, stocked and staffed on or before the *Required Completion Date* ~~Commencement Date or to perform any of its obligations to be performed prior to the Required Completion Date,~~ Landlord may, *with notice to Tenant,* ~~without notice or demand,~~ in addition to the right to exercise any other remedies and rights herein or at law provided, collect rent from the *Required Completion Date* ~~Commencement Date~~ in an amount equal to the Gross Annual Rent (hereinafter defined) and other additional rent and other amounts payable by Tenant hereunder, and, in addition thereto, *if Tenant fails to open within sixty (60) days following the Required Completion Date ("Grace Period"),* an amount equal to *twenty percent (20%)* ~~fifty percent (50%)~~ of 1/365ths of the Gross Annual Rent for each day that Tenant has failed to open for business on and after the *Grace Period* ~~Commencement Date~~, which latter amount shall be in lieu of Percentage Rent that might have been earned had Tenant opened in timely fashion. ~~In addition, Landlord may terminate this Lease, in which event Landlord shall have the right to recover, as liquidated damages and not as a penalty, a sum equal to the Gross Annual Rent payable for one (1) Lease Year, plus all expenses incurred by Landlord pursuant to this Section, plus the cost of any alterations or repairs which Landlord in its sole discretion deems advisable to relet the Premises. In the event that Tenant fails to make timely submission of Tenant's Plans as provided in this Lease, then Landlord shall have the right, in addition to its other rights and remedies as herein provided, to collect from Tenant a sum which shall be One Hundred and 00/100 Dollars ($100.00) per calendar day for each day that Tenant's Plans are not so submitted. All remedies in this Lease or at law provided shall be cumulative and not exclusive.~~

Section 3.4.    Condition of Premises.

~~Tenant's taking possession of the Premises shall be conclusive evidence of Tenant's acceptance thereof in good order and satisfactory condition.~~ Tenant shall acknowledge taking possession of the Premises in writing. *Subject to the provisions of Section 3.1 above and except as expressly set forth in this Lease,* Tenant agrees that Landlord has made no representations as to conformance with applicable laws respecting the condition of the Premises. ~~or the presence or absence of Hazardous Materials (hereinafter defined) in, at, under or abutting the Premises or the environment.~~ Tenant also agrees that *except as expressly set forth in this Lease,* no representations respecting the condition of the Premises, no warranties or guarantees, expressed or implied, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to

- 6 -

026767.000127 602929037.2

workmanship or any defects in material, and no promise to decorate, alter, repair or improve the Premises either before or after the execution hereof, have been made by Landlord or its agents to Tenant unless the same are contained herein.

Section 3.5.     Certification.

Within *ninety (90)* ~~fifteen (15)~~ days after the date Tenant opens for business in the Premises, Tenant shall deliver to Landlord the following: (a) *a letter* ~~Tenant's affidavit~~ stating that the work to be performed by Tenant pursuant to the terms of this Lease has been completed in strict compliance with Exhibit "B" and Tenant's Plans, as approved by Landlord; ~~and that no security interest under the Uniform Commercial Code or chattel mortgages are outstanding or have been filed, it being intended that any such affidavit may be relied upon by Landlord and that any deliberate misstatement by Tenant shall constitute an event of default hereunder;~~ (b) an affidavit of any general contractor performing Tenant's Work stating that all subcontractors, laborers and materialmen who have performed work on or furnished materials to the Premises (whose names and addresses shall be recited in the affidavit) have been paid in full and that all liens therefor that have or might be filed have been discharged of record or waived; (c) a complete release and waiver of lien with respect to the Premises from any general contractor and all subcontractors who have performed work on or furnished material to the Premises, or in lieu thereof, an attorney's certification that the lien period for the work performed on Tenant's behalf in the Premises has expired and that no liens in connection therewith have been filed; *and* (d) ~~Tenant's written acceptance of the Premises stating that Landlord has completed all of Landlord's Work, if any, required to be performed by Landlord pursuant to the terms of this Lease and that Tenant reserves no claims, offsets or backcharges, or stating those claimed; (e) any monies owing to Landlord for the cost of any work done for or on behalf of Tenant, as set forth in Exhibit "B" annexed hereto or otherwise; and (f)~~ all certificates and approvals with respect to the work performed by Tenant or on Tenant's behalf that may be required by any governmental authorities as a condition for the issuance of an occupancy certificate for the Premises together with a copy of any occupancy certificate issued by the proper governmental authority for the Premises.

## ARTICLE IV

## RENT

Section 4.1.     Gross and Percentage Rent.

Tenant covenants and agrees to pay to Landlord, without notice or demand, at the Remittance Address, the Gross Annual Rent set forth in Article I, in advance upon the first day of each and every month of the Lease Term.  If actual Store Floor Area is modified in accordance with this Lease, the Gross Annual Rent and the Sales Breakpoint shall be deemed automatically increased or decreased based upon the Store Floor Area as thus determined, and any overpayments or underpayments of Gross Monthly Rent and Percentage Rent to Landlord shall be adjusted accordingly. The failure of Tenant to object to any statement, invoice, or billing presented by Landlord, within *one (1) year* ~~thirty (30) days~~ after receipt of such statement, invoice, or billing based on Store Floor Area, shall constitute Tenant's acquiescence to the actual Store Floor Area as so determined by Landlord.

In addition to the payment of Gross Annual Rent, Tenant covenants and agrees to pay to Landlord, without notice or demand, at the Remittance Address, an amount, if any, equal to the Percentage Rent Rate applied against that portion of Tenant's Adjusted Gross Sales during each Lease Year or Partial Lease Year in excess of the Sales Breakpoint for such period (hereinafter referred to as "Percentage Rent").  In the event of a Partial Lease Year, the Sales Breakpoint shall be determined by multiplying the Sales Breakpoint for the full Lease Year, by a fraction, the numerator of which shall be the number of days contained in such Partial Lease Year and the denominator of which shall be 365 days.  If Gross Annual Rent for any Lease Year or Partial Lease Year is reduced or abated for any reason, the Sales Breakpoint shall be reduced in direct proportion to the reduction or abatement of Gross Annual Rent for the period of time that such reduction or abatement of Gross Annual Rent is in effect.  If the Sales Breakpoint changes during a Lease Year, the Sales Breakpoint for that Lease Year shall be appropriately adjusted.

Section 4.2.     Miscellaneous Rent Provisions.

If Tenant shall fail to pay any installment of Gross Annual Rent, Percentage Rent or any item of Additional Rent within five (5) days after the date the same became due and payable, then Tenant shall pay to Landlord a late payment service charge ("Late Charge") covering administrative and overhead expenses equal to *$250.00.* ~~the greater of (a) $250.00 or (b) 5¢ per each dollar so overdue.~~  Provision herein for payment of the Late Charge shall not be construed to extend the date for payment of any sums required to be paid by Tenant hereunder or to relieve Tenant of its obligation to pay all such sums at the times herein stipulated.  If the Commencement Date is other than the first day of a month, Tenant shall pay on the Commencement Date a prorated partial Gross Monthly Rent for the period prior to the first day of the next calendar month, and thereafter Gross Monthly Rent payments shall be made not later than the first day of each calendar month.

Section 4.3.     Percentage Rent.

Tenant shall (i) not later than *twenty (20) days* ~~the fifth (5th) day~~ after the *end* ~~close~~ of each calendar month, deliver to Landlord at the Center office a written statement *signed* ~~certified under oath~~ by ~~Tenant or~~ an officer of Tenant, showing Gross Sales and Adjusted Gross Sales made in such calendar month; and (ii) not later than ~~thirty (30)~~ *forty-five (45)* days after the end of each Lease Year or Partial Lease Year, deliver to Landlord at the Center office a statement of Gross Sales and *of* Adjusted Gross Sales for such Lease Year or Partial Lease Year *signed by* ~~the correctness of which is certified to by Tenant or~~ an officer of Tenant.  If Tenant fails to prepare and deliver any statement of Gross Sales and Adjusted Gross Sales required hereunder, within the time or times specified above, then Landlord shall have the right, in addition to the other rights and remedies set forth in this Lease, ~~(a)~~ to collect from Tenant a sum which shall be $250.00 which shall be deemed liquidated damages for administrative and overhead expenses resulting from such failure. ~~and (b) to estimate Tenant's Adjusted Gross Sales for any non-reported period and bill Tenant's Percentage Rent accordingly.  Landlord reserves the right, at Landlord's option, to adjust Percentage Rent billings when actual Adjusted Gross Sales reports are received.~~

Percentage Rent shall become due and payable in each Lease Year on the *thirtieth (30th)* ~~fifteenth (15th)~~ day of the month immediately following the month during which Adjusted Gross Sales exceed the Sales Breakpoint for such Lease Year, and thereafter shall be paid monthly on all additional Adjusted Gross Sales made during the remainder of such Lease Year, such payments to be *submitted with a* ~~made concurrently with the submission by Tenant to Landlord of the~~ written statement of monthly Adjusted Gross Sales as provided for herein.

Tenant will preserve for at least *two (2)* ~~three (3)~~ years at Tenant's notice address ~~all original books and~~ records disclosing information pertaining to Gross Sales and Adjusted Gross Sales and such other information respecting Gross Sales and Adjusted Gross Sales. *For a period of two (2) years following Landlord's receipt of the Gross Sales and Adjusted Gross Sales records, Landlord and its agents shall have the right to request an audit of such books and records preserved by Tenant. If Landlord does not make a written request to audit Tenant's books and records relating to Gross Sales and Adjusted Gross Sales within such two (2) year period, Landlord shall be deemed to have waived its right to request an audit. Upon receiving a written request, Tenant shall make the records for Gross Sales and Adjusted Gross Sales available, at Tenant's United States corporate headquarters, within thirty (30) days after such request, during ordinary business hours to Landlord or the certified public accounting firm designated by Landlord, provided that, in no event shall Landlord have the right to audit Gross Sales Records more frequently than once per calendar year. If the annual statement of Gross Sales and Adjusted Gross Sales previously submitted by Tenant to Landlord shall be found by any such audit to be incorrect as reported for the year to which such annual statement relates, Landlord shall submit to Tenant a report detailing errors with supporting documentation to allow Tenant to review the alleged errors. Tenant or Tenant's designated certified public accountants shall have a period of forty-five (45) days to provide to Landlord any information that relates to the accuracy of the alleged errors and to attempt to resolve any issues pertaining thereto. In the event Landlord and Tenant, along with their respective designated certified public accountants are unable to resolve their differences regarding the alleged errors despite good faith efforts within such forty-five (45) day period, Tenant shall, within fifteen (15) days thereafter either pay the amount required to comply with Landlord's audit (less any adjustments agreed to by Landlord) or submit the matter to an independent (i.e., not representing either Landlord or Tenant) nationally-recognized certified public accounting firm as agreed to by Landlord and Tenant, or if they cannot agree on the auditor within ten (10) days of Tenant's notice to Landlord, the independent firm with the largest office in the State of Minnesota ("Final Auditor"). Each party shall within ten (10) days of designation of the Final Auditor submit copies of all information required by the Final Auditor in order to make a determination, but only to the extent copies thereof were supplied to the other party prior to the date thereof. The determination by the Final Auditor shall be the final and binding decision and each party agrees to be bound thereby, and if a party is deemed by the Final Auditor to owe money to the other, payment shall be made within thirty (30) days of the final decision by the Final Auditor. The cost and expense of the Final Auditor shall be borne by the party whose proposal for the correct amount of the disputed Gross Sales and Adjusted Gross Sales is farthest from the determination of the Final Auditor. Further, in the event the errors agreed to by Tenant or determined to exist by the Final Auditor exceed three percent (3%) of the sums paid by Tenant to Landlord as Percentage Rent for the respective year and Landlord is entitled to any additional Percentage Rent as a result thereof, then Tenant shall pay on demand the actual reasonable cost of Landlord's audit (not to exceed $2,000.00). Any information gained from such statements or inspection shall be confidential and shall not be disclosed other than to carry out the purpose hereof.* ~~as Landlord requires, including, but not limited to, cash register tapes, sales slips, sales checks, gross income and sales tax returns, bank deposit records, sales journals and other supporting data including itemized records of permitted exclusions. Landlord and its agents shall have the right during business hours to examine and audit such books and records preserved by Tenant. If such examination or audit discloses a liability for Percentage Rent three percent (3%) or more in excess of the Percentage Rent paid by Tenant for any period and at least $500.00 of Percentage Rent is owed as the result of such audit, or if Tenant's Gross Sales and Adjusted Gross Sales cannot be verified due to the insufficiency or inadequacy of Tenant's records, or if Tenant shall have failed to furnish Landlord any monthly statement of Gross Sales and Adjusted Gross Sales during any Lease Year, Tenant shall promptly pay Landlord the cost of said audit. Tenant shall, in any event, pay to Landlord the amount of any deficiency in rents which is disclosed by such audit. If such examination or audit discloses an overpayment of Percentage Rent, then the excess, less the cost of such examination or audit, shall be credited to Tenant's account. Tenant's obligation to preserve all original books and records shall survive the expiration of the Lease Term or the earlier termination of this Lease.~~

<u>Section 4.4.</u>     <u>Gross Sales and Adjusted Gross Sales Defined</u>.

As used herein, Gross Sales means the sale prices of all goods, wares and merchandise sold and the charges for all services performed by Tenant or any other person or entity in, at, or from the Premises for cash, credit or otherwise, ~~without reserve or deduction for uncollected amounts,~~ including but not limited to sales and services (i) where the orders originate in, at or from the Premises, regardless from whence delivery or performance is made, (ii) pursuant to mail, telephone, telegraph, catalogue, facsimile, internet, electronic, video and computer orders, and orders by means of other technology-based systems whether now existing or hereafter developed, and other orders received, placed or filled at the Premises, *and* (iii) resulting from transactions originating in, at or from the Premises. ~~and (iv) deposits not refunded to customers.~~ Excluded from Gross Sales in order to determine Adjusted Gross Sales shall be: (i) exchanges of merchandise between Tenant's stores made *in* ~~only for the~~ *customary* ~~convenient~~ operation of Tenant's business and not *for the purpose of avoiding inclusion of such transaction,* ~~to consummate a sale made in, at or from the Premises,~~ (ii) returns to manufacturers *distributors, shippers or suppliers,* (iii) refunds to customers (but only to the extent included in Gross Sales), (iv) sales of fixtures, machinery ~~and~~ *or* equipment *or memorabilia outside of the normal course of* ~~after use in~~ Tenant's business, *or other similar sales or transfers commonly considered capital in nature,* ~~in the Premises, and~~ (v) *sales taxes, so-called luxury taxes, consumers' excise taxes, retailers occupation taxes, gross receipts taxes and other similar taxes now or in the future imposed upon the sale of merchandise or services, but only if collected separately from the selling price of merchandise or services* ~~sales, excise or similar imposed by governmental authority~~ and collected from customers, *(vi) sums paid or retained by third party operators of any mechanical or vending device, (vii) discounts or charges of credit card issuers on sales made by credit card not to exceed two percent (2%) of Gross Sales by credit card, (viii) sales of gift certificates (except upon redemption), (ix) the net amount of discounts or complimentary service to customers or employees pursuant to Tenant's customary and reasonable policies, (x) interest and dividend income; (xi) proceeds of insurance, condemnation or indemnity for*

- 8 -

026767.000127 602929037.2

*a loss or taking, (xii) proceeds of sales from charity events or special events, to the extent that such proceeds are donated by Tenant to charitable organizations within twelve months from receipt, (xiii) sales for credit which are charged off as "bad debt" in the ordinary course of business, to the extent not actually collected, or (xiv) any other sales of goods or services which are not considered food, beverages or retail merchandise which relate to special events or vending which is not part of the restaurant/retail operation of the Tenant, for which Tenant does not derive revenue, monies or income.* ~~and paid out by Tenant.~~ No other taxes shall be deducted from Gross Sales.

### Section 4.5.    Taxes.

A.    <u>Definition</u>. Landlord shall pay or cause to be paid, upon the discretion of Landlord but before delinquent, all Taxes (as hereinafter defined) levied, assessed, imposed, become due and payable, or liens arising in connection with the use, occupancy or possession of or become due and payable out of or for, the Center or any part thereof during the Lease Term. As used in this Section 4.5 the term "Taxes" shall mean and include all property taxes, both real and personal, public and governmental charges and assessments, and all other taxes which Landlord is obligated to pay with respect to the development of the Center, including all extraordinary or special assessments or assessments against any of Landlord's personal property now or hereafter located in the Center, all costs and expenses including, but not limited to consulting, appraisal and attorneys' fees incurred by Landlord in researching, reviewing, evaluating, contesting, appealing or negotiating with public authorities (Landlord having the sole authority to conduct such a contest or enter into such negotiations) as to any of the same and all sewer, water and other utility taxes and impositions, but shall not include taxes on Tenant's machinery, equipment, inventory or other personal property or assets of Tenant, Tenant agreeing to pay all taxes upon or attributable to such excluded property without apportionment.

Taxes shall not include interest and penalties due on delinquent Taxes, but shall include interest on Taxes withheld by virtue of Landlord making partial payment under protest, in the event such partial payment is permitted in connection with a tax appeal proceeding.

B.    <u>Tenant's Share</u>. *Intentionally Deleted* ~~Tenant shall pay to Landlord, as Additional Rent, its proportionate share of all calendar year or fiscal year Taxes; such proportionate share is to be prorated for periods at the beginning and end of the Lease Term which do not constitute full calendar months or years. Landlord shall endeavor to have the Retail Space and Hotel Space separately assessed. If this cannot be accomplished then Landlord, in its sole discretion, shall allocate Taxes among the Retail Space and Hotel Space based on its determination of the assessed value of each such Space. This determination shall control except in case of manifest error. Taxes allocated by Landlord to the Retail Space are referred to herein as "Retail Space Taxes". Tenant's proportionate share of any such Retail Space Taxes shall be that portion of such Retail Space Taxes which bears the same ratio to the total Retail Space Taxes as the Store Floor Area bears to the average rentable floor area rented or occupied in the Retail Space (hereinafter called "Rented Floor Area") during the calendar year or fiscal year in which such Retail Space Taxes constitute a lien upon the Center. The floor area of (i) Major Tenant spaces whether such spaces are vacant or occupied, (ii) any tenant in a free-standing premises, (iii) theaters, (iv) full-service, sit-down restaurants, (v) kiosks, (vi) storage spaces, (vii) tenants with no frontage on the enclosed mall of the Center, and (viii) Common Areas, as hereinafter defined, shall not be included in the Rented Floor Area and in the rentable floor area, and any contributions to Taxes received by Landlord from such tenants (less any tax payments recaptured against any other rents or payments due Landlord) shall be deducted from Taxes prior to the calculating of Tenant's proportionate share.~~

C.    <u>Payment by Tenant</u>. *Intentionally Deleted* ~~Tenant's proportionate share of Retail Space Taxes shall be paid in monthly installments commencing with the Commencement Date, in amounts initially estimated by Landlord, one (1) such installment being due on the first day of each full or partial month during the Lease Term. Upon notice from Landlord, such monthly installments shall increase or decrease from time to time to reflect the then current estimate of the amount of any Retail Space Taxes due. When the actual amount of any such Retail Space Taxes is determined by Landlord, Landlord will notify Tenant of such actual amount (in a format to be determined by Landlord) and of any excess or deficiency in the amount theretofore paid by Tenant as its share of such Retail Space Taxes. Any such excess will be credited to Tenant's account. Tenant will pay the amount of any deficiency to Landlord within ten (10) days following Landlord's notice thereof. Tenant acknowledges and stipulates that Landlord has made no representations or agreement of any kind as to the total dollar amount of such Retail Space Taxes, actual or estimated, or Tenant's dollar share thereof.~~

D.    <u>Other Taxes</u>. *Intentionally Deleted* ~~Tenant's proportionate share of any governmental tax or charge (other than income tax) levied, assessed, or imposed on account of the payment by Tenant or receipt by Landlord, or based in whole or in part upon, the rents in this Lease reserved or upon the Center or the value thereof shall be paid by Tenant including any new direct or indirect tax or surcharge against the Center, the parking areas, or the number of parking spaces in the Center or any new direct or indirect tax or surcharge in addition to or by way of substitution for any existing tax or assessment which Landlord becomes obligated to pay with respect to the Center.~~

E.    <u>Larger Parcel</u>. *Intentionally Deleted* ~~If the land under the Center is a part of a larger parcel of land for assessment purposes (the "Larger Parcel"), the taxes and assessments allocable to the land in the Center for the purpose of determining Taxes under this Section shall be deemed a fractional portion of the taxes and assessments levied against the Larger Parcel, the numerator of which is the acreage in the Center and the denominator of which is the acreage in the Larger Parcel.~~

### Section 4.6.    Additional Rent.

All amounts required or provided to be paid by Tenant under this Lease other than Gross Annual Rent and Percentage Rent shall be deemed Additional Rent and Gross Annual Rent, Percentage Rent and Additional Rent shall in all events be deemed rent.

1210251-13.68    026767.000127 602929037.2

Section 4.7.    Sprinkler System.
Landlord has provided, installed on a standard grid, and will maintain, *in good condition*, a sprinkler system in the Premises. ~~and Tenant's proportionate share of the Sprinkler Charge shall be included in the Fixed Rate Charge as set forth in Article I.~~

Section 4.8.    Landlord's Expenses.
If, *after the occurrence of a default (beyond applicable notice and cure periods) by Tenant of its obligations hereunder*, Landlord pays any monies or incurs any expense to correct a breach of this Lease by Tenant, ~~or to do anything in this Lease required to be done by Tenant, or incurs any expense (including, but not limited to, attorneys' fees and court costs), as a result of Tenant's failure to perform any of Tenant's obligations under this Lease;~~ all amounts so paid or incurred shall, on notice to Tenant, be considered additional Rent payable by Tenant with the first Gross Monthly Rent installment thereafter becoming due and payable, and may be collected as provided by law in the case of rent.

### ARTICLE V

### PARKING AND COMMON AREAS AND FACILITIES

Section 5.1.    Common Areas.
All parking areas, access roads and facilities furnished, made available or maintained by Landlord in or near the Center, including employee parking areas, truck ways, driveways, loading docks and areas, delivery areas, multi-story parking facilities (if any), package pickup stations, elevators, escalators, pedestrian sidewalks, malls, including the enclosed mall and Food Court, if any, courts and ramps, landscaped areas, retaining walls, stairways, bus stops, light rail stops, first-aid and comfort stations, lighting facilities, sanitary systems, utility lines, water filtration and treatment facilities and other areas and improvements provided by Landlord for the general use in common of tenants and their customers and Major Tenants in the Center (all herein called "Common Areas") shall at all times be subject to the exclusive control and management of Landlord, and Landlord shall have the right, from time to time, to establish, modify and enforce reasonable rules and regulations with respect to all Common Areas. Tenant agrees to comply with all *reasonable* rules and regulations set forth in Section 8.9 and all reasonable amendments thereto. *During the Lease Term, Landlord shall provide a trash chute at the location identified on Exhibit A-1.*

Landlord shall have the right from time to time to:  change or modify and add to or subtract from the sizes, locations, shapes and arrangements of parking areas, entrances, exits, parking aisle alignments and other Common Areas, provided, however, that the size of parking areas on Landlord's Tract shall not be substantially reduced; restrict parking by Tenant's employees to designated areas; construct surface, sub-surface or elevated parking areas and facilities; establish and from time to time change the level or grade of parking surfaces; enforce parking charges (by meters or otherwise) with appropriate provisions for ticket validating; add to or subtract from the buildings in the Center; and do and perform such other acts in and to said Common Areas as Landlord in its sole discretion, reasonably applied, deems advisable for the use thereof by tenants and their customers. *In exercising its right under this Section 2.6, Landlord shall not materially impair ingress or egress to the Premises, or visibility of the Premises or the Tenant's signage from the enclosed mall area, provided, however, that the foregoing shall not, restrict Landlord's right to temporarily close portions of the Commons Areas to make repairs or changes or for other reasonable purposes, provided that, except in the event of an emergency, there shall always be maintained reasonable access to the Premises for Tenant's use.*

Section 5.2.    Use of Common Areas.
Tenant and its business invitees, employees and customers shall have the nonexclusive right, in common with Landlord and all others to whom Landlord has granted or may hereafter grant rights, to use the Common Areas subject to such reasonable regulations as Landlord may from time to time impose and the rights of Landlord set forth above. ~~Tenant shall pay Landlord, upon demand, $25.00 for each day on which a car of Tenant, a concessionaire, employee or agent of Tenant is parked outside any area designated by Landlord for employee parking. Tenant authorizes Landlord to cause any such car to be towed from the Center and Tenant shall reimburse Landlord for the cost thereof upon demand, and otherwise indemnify and hold Landlord harmless with respect thereto.~~ Tenant shall abide by all rules and regulations and cause its concessionaires, officers, employees, agents, customers and invitees to abide thereby. Landlord may at any time close temporarily any Common Areas to make repairs or changes, prevent the acquisition of public rights therein, discourage noncustomer parking, or for other reasonable purposes. Tenant shall furnish Landlord license numbers and descriptions of cars used by Tenant and its concessionaires, officers and employees. Tenant shall not interfere with Landlord's or other tenants' rights to use any part of the Common Areas.

### ARTICLE VI

### MAINTENANCE OF COMMON AREAS

Section 6.1.    Operation and Maintenance of the Common Facilities.
Landlord will operate, manage, maintain and repair or cause to be operated, managed, maintained or repaired, the Common Areas *of the Center in good condition and repair to maintain the current quality level* of the Center, to the extent the same is not done by any Major Tenant. *Landlord shall use commercially reasonable efforts to ensure that the party responsible for the maintenance of the Common Area fully complies and performs such obligations.* The maintenance obligations of Landlord shall include, without limitation, the restriping of the Parking Space when required, cleaning and removal of ice and snow, repairing of Common Areas, and adequate lighting of all developed exterior Common Areas during all hours of darkness during which the Center shall be open for business and for one (1) hour thereafter.  The interior mall shall be adequately heated, ventilated, air conditioned and lighted.

1210251-14.68      026767.000127 602929037.2

<u>Section 6.2</u>.   <u>Tenant's Fixed Rate Charge</u>. *Intentionally Deleted*

~~In consideration of Landlord's maintenance of the Common Areas of the Center as provided herein, Tenant will pay Landlord, in addition to all other amounts contained in this Lease, the Fixed Rate Charge set forth in Article I. The Fixed Rate Charge shall be increased by the Escalation Factor annually, commencing on the January 1st immediately following the Commencement Date of the Lease and on each January 1st thereafter. In this Agreement the Escalation Factor shall mean the greater of: (a) the percentage increase in the Consumer Price Index annually, specifically the percentage increase from the Comparative CPI to the Current CPI, as such terms are defined below; or (b) a Five Percent (5%) increase, annually. Tenant's Fixed Rate Charge shall be paid in monthly installments, one (1) such installment being due on the first day of each month of each calendar year. Tenant shall not have the right to examine, inspect, or audit Landlord's records pertaining to Landlord's Common Area costs.~~

~~The term "Consumer Price Index" ("CPI") as used in this Section 6.2 herein shall mean "United States City Average All Items for All Urban Consumers (CPI-U, 1982-84=100)" published by the Bureau of Labor Statistics of the U.S. Department of Labor. If the publication of the Consumer Price Index of the U.S. Bureau of Labor Statistics is discontinued, comparable statistics on the purchasing power of the consumer dollar published by a responsible financial periodical selected by Landlord shall be used for making such computations. The term "Current CPI" shall mean the CPI for August of the current calendar year. The term "Comparative CPI" shall mean the CPI for the August occurring one year prior to the Current CPI.~~

## ARTICLE VII

### UTILITIES AND SERVICES

<u>Section 7.1</u>.   <u>Utilities</u>.

Tenant shall not install any equipment which can exceed the capacity of any utility facilities and if any equipment installed by Tenant requires additional utility facilities, the same shall be installed at Tenant's expense in compliance with all code requirements and plans and specifications which must be approved in writing by Landlord, *not to be unreasonably withheld, conditioned or delayed.* Tenant shall be solely responsible for and promptly pay all charges for use or consumption of sewer, gas, electricity, water and all other utility services *consumed by Tenant at the Premises*. Landlord may make electrical service available to the Premises, and so long as Landlord continues to provide such electrical service Tenant agrees to purchase the same from Landlord and pay Landlord for the electrical service (based upon Landlord's *reasonable* determination from time to time of Tenant's consumption of electricity), as additional rent, on the first day of each month in advance (and prorated for partial months), commencing on the Commencement Date at the same cost as would be charged to Tenant from time to time by the utility company which otherwise would furnish such services to the Premises if it provided such services and metered the same directly to the Premises, ~~but in no event at a cost which is less than the cost Landlord must pay in providing such electrical service.~~ Landlord may supply water or other utilities to the Premises, and so long as Landlord continues to provide water or such other utilities Tenant shall pay Landlord for same at the same cost as would be charged to Tenant by the utility company which otherwise would furnish such service to the Premises if it provided such service and metered the same directly to the Premises, but ~~in no event at a cost which is less than the cost Landlord must pay in providing such service, and~~ in no event less than the minimum monthly charge which would have been charged by the utility company in providing such service. Subject to the applicable rules and regulations of the State Public Service Commission, Landlord may provide a shared tenant telephone service to the Premises. *Landlord shall provide the utilities hereunder at charges for such services that are competitive with the charges which Tenant would pay if it obtained service directly from the utility company.* ~~and so long as Landlord continues to provide such telephone service Tenant agrees to purchase the same from Landlord and pay Landlord for the telephone service at the same cost as would be charged to Tenant by the utility company which otherwise would furnish such service to the Premises if it provided such service directly to the Premises, but in no event at a cost which is less than the cost Landlord must pay in providing such telephone service.~~ Landlord shall have the right to designate an alternate third party utility company or provider to provide any such utility service to the Premises and/or the Center, *provided that on the date that Landlord discontinues providing the applicable service, there shall be in no instance a loss or interruption in service.*

*Upon Tenant's request and at Tenant's expense, unless prohibited by law, Landlord shall install a Landlord-approved revenue grade check meter to monitor Tenant's electrical usage at the Premises. Upon Tenant's request, Landlord shall provide Tenant with the costs and expenses to install such meter prior to installation such that Tenant may evaluate the merits of installation of the meter. Such installation shall be performed at Tenant's sole cost and expense and shall be completed within ninety (90) days after Landlord's receipt of Tenant's written approval of the check meter installation quote provided by Landlord to Tenant.*

*Following installation of the check meter, Landlord shall, at Tenant's sole cost:*

1. *Read the check meter on a monthly basis. Such meter readings shall be final, binding and conclusive.*
2. *Utilize such readings, when available, to retroactively adjust the electricity charges for the period from the date of the last adjustment through the date of the adjustment.*
3. *Utilize such readings to establish new monthly billings following the date of the adjustment.*

*Landlord shall provide to Tenant (i) copies of the meter readings of Tenant's usage and (ii) access to the check meter for the Premises upon Tenant's reasonable request.*

Tenant shall operate its heating and air conditioning so that the temperatures in the Premises *are reasonably consistent with* ~~will be the same as that in~~ the adjoining mall, *subject to minor variances due to the restaurant use of the Premises and the open areas of the adjoining theme park* ~~, and set Tenant's thermostat at the same temperature as that thermostat in the mall which is nearest the Premises~~. Tenant shall be responsible for the installation, maintenance, repair and replacement of air conditioning, heating and ventilation systems within and *to the extent exclusively serving*

- 11 -

026767.000127 602929037.2

~~specifically for~~ the Premises, including all components such as air handling units, air distribution systems, motors, controls, grilles, thermostats, filters and all other components. Tenant shall contract for, in its own name, and shall pay for a qualified service contractor to periodically inspect, adjust, clean and repair such systems, including changing filters on a quarterly basis. *Upon written request,* Tenant shall promptly furnish a copy of each inspection and service report to the Center manager. Tenant shall *endeavor to* operate ventilation so that the relative air pressure in the Premises will be the same as or less than that in the adjoining mall as required by Landlord. If Tenant's use of the Premises results in special exhaust requirements, Tenant shall have the exhaust fans interlocked with the make-up air units. If Tenant's use of the Premises requires a grease trap, Tenant shall contract for, in its own name, and shall pay for a qualified service contractor to inspect *and* clean *the* ~~and repair such~~ grease trap, *or portion of a larger system that serves the Premises* at such intervals as may be required by Tenant's use, but in no event less frequently than once a month. *Upon written request,* Tenant shall promptly furnish a copy of the inspection and service report to the Center manager. In the event such grease trap services Tenant and other tenants in the Center, Landlord may elect to perform such inspection, cleaning and repairing, and Tenant shall pay to Landlord its proportionate share of the cost thereof based upon the number of tenants serviced by such grease trap. Tenant's proportionate share of such cost shall be due and payable within ten (10) days after billings, *with sufficient supporting documentation,* therefor are rendered to Tenant. *For purposes of clarification, Tenant shall be responsible for the maintenance or repair of any electrical systems, wiring, plumbing fixtures, sewerage facilities, drains or utility lines (collectively "Mechanical Systems") located within the Premises or to the extent the Mechanical Systems exclusively serve the Premises; Landlord shall be responsible for the maintenance or repair of the Mechanical Systems at the point at which they become common electrical systems, wiring, plumbing fixtures, sewerage facilities, drains or utility lines (for purposes of this paragraph "common" shall meaning serving more than one space in the Center), unless such maintenance or repair is necessitated by the omission or negligence of Tenant.*

### Grease, Thermal and Dishwasher Exhaust Systems

*Landlord agrees to transfer ownership of these systems to the Tenant as is. Tenant at its sole cost and expense shall make all necessary mechanical modifications of these systems per Tenant's design, Tenant shall also make electrical modifications to ensure power feeds are relocated to Tenant's electrical gear. Tenant will be responsible for the on-going operation, maintenance, necessary scheduled cleaning, repair and replacement of mechanical system KN3 (grease exhaust) and KN2(thermal exhaust). These costs shall include scheduled quarterly grease cleaning of hoods, and vertical/horizontal duct and exhaust fans from Tenant's Premises to the Landlord's roof. If through the design process it is determined that there is a system that needs to remain connected for the Landlord's use, the Landlord will compensate Tenant based on a percentage of balanced exhaust volume between Landlord/Tenant as per the mechanical design.*

### Existing Mechanical and Kitchen Equipment

*Landlord agrees to transfer the ownership of all existing mechanical refrigeration and kitchen equipment to the Tenant as is. Tenant will be responsible for all future costs associated with ownership of this equipment.*

*In the event Tenant requires the use of telecommunication services, including, but not limited to, credit card verification and/or other data transmission, then Tenant shall contract for such services with one of the service providers available at the Center.*

Section 7.2.     Air Conditioning of Premises.
Landlord will provide and maintain a central plant and a system of chilled media to the Premises *with design parameters that allow .8 cfm per square foot of leased area,* installed at a point determined by Landlord. *If Tenant desires to install a supplemental HVAC system in order to meet additional cooling needs for its requirements; the size, scope, design and specifications of said supplemental system shall be subject to Landlord's review and approval, not to be unreasonably withheld or delayed, and shall conform to Landlord's construction requirements.* ~~Tenant agrees to purchase the chilled media services from Landlord and pay Landlord annually therefore. Tenant's proportionate share of the chilled media services shall be included in the Fixed Rate Charge as set forth in Article I.~~

Section 7.3.     ~~Enforcement and Termination.~~ *Interruption of Utilities.*
~~In the event of any default by Tenant, Landlord reserves the right, in addition to all other rights and remedies available to Landlord, to cut off and discontinue, without notice or liability to Tenant, any utilities or services provided in accordance with the provisions of this Article VII.~~ *Unless due to Landlord's failure to perform its obligations under this Lease or its negligence or willful misconduct,* Landlord shall not be liable to Tenant in damages or otherwise if any utilities or services, whether or not furnished by Landlord hereunder, are interrupted or terminated because of repairs, installation or improvements, or any cause beyond Landlord's reasonable control, nor shall any such termination relieve Tenant of any of its obligations under this Lease. Tenant shall *endeavor to* operate the Premises in such a way as shall not waste fuel, energy or natural resources. ~~Tenant shall cooperate with Landlord's reasonable directives to reduce energy consumption, including installation of new energy-efficient equipment or the modification or replacement of existing equipment, as the case may be.~~ If any governmental authority shall order mandatory energy conservation, ~~or if Landlord elects voluntarily to cooperate in energy conservation at the request of any governmental authority,~~ including, without limitation, a reduction in operating hours or lighting usage, then Tenant shall comply with such requirements. Landlord may cease to furnish any one or more of said utilities or services to Tenant without liability for the same, and no discontinuance of any utilities or services shall constitute a constructive eviction, *provided, however, in no event shall Landlord discontinue supplying any such utility service until and unless it shall have first connected the service facilities with other utilities which are adequate to service the Premises.*

Section 7.4.     Abatement Event.
*In the event that Tenant is prevented from operating in the Premises as a result of (i) any repair, maintenance, alteration, or remediation performed by Landlord (unless the same is required due to the gross negligence or willful misconduct of Tenant or any of Tenant's employees, contractors, agents, or any party acting on Tenant's behalf), (ii) the unavailability of any utility to the Premises where such unavailability is principally due to acts or omissions of Landlord or Landlord's employees, contractors, agents, or any party acting on Landlord's*

026767.000127 602929037.2

*behalf, (any such set of circumstances as set forth in items (i) and (ii), above, to be known as an "Abatement Event"), then Tenant shall give Landlord prompt notice of such Abatement Event, and if such Abatement Event continues for forty-eight (48) hours after the commencement of such Abatement Event (the "Eligibility Period"), then the Gross Annual Rent shall be abated or reduced, as the case may be, after expiration of the Eligibility Period for such time that Tenant continues to be so prevented from operating, and does not operate in the Premises.*

<u>ARTICLE VIII</u>

<u>CONDUCT OF BUSINESS BY TENANT</u>

<u>Section 8.1.</u>    <u>Use of Premises.</u>
The Premises shall be occupied and used by Tenant solely for the Permitted Use set forth in Article I. Tenant expressly understands and acknowledges that, *subject to the provisions of Section 24.28,* its Permitted Use is nonexclusive, and that other tenants may sell items identical or similar to those sold by Tenant. Tenant hereby warrants that it has the full and unfettered right to use the Trade Name, set forth in Article I, for the entire Lease Term. ~~and that such use will not in any way infringe on the rights of others.~~ The Permitted Use is a material consideration to Tenant entering into this Lease so as to permit Landlord to maintain an appropriate tenant mix, or balance, both to the quality and quantity of sales, within the Center in order to achieve the maximum Gross Sales for all tenants and to assure the continued operation of a full service regional shopping center development.

The Premises shall not be used, whether by Tenant or any other party, for any of the following activities: (a) operation of an automated teller machine (ATM) or any other machine or device performing any of the functions typically performed by ATM's; (b) operation of one or more antennae or other transmission device which results in the distribution of wireless frequency into the Common Area of the Center; (c) display of signs, billboards or other advertising media not directly related to the conduct of Tenant's primary business; (d) operation of vending machines of any kind or character, unless (i) access to such machines is strictly limited to Tenant's employees only, and (ii) such machines are not visible to Tenant's customers or the public; or (e) any other activity that is not directly or integrally related to the conduct of Tenant's primary business activity or activities.as described in Article I (Permitted Use) hereof.

*Landlord acknowledges the national market theme of rock'n'roll music and entertainment played and promoted in and through "Hard Rock Cafes" throughout the country and the world. Landlord further acknowledges and agrees that Landlord shall not prohibit Tenant's use of the Premises in furtherance of its rock'n'roll music and entertainment theme provided Tenant's playing and promotion of its rock'n'roll music and entertainment theme complies with applicable laws, and provided further that the restaurant's environment and operations shall still be required to be consistent with the Center's family friendly environment. To this end, Tenant shall be permitted to broadcast music audible from the exterior of the Premises in areas adjacent to the main entrances of the Premises (subject to compliance with applicable code requirements, if any) provided (i) the sound systems are independent zones, and when required can be turned down on a zone basis; (ii)Tenant maintains the volume thereof at a level not to exceed eighty (80) decibels outside of a ten foot (10') radius from the boundaries of the main entrances so as not to disturb other tenants or occupants or customers of the Center, including the guests to the theme park and the adjacent Lego Land; and (iii) Tenant agrees to reduce the volume of such music or sound to a reasonable level upon Landlord's commercially reasonable request if Landlord or Landlord's Center Manager receives reasonable complaints with respect to Tenant's music or sound in the Premises. Further, upon Landlord's request, Tenant agrees to cease playing music audible from the entrances of the Premises during the nightly theme park light show, special events or other promotional events then being conducted at the Center or in the Theme Park.*

<u>Section 8.2.</u>    <u>Prompt Occupancy and Use.</u>
*Except as expressly provided in Section 8.3 herein,* Tenant will occupy the Premises upon the Commencement Date and thereafter continuously operate and conduct in one hundred percent (100%) of the Premises during ~~each hour of~~ the entire Lease Term when Tenant is required under this Lease to be open for business the business permitted under Section 1.1 hereof *as a typical Hard Rock Café,* ~~with a full staff and full stock of merchandise,~~ using only such minor portions of the Premises for storage and office purposes as are reasonably required. The parties agree that: Landlord has relied upon Tenant's occupancy and operation in accordance with the foregoing provisions; because of the difficulty or impossibility of determining Landlord's damages which would result from Tenant's violation of such provisions, including but not limited to damages from loss of Percentage Rent from Tenant and other tenants, and diminished saleability, mortgageability and economic value, Landlord shall be entitled to liquidated damages if it elects to pursue such remedy; therefore for any day that Tenant does not fully comply with the provisions of this Section 8.2 the Gross Annual Rent, prorated on a daily basis, shall be increased by twenty-five percent (25%), such increased sum representing the damages which the parties agree Landlord will suffer by Tenant's noncompliance. In addition to all other remedies, Landlord shall have the right to obtain specific performance by Tenant upon Tenant's failure to comply with the provisions of this Section 8.2.

<u>Section 8.3.</u>    <u>Conduct of Business.</u>
Such business shall be conducted under the Trade Name set forth in Article I unless another name is previously approved in writing by Landlord. ~~and in such manner as shall assure the transaction of a maximum volume of business in and at the Premises.~~ *Except as set forth herein,* Tenant's store shall be and remain open from *11:00* A.M. until *the later of (a)* 9:30 P.M. *or (b) at Tenant's election, such later hours as allowed by the State of Minnesota, the County of Hennepin or the City of Bloomington for business establishments similar to Tenant's business,* each day of the week except Sunday, on Sunday from 11:00 A.M. until *the later of (a)* 7:00 P.M. *or (b) at Tenant's election, such later hours as allowed by the State of Minnesota, the County of Hennepin or the City of Bloomington for business establishments similar to Tenant's business,* ~~and in addition, during all days, nights and hours (including Sundays as permitted by law) that any two (2) Major Tenants in the Center (as referred to in Section I.3 above) is open for business, and such other days, nights and hours as Landlord shall approve in writing. If the Premises open late or close early and if Tenant has been given written notice at the Premises or such breach on more than one occasion, Tenant shall thereafter, upon occasion of late opening or early closure, pay to Landlord, concurrent with the next Gross Annual Rent~~

- 13 -

~~payment due after receipt of invoice the sum of One Hundred Dollars ($100.00), or such other amount as may be determined by Landlord from time to time; which amount is not a penalty but is acknowledged by Tenant to be a genuine pre-estimate of the damage suffered by Landlord for such breach.~~  Tenant shall not be required to open for business at or during times when it is not permitted to do so by law.

*Notwithstanding the foregoing, and upon at least ten (10) days written notice to Landlord, Tenant shall have the right to close the Premises for business to the public (i) for up to ten (10) days in each calendar year for the purpose of minor remodeling, taking inventory, staffing and training, (ii) for a period of up to sixty (60) days once every five (5) years, unless additional time is approved by Landlord, as reasonably necessary in order to perform a major remodeling of the Premises (subject to Landlord's right to approve any alterations in connection therewith), and/or (iii) as a result of fire or other casualty, closures due to the exercise of Landlord's rights contained in this Lease, condemnation or acts of Force Majeure (collectively "Permitted Closures").*

**Section 8.4.    Operation by Tenant.**
Tenant covenants and agrees that it will:  not place or maintain any merchandise, vending machines or other articles in any vestibule or entry of the Premises or outside the Premises; store garbage, trash, rubbish and other refuse in rat-proof and insect-proof containers inside the Premises, and remove the same frequently, ~~and regularly and, if directed by Landlord,~~ by such means and methods and at such times and intervals as are *reasonably* designated by Landlord, all at Tenant's costs; *except as set forth herein,* ~~including a pre-stocking charge for the removal of trash prior to the Commencement Date; and, upon Landlord's request, provide a Waste Profile Sheet or equivalent information concerning contents of trash;~~ not permit any sound system audible or objectionable advertising medium visible outside the Premises; keep all mechanical equipment ~~free of vibration and noise and~~ in good working order and condition; not commit or permit waste or a nuisance upon the Premises; not permit or cause *offensive* odors to emanate or be dispelled from the Premises; not solicit business in the Common Areas nor distribute advertising matter to, in or upon any Common Area; not permit the loading or unloading or the parking or standing of delivery vehicles outside any area designated therefor, nor permit any use of vehicles which will interfere with the use of any Common Areas; comply with all laws, recommendations, ordinances, rules and regulations of governmental, public, private and other authorities and agencies, including those with authority over insurance rates, with respect to the use or occupancy of the Premises, and including but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act; ~~light the show windows of the Premises and all signs each night of the year for not less than one (1) hour after the Premises is permitted to be closed;~~ not permit any noxious, toxic or corrosive fuel or gas, dust, dirt or fly ash on the Premises; not place a load on any floor in the Center which exceeds the floor load per square foot which such floor was designed to carry; store in the Premises only merchandise which Tenant intends to sell at, in or from the Premises, within a reasonable time after receipt thereof. *Landlord will operate, manage, maintain and repair the Common Areas of the Center in accordance with all applicable laws and regulations. Notwithstanding, anything contained in this Lease to the contrary, there shall be no obligation on the Tenant to comply with any of the laws, directions, rules or regulations referred to which may require structural alterations, changes, repairs or additions, all of which required structural alterations, changes, repairs or additions shall be the obligation of Landlord unless made necessary by Tenant's Work or Tenant's particular use of the Premises or the negligence or default of Tenant.*

Landlord may make additional services, including but not limited to, ~~music systems,~~ pest control, *and/or* trash removal, ~~and/or trash compactor, cleaning, maintenance, and security,~~ available to the Premises and, in such event, Tenant shall utilize such services, at Tenant's expense.

**Section 8.5.    Emissions and Hazardous Materials.**
A.    Emissions.  Tenant shall not, without the prior written consent of Landlord:

(i)    make, or permit to be made, any use of the Premises or any portion thereof which emits, or permits the emission of dust, sweepings, dirt, cinders, fumes or odors into the atmosphere, the ground or any body of water, whether natural or artificial (including rivers, streams, lakes, ponds, dams, canals, or flood control channels) which is in violation of any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement;

(ii)    permit any vehicle on the Premises to emit exhaust which is in violation of any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement;

(iii)    create, or permit to be created, any sound pressure level which will interfere with the quiet enjoyment of any real property adjacent to the Premises, or which will create a nuisance or violate any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement;

(iv)    transmit, receive, or permit to be transmitted or received any electromagnetic, microwave or other radiation which is harmful or hazardous to any person or property in, on or about the Premises, or anywhere else, or which interferes with the operation of any electrical, electronic, telephonic or other equipment wherever located, whether on the Premises or anywhere else;

(v)    create, or permit to be created, any ground vibration that is discernible outside the Premises; or

(vi)    produce or permit to be produced any intense glare, light or heat except within an enclosed or screened area and then only in such manner that the glare, light or heat shall not be discernible outside the Premises.

B.    Hazardous Material.
Tenant shall not, without the prior written consent of Landlord, cause or permit, knowingly or unknowingly, any Hazardous Material (hereinafter defined) to be brought or remain upon, kept, used, discharged, leaked, or emitted in

- 14 -

1210251-18.68    026767.000127 602929037.2

or about, or treated at the Premises *in violation of applicable law*. As used in this Lease, "Hazardous Material(s)" shall mean any hazardous, toxic or radioactive substance, material, matter or waste which is or becomes regulated by any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement, and shall include asbestos, petroleum products and the terms "Hazardous Substance" and "Hazardous Waste" as defined in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), as amended, 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act ("RCRA"), as amended, 42 U.S.C. § 6901 et seq. *"Hazardous Materials" shall not include substances which are used in the ordinary course of a business similar to Tenant's business as permitted pursuant to Section 1.1 of this Lease, provided, however, that such substances are used, handled, transported, stored and disposed of in strict compliance with any applicable federal, state or local law, rule, regulation, code, ordinance or any other governmental restriction or requirement. If such substances are so used, handled, transported, stored or disposed of then they shall not be deemed "Hazardous Materials" for purposes of this Lease.* To obtain Landlord's consent, Tenant shall have an "Environmental Audit" prepared by a Qualified Engineer or Environmental Professional for Landlord's review to be relied upon by Landlord and for Landlord's use. Such Environmental Audit shall list: (1) the name(s) of each Hazardous Material and a Material Safety Data Sheet (MSDS) as required by the Occupational Safety and Health Act; (2) the volume proposed to be used, stored and/or treated at the Premises (monthly); (3) the purpose of such Hazardous Material; (4) the proposed on-premises storage location(s); (5) the type and description of such storage area(s); (6) the location of sanitary and storm drains; (7) the name(s) of the proposed off-premises disposal entity; and (8) an emergency preparedness plan in the event of a release. Additionally, the Environmental Audit shall include copies of all required federal, state, and local permits concerning or related to the proposed use, storage, or treatment of Hazardous Materials at the Premises. Tenant shall submit a new Environmental Audit whenever it proposes to use, store, or treat a new Hazardous Material at the Premises or when the volume of existing Hazardous Materials to be used, stored, or treated at the Premises expands by ten percent (10%) during any thirty (30) day period. If Landlord in its reasonable judgment finds the Environmental Audit acceptable, then Landlord shall deliver to Tenant Landlord's written consent. Notwithstanding such consent, Landlord may revoke its consent upon: (1) Tenant's failure to remain in full compliance with applicable environmental permits and/or any other requirements under any federal, state, or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement (including but not limited to CERCLA and/or RCRA), related to environmental safety, human health, or employee safety; (2) Tenant's business operations pose or potentially pose a human health risk to other tenants; or (3) Tenant expands its use, storage, or treatment of Hazardous Materials in a manner inconsistent with the safe operation of a shopping center. Should Landlord consent in writing to Tenant bringing, using, storing or treating any Hazardous Material in or upon the Premises, Tenant shall strictly obey and adhere to any and all federal, state or local laws, ordinances, orders, rules, regulations, codes or any other governmental restrictions or requirements (including but not limited to CERCLA and/or RCRA), which in any way regulates, governs or impacts Tenant's possession, use, storage, treatment or disposal of said Hazardous Material. In addition, Tenant represents and warrants to Landlord that: (1) Tenant shall apply for and remain in compliance with applicable RCRA and state permits; (2) Tenant shall report to applicable governmental authorities any release of reportable quantities of a hazardous substance(s) as mandated by Section 103(a) of CERCLA; (3) Tenant, within five (5) days of receipt, shall send to Landlord a copy of any notice, inspection report, or other document issued by any governmental authorities relevant to Tenant's compliance status with environmental or health and safety laws; and, (4) Tenant shall remove from the Premises all Hazardous Materials at the termination of this Lease.

In addition to, and in no way limiting, Tenant's duties and obligations as set forth in Section 11.6 of this Lease, should Tenant breach any of its duties and obligations as set forth in this Section 8.5 of this Lease, or if the presence of any Hazardous Material *brought* on the Premises *by Tenant* results in contamination of the Premises, the Center, any land other than the Center, the atmosphere, or any water or waterway (including groundwater), or if contamination of the Premises or of the Center by any Hazardous Material otherwise occurs for which Tenant is otherwise legally liable to Landlord for damages resulting therefrom, Tenant shall indemnify, save harmless and, at Landlord's option and with attorneys approved in writing by Landlord, defend Landlord, and its contractors, agents, employees, partners, officers, directors, and mortgagees, if any, from any and all claims, demands, damages, expenses, fees, costs, fines, penalties, suits, proceedings, actions, causes of action, and losses of any and every kind and nature (including, without limitation, ~~diminution in value of the Premises or the Center, damages for the loss or restriction on use of the rentable or usable space or of any amenity of the Premises or the Center, damages arising from any adverse impact on marketing space in the Center, and sums paid in settlement of claims and for~~ attorney's fees, consultant fees and expert fees, which may arise during or after the Lease Term or any extension thereof as a result of such contamination). This includes, without limitation, costs and expenses, incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of the presence of Hazardous Material on or about the Premises or the Center, or because of the presence of Hazardous Material anywhere else which came or otherwise emanated from Tenant or the Premises *if brought on the Premises by Tenant after taking possession*. Without limiting the foregoing, if the presence of any Hazardous Material on or about the Premises or the Center caused or permitted by Tenant results in any contamination of the Premises or the Center, Tenant shall, at its sole expense, promptly take all actions and expense as are necessary to return the Premises and/or the Center to the condition existing prior to the introduction of any such Hazardous Material to the Premises or the Center; provided, however, that Landlord's approval of such actions shall first be obtained in writing.

*Landlord represents to Tenant that, to Landlord's reasonable knowledge, the Premises is free of Hazardous Materials and is in compliance with applicable environmental laws. If Hazardous Materials are found to have been brought upon or located in the Premises prior to the Possession Date, Landlord shall cause the same to be immediately removed at Landlord's sole cost and expense (unless brought on the Premises by Tenant, in which event Tenant shall remove same as provided above). Landlord shall indemnify and hold Tenant harmless from and against any and all claims, demands, causes of action, damages, losses, costs and expenses (including reasonable attorney's fees) which may hereafter be asserted against or incurred by Tenant as a result of, based upon, arising out of, or in connection with (i) any Hazardous Materials which existed on, under or about the Premises on or before the delivery of the Premises to Tenant, or (ii) the acts or omissions of Landlord or its authorized representatives resulting in the release of any Hazardous Materials.*

1210251-19.68    026767.000127 602929037.2

**Section 8.6.    Painting. Decorating. Displays, Alterations, Signage.**

*Except as set forth herein,* Tenant will not paint, decorate or change the architectural treatment of any part of the exterior of the Premises nor any part of the interior of the Premises visible from the exterior nor make any structural alterations, additions or changes in the Premises without Landlord's written approval thereto, and will promptly remove any paint, decoration, alteration, addition or changes applied or installed without Landlord's approval and restore the Premises to an acceptable condition or take such other action with respect thereto as Landlord directs.

*Notwithstanding the foregoing, without Landlord's approval, Tenant may make interior non-structural alterations and decorative changes which do not exceed One Hundred Thousand and No/100 Dollars ($100,000) in the aggregate per Lease Year, make routine repairs to the Premises, paint the entirety of the interior of the Premises and make such other non-structural alterations and decorations as are consistent with other Hard Rock Cafés nationally (notwithstanding the foregoing, Landlord will have approval over these alterations, decorations, and improvements to the extent that they change or alter the exterior of the Premises, to the extent that they affect the basic electrical, plumbing, or mechanical systems serving any other part of the Center, or to the extent that they affect the structure of the Center). All alterations, decorations, additions and improvements made by Tenant will be at the sole expense of Tenant, will be of a quality that is consistent with other Hard Rock Cafés nationally and will be performed in accordance with all laws, ordinances, rules and regulations and in compliance with Landlord's construction criteria for the Center.*

~~Tenant will install and maintain at all times, subject to the other provisions of this Section 8.6, merchandise displays in any show windows on the Premises; the arrangement, style, color and general appearance thereof and of displays in the interior of the Premises which are visible from the exterior, including, but not limited to, window displays, advertising matter, signs, merchandise and store fixtures, shall be maintained in keeping with the character and standards of the Center.~~

Tenant shall erect and maintain identification signage of a type, design and to specifications which comply with Signage Criteria established by Landlord from time to time. Tenant shall not affix any signage, lettering, sale bills, posters, other advertising medium or other material or equipment whatsoever upon or above the exterior of the Premises, the store front thereof, or the building in which the Premises are situated without the prior written consent of Landlord. In the event Tenant has illuminated signs or illumination on static signs it must be operational during occupied hours. *Tenant shall not have the right to install signage on the exterior of the Mall, however, Tenant shall be allowed to install maximum allowable signage under Landlord's criteria set forth in Tenant Information Package, and Tenant shall have the right to design and construct signage for the Premises in accordance with Tenant's unique architectural design in keeping with its then current design program, provided the same are in compliance with Landlord's signage criteria. Landlord shall not unreasonably withhold its approval of Tenant's storefront and signage provided such design is approved by permitting authorities if applicable (e.g. city, county architectural review boards) and consistent with the signage and storefront criteria for the Property, and Landlord agrees to provide preliminary approval for Tenant's storefront and signage renderings within ten (10) business days after Tenant submits the renderings. Signage shall not interfere with the structured integrity of the property.*

**Section 8.7.    Other Operations.**

If during the Lease Term Tenant or ~~any member of his/her immediate family, or if Tenant is a corporation,~~ any officer, director, shareholder or parent, subsidiary or affiliated corporation or franchisee or licensee of any of them (collectively "Tenant" for purposes of this Section 8.7), directly or indirectly operates, manages or has any interest whatsoever in any other store or business operated ~~for a purpose or business similar to or in competition with all or part of the business permitted under Section 1.1 hereof in any~~ *as a Hard Rock Café (or a substantially similar trade name or derivative thereof operating a restaurant)* within five (5) miles of any boundary line of the Center, it will injure Landlord's ability and right to receive Percentage Rent (such ability and right being a major consideration for this Lease and the construction of the Center) ), *provided that the foregoing shall not apply to, and there shall be no restriction with regard to, any Hard Rock hotel, Hard Rock casino, or Hard Rock entertainment venue, or any retail store located with such project with the term "Hard Rock" in the name, provided that none of the foregoing projects shall contain a Hard Rock Café (or a substantially similar trade name or derivative thereof operating a restaurant).* Accordingly, if Tenant operates, manages or has such interest in any such ~~store or business~~ *Hard Rock Café (or a substantially similar trade name or derivative thereof operating a restaurant)* within such area (a "Radius Violation"), then, in addition to any and all other remedies available to Landlord for breach of this covenant, it is specifically agreed that at Landlord's option, either (i) Tenant's Effective Rent (as defined below) shall be automatically increased by fifty percent (50%) calculated on a per diem basis for so long as the Radius Violation continues, such increase representing liquidated damages and not a penalty or (ii) one hundred percent (100%) of all sales made from any such other store or business shall be included in the computation of Gross Sales and Adjusted Gross Sales for the purpose of determining Percentage Rent under this Lease as though said Gross Sales and Adjusted Gross Sales had actually been made at, in or from the Premises. "Effective Rent" shall be Tenant's Gross Annual Rent plus the highest Percentage Rent payable under the Lease by Tenant during the three (3) Lease Years immediately preceding the Radius Violation. Landlord shall have all rights of inspection of books and records with respect to such stores or businesses that are the subject of the Radius Violation as it has with respect to the Premises; and Tenant shall furnish to Landlord such reports with respect to Gross Sales and Adjusted Gross Sales from such other store or business as it is herein required to furnish with respect to the Premises.

**Section 8.8.    Sales and Dignified Use.**

*Except for permitted closures as otherwise provided for in this Lease,* Tenant shall continuously and without interruption, throughout the Lease Term in good faith, actively use, occupy and operate the entire Premises, with fixtures and decor, an inventory of goods and merchandise and a staff of sales personnel adequate, sufficient and appropriate to operate the Premises as a "first-class" *restaurant substantially similar to Tenant's other United States restaurants.* ~~"High-quality", "fashionable" store or business (as opposed to a "general", "promotional" or "self-service" store or business) as those standards of operation may be interpreted from time to time during the Lease Term. The foregoing description is intended only as a description of the general quality of the merchandise or services Tenant may~~

~~sell and the general quality of customer service, merchandising, fixturing and decor. Tenant must maintain in the operation of the Premises. The foregoing description is not intended by Landlord and will not be enforced to affect the retail selling price of Tenant's merchandise or services.~~ Tenant shall operate its business at the Premises in a respectable, reputable, tasteful, competent and dignified manner in order to enhance the image of the Center as a whole and its reputation as a dignified and desirable place to shop. ~~and to achieve the maximum volume of sales so that Landlord will receive the maximum amount of Percentage Rent from Tenant or percentage rent from other tenants and occupants of the Center.~~ No public or private auction or any fire, "going out of business," bankruptcy or similar sales or auctions shall be conducted in or from the Premises and the Premises shall not be used in a disreputable or immoral manner or in violation of national, state or local laws.

**Section 8.9.**     **Rules and Regulations.**

Tenant shall comply with the following rules and regulations and any *reasonable, non-discriminatory* amendments thereto as developed by Center management *provided such amendments do not materially interfere with the operation of Tenant's business and so long as Landlord enforces such rules and regulations in a non-discriminatory manner:* (i) Tenant shall advise and cause its vendors to deliver all merchandise before noon on Mondays through Fridays, not at other times; (ii) all deliveries are to be made to designated service or receiving areas and Tenant shall request delivery trucks to approach their service or receiving areas by designated service routes and drives; (iii) tractor trailers which must be unhooked or parked must use steel plates under dolly wheels to prevent damage to the asphalt paving surface. *In the event of a conflict between the rules and regulations and the terms and provisions of this Lease, the terms and provisions of this Lease shall prevail.* In addition, wheel blocking must be available for use. Tractor trailers are to be removed from the loading areas after unloading. No parking or storing of such trailers will be permitted in the Center; (iv) except for small parcel packages, no deliveries will be permitted through the malls unless Tenant does not have a rear service door. In such event, prior arrangements must be made with the Mall Manager for delivery. Merchandise being received shall immediately be moved into Tenant's Premises and not be left in the service or receiving areas; (v) Tenant is responsible for storage and removal of its trash, refuse and garbage. Tenant shall not dispose of the following items in sinks or commodes: plastic products (plastic bags, straws, boxes); sanitary napkins; tea bags; cooking fats, cooking oils; any meat scraps or cutting residue; petroleum products (gasoline, naphtha, kerosene, lubricating oils); paint products (thinner, brushes); or any other item which the same are not designed to receive. All Store Floor Area of Tenant, including vestibules, entrances and returns, doors, fixtures, windows and plate glass, shall be maintained in a safe, neat and clean condition; (vi) other than as permitted under the provisions of the Lease, Tenant shall not permit or suffer any advertising medium to be placed on mall walls, on Tenant's mall or exterior windows, on standards in the mall, on the sidewalks or on the parking lot areas or light poles. No permission, expressed or implied, is granted to exhibit or display any banner, pennant, sign, and trade or seasonal decoration of any size, style or material within the Center, outside the Premises; (vii) Tenant shall not permit or suffer the use of any advertising medium which can be heard or experienced outside of the Premises, including, without limiting the generality of the foregoing, flashing lights, searchlights, loud speakers, phonographs, radios or television. No radio, television, or other communication antenna equipment or device is to be mounted, attached, or secured to any part of the roof, exterior surface, or anywhere outside the Premises, unless Landlord has previously given its written consent; (viii) Tenant shall not permit or suffer merchandise of any kind at any time to be placed, exhibited or displayed outside its Premises, nor shall Tenant use the exterior sidewalks or exterior walkways of its Premises to display, store or place any merchandise. No sale of merchandise by tent sale, truck load sale or the like, shall be permitted on the parking lot or other Common Areas; (ix) Tenant shall not permit or suffer any portion of the Premises to be used for lodging purposes, nor conduct or permit any unusual firing, explosion or other damaging or dangerous hazard within the Premises or the Common Areas; (x) Tenant shall not permit or suffer any portion of the Premises to be used for any warehouse operation, or any assembling, manufacturing, distilling, refining, smelting, industrial, agricultural, drilling or mining operation, adult bookstore or cinema, peepshow, entertainment or sale of products of an obscene or pornographic nature or predominately sexual nature; (xi) Tenant shall not, in or on any part of the Common Areas: (a) vend, peddle or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet or other matter whatsoever; (b) exhibit any sign, placard, banner, notice or other written material, except for activities as approved in writing by Landlord; (c) distribute any circular, booklet, handbill, placard or other material, except for activities as approved in writing by Landlord; (d) solicit membership in any organization, group or association or contribution for any purpose; (e) create a public or private nuisance; (f) use any Common Areas (including the enclosed mall) for any purpose when none of the other retail establishments within the Center is open for business or employment, except for activities as approved in writing by Landlord; (g) throw, discard or deposit any paper, glass or extraneous matter of any kind except in designated receptacles, or create litter or hazards of any kind; (h) deface, damage or demolish any sign, light standard or fixture, landscaping materials or other improvement within the Center, or the property of customers, business invitees or employees situated within the Center; and (xii) all food tenants or tenants serving food shall comply with the Food Tenant Rules and Regulations and any amendments thereto.

*Landlord acknowledges the Hard Rock Café's rock 'n roll and entertainment themed concept for the Premises and Landlord shall not take any action that materially adversely affects the Tenant's right to conduct the Permitted Use and Tenant's rock 'n roll and entertainment themed concept in the Premises, provided that the Tenant acknowledges (i) that the restaurant's environment and operations shall still be required to be consistent with the Center's family friendly environment; and (ii) that Landlord shall not be prohibited from pursuing remedies against Tenant to enforce applicable laws, from enforcing any of Tenant's obligations under this Lease, or from pursuing any of its rights or remedies under this Lease including compliance with subsection (i) herein. Landlord further acknowledges that, subject to the foregoing, Tenant's playing of rock 'n roll music and Tenant's entertainment themed concept for the Premises does not conflict with the terms of this Lease or the rules and regulations, but this acknowledgment will not relieve Tenant from complying with its obligations under this Lease, including the provisions regarding the playing of music audible from the exterior of the Premises in accordance with Section 8.1.*

## ARTICLE IX

## MAINTENANCE OF PREMISES

**Section 9.1.     Maintenance by Landlord.**
Landlord shall keep or cause to be kept the foundations, roof and structural portions of the walls, *floors and other structural components* of the Premises, *and plumbing, electrical and other utility systems serving the Premises (other than such utility systems within or to the extent exclusively serving the Premises)* in good order, repair and condition except for damage thereto due to the acts or omissions of Tenant, its agents, employees or invitees.  The foregoing provision shall not prejudice Landlord's right to include the cost of maintaining the roof over the Premises within the provisions of Article VI of this Lease.  Landlord shall commence required repairs as soon as reasonably practicable after receiving written notice from Tenant thereof.  This Section 9.1 shall not apply in case of damage or destruction by fire or other casualty or condemnation or eminent domain, in which events the obligations of Landlord shall be controlled by Article XVI and XVII.  Except as provided in this Section 9.1, *or expressly stated elsewhere in this Lease,* Landlord shall not be obligated to make repairs, replacements or improvements of any kind upon the Premises, or to any equipment, merchandise, stock in trade, facilities or fixtures therein, all of which shall be Tenant's responsibility, but Tenant shall give Landlord prompt written notice of any accident, casualty, damage or other similar occurrence in or to the Premises or the Common Areas of which Tenant has knowledge. *For purposes of clarification and consistency with Section 7.1, Tenant shall be responsible for the maintenance or repair of any electrical systems, wiring, plumbing fixtures, sewerage facilities, drains or utility lines (collectively "Mechanical Systems") located within the Premises or to the extent the Mechanical Systems exclusively serve the Premises; Landlord shall be responsible for the maintenance or repair of the Mechanical Systems at the point at which they become common electrical systems, wiring, plumbing fixtures, sewerage facilities, drains or utility lines (for purposes of this paragraph "common" shall meaning serving more than one space in the Center), unless such maintenance or repair is necessitated by the omission or negligence of Tenant.*

**Section 9.2.     Maintenance by Tenant.**
Tenant shall at all times, at Tenant's sole cost and expense, keep the *non-structural portions of the* Premises (including all entrances and vestibules) and all partitions, window and window frames and moldings, glass, store fronts, doors, door openers, fixtures, equipment and appurtenances thereof (including lighting, heating, electrical *(from and after the point of Tenant's connection),* plumbing *(from and after the point of Tenant's connection),* waterproofing ventilating and air conditioning fixtures and systems and other mechanical equipment and appurtenances *(from and after the point of Tenant's connection),* and all parts of the Premises and parts of Tenant's Work not on the Premises, not required herein to be maintained by Landlord, in good order, condition and repair and clean, orderly, sanitary and safe, damage by ~~unavoidable~~ casualty *condemnation, ordinary wear and tear* excepted, (including but not limited to doing such things as are necessary to cause the Premises to comply with applicable laws, ordinances, rules, regulations and orders of governmental and public bodies and agencies, such as but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act).  If replacement of equipment, fixtures and appurtenances thereto is necessary, Tenant shall replace the same with new or completely reconditioned equipment, fixtures and appurtenances, and repair all damages done in or by such replacement.  *Notwithstanding the foregoing, subject to the provisions of Article XI, in no event shall Tenant be required to make repairs to the Premises (and Tenant shall give Landlord written notice of any repairs) necessitated by the negligence or willful acts of Landlord or anyone claiming under Landlord, because of the failure of Landlord to perform or observe any term or condition of this Lease, or because of improvements made by Landlord.*  If Tenant fails to perform its obligations hereunder, Landlord, *after written notice to Tenant and opportunity to cure,* ~~without notice~~ may but shall not be obligated to, perform Tenant's obligations or perform work resulting from Tenant's acts, actions or omissions and add the cost of the same, in addition to an administrative fee equal to fifteen percent (15%) of the total of all such costs and expenses, to the next installment of Gross Monthly Rent due hereunder.

**Section 9.3.     Surrender of Premises.**
At the expiration of the Lease Term, Tenant shall surrender the Premises in *good* ~~the same~~ condition *and repair,* ~~as they were required to be in on the Required Completion Date,~~ reasonable wear and tear, *depreciation, obsolescence, condemnation* and ~~damage by unavoidable~~ casualty excepted, and deliver all keys for, and all combinations on locks, safes and vaults in, the Premises to Landlord at Landlord's notice address as specified in Section 1.1 or, at Landlord's option, to the office of the Center's general manager.  In the event Tenant fails to surrender the Premises as aforesaid, Landlord shall have the right, but not the obligation, to remove therefrom all or any part of the personal property located therein and may place the same in storage at a public warehouse at the expense and risk of Tenant.

## ARTICLE X

## ALTERATIONS AND TENANT'S LIENS

**Section 10.1.     Remodeling.**
*Tenant, at its sole cost and expense, shall keep the Premises in a first class condition consistent with other similar Hard Rock Café locations throughout the Term of the Lease.* ~~Upon the expiration of the fifth (5th) Lease Year of the Term Tenant, at its sole cost and expense, shall complete a substantial renovation to the Premises, including but not limited to all or any portion of the interior of the Premises so that the furnishings, furniture, flooring, wall fixtures and coverings, equipment and other appurtenances in the Premises shall be in keeping with a first class regional shopping center and current with industry standards (the "Renovation Work"), all in accordance with Exhibit "B" to the Lease and plans and specifications approved by Landlord, it being understood and agreed that the renovations shall bring the Premises to a standard equal to or greater than Tenant's most current store in terms of storefront, signage and design.~~

1210251-22.68     026767.000127 602929037.2

Section 10.2.    Removal and Restoration by Tenant.

All alterations, changes and additions and all improvements, including leasehold improvements, made by Tenant ~~as whether~~ part of Tenant's Work, ~~or not,~~ shall, *if not removed by Tenant as permitted below* ~~immediately~~ upon *the expiration of the Lease be* ~~installation attach to the fee~~ and become Landlord's property. ~~and shall not be removed unless replaced by like property.~~ If Tenant fails to remove any shelving, decorations, equipment, trade fixtures or personal property from the Premises *by* ~~prior to~~ the end of the Lease Term, they shall become Landlord's property and Tenant shall repair or pay for the repair of any damage done to the Premises resulting from removing same but not for painting or redecorating the Premises.

*"Tenant's Property" means all trade fixtures, furniture, furnishings, equipment and other similar moveable personality owned or installed by Tenant during the Term hereof, including, without limitation Tenant's Memorabilia (as hereinafter defined). Notwithstanding anything to the contrary contained herein, Landlord shall at no time have any right to or interest in any Tenant's Property. "Tenant's Memorabilia" shall mean and refer to (collectively and individually) all memorabilia, signage, merchandise and stained glass or other item/element that contains a logo or other mark affiliated with Tenant's trade name or theme located at any time, and from time to time, on the Premises. Tenant shall have the right to remove any and all of Tenant's Property as Tenant deems desirable, at its sole discretion, provided that Tenant restores any damage to the Premises caused by such removal. Landlord waives and releases any claim, interest, lien or rights to a lien upon or against Tenant's Property, including but not limited to, Tenant's Memorabilia. Upon surrender, Tenant may, in its sole discretion and at its expense, remove from the Premises, in whole or in part, trade dress, trade and service marks, or other proprietary property, and other trade distinctive improvements, fixtures, furniture, equipment and characteristics, that are indicative of Tenant's business which Tenant installs in the Premises, and to otherwise to "de-identify" the Premises, as Tenant reasonably believes necessary or appropriate for the protection of Tenant's interest in Tenant's trademarks, trade names, service marks, copyrights or other proprietary rights, provided Tenant shall repair any damage to the Premises caused by any removal thereof. Tenant's Property shall remain the property of Tenant and may be removed by Tenant at any time during the Term hereof or within five (5) days in case of earlier termination of this Lease.*

Section 10.3.    Tenant's Liens.

~~A.~~ Tenant shall not suffer any mechanic's or materialmen's lien to be filed against the Premises or the Center by reason of work, labor, services or materials performed or furnished to Tenant or anyone holding any part of the Premises under Tenant. If any such lien shall at any time be filed as aforesaid, Tenant may contest the same in good faith, but, notwithstanding such contest, Tenant shall, within *thirty (30)* ~~fifteen (15)~~ days after the *receipt of notice the existence* ~~filing~~ thereof, cause such lien to be released of record by payment, bond, order of a court of competent jurisdiction, or otherwise. In the event of Tenant's failure to release of record any such lien within the aforesaid period, Landlord may remove said lien by paying the full amount thereof or by bonding or in any other manner Landlord deems appropriate, without investigating the validity thereof, and irrespective of the fact that Tenant may contest the propriety or the amount thereof, and Tenant, upon demand, shall pay Landlord the amount so paid out by Landlord in connection with the discharge of said lien, together with interest thereon at the rate of twelve percent (12%) per annum and reasonable expenses incurred in connection therewith, including reasonable attorneys' fees, which amounts are due and payable to Landlord as additional rent on the first day of the next following month. Landlord shall have the right to deduct the expenses incurred by Landlord pursuant to this Section 10.3 from Tenant's Improvement Allowance toward Tenant's Work, if any. Nothing contained in this Lease shall be construed as a consent on the part of Landlord to subject Landlord's estate in the Premises to any lien or liability under the lien laws of Minnesota. Tenant's obligation to observe and perform any of the provisions of this Section 10.3 shall survive the expiration of the Lease Term or the earlier termination of this Lease.

~~B.    Tenant shall not create or suffer to be created a security interest or other lien against any improvements, additions or other construction made by Tenant in or to the Premises or against any equipment or fixtures installed by Tenant therein (other than Tenant's property), and should any security interest be created in breach of the foregoing, Landlord shall be entitled to discharge the same by exercising the rights and remedies afforded it under paragraph A of this Section.~~

## ARTICLE XI

## INSURANCE

Section 11.1.    By Landlord.

Landlord shall carry commercial general liability insurance (either through the purchase of insurance or a self-insurance plan) on those portions of the Common Areas included in Landlord's Tract providing coverage of not less than $5,000,000.00 against liability for bodily injury including death and personal injury for any one (1) occurrence and $1,000,000.00 property damage insurance, or combined single limit insurance in the amount of $5,000,000.00.

Landlord shall also carry insurance for fire, extended coverage, vandalism, malicious mischief and other endorsements deemed advisable by Landlord, insuring all improvements on Landlord's Tract, including the Premises and all leasehold improvements thereon and appurtenances thereto (excluding Tenant's merchandise, trade fixtures, furnishings, equipment, personal property and including plate glass) for the full insurable value thereof, with such deductibles as Landlord deems advisable, such insurance coverage to include improvements provided by Tenant as set forth in Exhibit "B" and "B-2" as Tenant's Work (excluding wall covering, floor covering, carpeting and drapes) and Landlord's Work as defined in Exhibit "B". Any insurance provided by Landlord shall be strictly excess, secondary and non-contributory of the insurance coverage provided by Tenant. ~~Tenant's proportionate share of the Insurance Charge shall be included in the Fixed Rate Charge as set forth in Article 1. Notwithstanding Tenant contributions to Landlord insurance premiums.~~ No insurable interest is conferred upon Tenant under policies carried by Landlord. Landlord, acting reasonably, shall determine all policy terms including deductibles and may take out and maintain other insurance

as it considers advisable, but Landlord shall not be required to take out or maintain any insurance with respect to any loss, injury or damage required to be insured against by Tenant or with respect to Tenant Property.

Section 11.2.   By Tenant.

Tenant agrees to carry commercial general liability insurance on the Premises during the Lease Term, covering Tenant and naming Landlord, MOAC Mall Holdings LLC, MOA Management LLC, MOA Entertainment Company LLC, MOA Marketing, Inc., Landlord's mortgage company, City of Bloomington, Minnesota, and Port Authority of the City of Bloomington as additional insureds, ~~with terms and companies satisfactory to Landlord,~~ on an Occurrence Form with a limit of not less than $1,000,000.00 for any one (1) occurrence, together with Umbrella or Excess insurance in an amount of not less than $5,000,000.00. Tenant's insurance will include contractual liability coverage recognizing this Lease, products and completed operations liability and providing that ~~Landlord and~~ Tenant shall ~~give be given~~ a minimum of ~~sixty (60)~~ *thirty (30)* days written notice *to Landlord* ~~by the insurance company~~ prior to cancellation, termination or change in such insurance. Tenant also agrees to carry ~~insurance against fire and such other risks as are from time to time required by Landlord, including, but not limited to,~~ a special form policy of property insurance protecting against ~~all risk of~~ physical loss or damage, including ~~without limitation,~~ sprinkler leakage coverage and plate glass insurance covering all plate glass in the Premises (including store fronts), in amounts not less than the *insurable value thereof,* ~~actual replacement cost,~~ covering all of Tenant's merchandise, trade fixtures, furnishing, wall covering, floor covering, carpeting, drapes, equipment and all items of personal property of Tenant located on or within the Premises. Tenant's insurance shall be primary and non-contributory. Upon the Commencement Date and annually thereafter, Tenant shall provide Landlord with certificates ~~or, at Landlord's request, copies of the policies,~~ evidencing that such insurance is in full force and effect and stating the terms thereof, including all endorsements at Landlord's notice address set forth herein (or such other address as Landlord may notify Tenant). *Tenant's obligation to carry the property insurance provided herein may be maintained by Tenant under a blanket policy or endorsements, provided, however, that the minimum amount of total insurance afforded by such blanket policy or endorsements which shall be allocable to the Premises shall be no less than the amounts of insurance required by this Section 11.2.* The minimum limits of the commercial general liability policy of insurance shall in no way limit or diminish Tenant's liability under Section 11.6 hereof. ~~and shall be subject to increase at any time, and from time-to-time, after the commencement of the fifth (5th) year of the Lease Term if Landlord in the exercise of its reasonable judgment shall deem sums necessary for adequate protection. Within thirty (30) days after demand therefor by Landlord, Tenant shall furnish Landlord with evidence that it has complied with such demand.~~ Prior to the Commencement Date, Tenant's insurance coverage shall be governed by the provisions of Exhibit "B".

~~Notwithstanding the above mentioned commercial general liability insurance policy limit for Tenant, if Tenant after obtaining Landlord's prior written consent, does or intends to bring, possess, use, store, treat or dispose any Hazardous Material (herein defined) in or upon the Premises or Center, Landlord shall have the right, as a condition to such consent, to require Tenant to purchase additional public liability insurance with coverage of no less than Five Million and 00/100 Dollars ($5,000,000.00) and to purchase environmental impairment liability insurance with coverage of no less than Five Million and 00/100 Dollars ($5,000,000.00) with a deductible of no greater than Fifty Thousand and 00/100 Dollars ($50,000.00) to insure that anything contaminated with or by the Hazardous Material be removed from the Premises and/or the Center, and that the Premises and/or the Center be restored to a clean, neat, attractive, healthy, sanitary and non-contaminated condition.~~

Section 11.3.   *Mutual* Waiver of Subrogation Rights.

*Landlord and* Tenant and all parties claiming, by, through or under them *mutually* release and discharge *each other* ~~Landlord~~ from all claims and liabilities arising from or caused by any casualty or hazard covered or required hereunder to be covered in whole or in part by insurance on the Premises or in connection with property on or activities conducted on the Premises, and waive any right of subrogation which might otherwise exist in or accrue to any person on account thereof and further agree to evidence such waiver by endorsement to the required insurance policies, provided that such release shall not operate in any case where the effect is to invalidate such insurance coverage. *The foregoing waivers shall be operative only so long as available in the state where the Center is located. The foregoing waivers shall be effective whether or not the parties maintain the insurance required to be carried pursuant to this Lease.*

Section 11.4.   Waiver.

*Unless caused by the willful misconduct or negligence of Landlord, its agents or employees, but subject to Section 11.3 hereof,* Landlord, its agents and employees, shall not be liable for, and Tenant waives all claims for, loss or damage, including but not limited to consequential damages, to person, property or otherwise, sustained by Tenant or any person claiming through Tenant resulting from any accident, casualty or occurrence in or upon any part of the Center including, but not limited to, claims for damage resulting from: (a) any equipment or appurtenances becoming out of repair; (b) Landlord's failure to keep any part of the Center in repair; (c) injury done or caused by wind, water, or other natural element; (d) any defect in or failure of plumbing, heating or air conditioning equipment, electric wiring or installation thereof, gas, water, and steam pipes, stairs, porches, railings or walks; (e) broken glass; (f) the backing up of any sewer pipe or downspout; (g) the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about the Premises; (h) the escape of steam or hot water; (i) water, snow or ice upon the Premises; (j) the falling of any fixture, plaster or stucco; (k) damage to or loss by theft or otherwise of property of Tenant or others; (l) acts or omissions of persons in the Premises, other tenants in the Center, occupants of nearby properties, or any other persons; and (m) any act or omission of owners of adjacent or contiguous property, or of Landlord, its agents or employees. All property of Tenant kept in the Premises shall be so kept at Tenant's risk only and Tenant shall save Landlord harmless from claims arising out of damage to the same, including subrogation claims by Tenant's insurance carrier. *Landlord and Tenant agree that as to the other, Landlord and Tenant shall not have any right to sue for or collect, nor any liability whatsoever for, any punitive or consequential damages (including lost profits) due to any default of the other under this Lease or any act, omission or negligence of Tenant and/or Tenant's agents, contractors or employees or of Landlord, its agents, contractors or employees, as the case may be, and Landlord and Tenant hereby waive any and all such rights. Landlord and Tenant acknowledge and agree that collection of Minimum Rent and additional rents, acceleration of such rents (if any), reletting expenses, and cost of*

- 20 -

026767.000127 602929037.2

*incurring fees or out-of-pocket costs with respect to reconstruction or repair of the Premises shall not be deemed punitive or consequential damages.*

Section 11.5.     Insurance - Tenant's Operation.
    Tenant will not *knowingly* do or suffer to be done anything which will *invalidate* ~~contravene~~ Landlord's insurance policies or prevent Landlord from procuring such policies. ~~in amounts and companies selected by Landlord~~ If anything done, omitted to be done or suffered to be done by Tenant in, upon or about the Premises shall cause the rates of any insurance effected or carried by Landlord on the Premises or other property to be increased beyond the regular rate from time to time applicable to the Premises for use for the purpose permitted under this Lease, or such other property for the use or uses made thereof, Tenant will pay the amount of such increase promptly upon Landlord's demand, *provided that Landlord acknowledges and agrees that Tenant's use of the Premises for the Permitted Use will not cause any increase or trigger Landlord's rights above.* ~~and Landlord shall have the right to correct any such condition at Tenant's expense.~~ In the event that this Lease so permits and Tenant engages in the preparation of food or packaged foods or engages in the use, sale or storage of inflammable or combustible material, Tenant shall install chemical extinguishing devices (such as ansul) approved by Underwriters Laboratories and Factory Mutual and the installation thereof must be approved by the appropriate local authority. Tenant shall keep such devices under service as required by such organizations. If gas is used in the Premises, Tenant shall install gas cut-off devices (manual and automatic).

Section 11.6.     Indemnification.
    *Unless due to the negligence or willful misconduct or Landlord, its agents, employees and mortgagee, if any (subject, however, to the provisions of Section 11.3),* Tenant shall save harmless, indemnify, and at Landlord's option, defend Landlord, its agents and employees, and mortgagee, if any, from and against any and all liability, liens, claims, demands, damages, expenses, fees, costs, fines, penalties, suits, proceedings, actions and causes of action of any and every kind and nature arising or growing out of or in any way connected with any occurrence on the Premises, Tenant's use, occupancy, management or control of the Premises or Tenant's operations, conduct or activities in the Center. This indemnification shall survive the expiration or sooner termination of the Term. In case Landlord is made a party to litigation begun by or against Tenant, excepting a bona fide action by Tenant against Landlord, Tenant shall pay all costs, expenses and legal fees incurred or paid by Landlord in connection with the litigation.

    *Landlord shall save harmless, indemnify, and at Tenant's option, defend Tenant, its agents and employees, and mortgagee, if any, from and against any and all claims, demands, damages, expenses, fees, costs, fines, penalties, suits, proceedings, actions and causes of action of any and every kind and nature arising or growing out of or in any way connected with any occurrence on the Center, Landlord's use, occupancy, management or control of the Center or Landlord's operations, conduct or activities in the Center. This indemnification shall survive the expiration or sooner termination of the Term. In case Tenant is made a party to litigation begun by or against Landlord, excepting a bona fide action by Landlord against Tenant, Landlord shall pay all costs, expenses and legal fees incurred or paid by Tenant in connection with the litigation.*

Section 11.7.     Dramshop Insurance.
    *Tenant agrees that it will purchase and maintain so-called "dramshop" insurance insuring both Landlord and Tenant in the event the State of Minnesota now has, or hereafter enacts a statute which provides that a judgment obtained against a retailer, or any other person or entity, who dispenses alcoholic beverages to unauthorized persons, as defined by said statute, shall be a lien against the real estate from which said alcoholic beverages were illegally dispensed (sometimes referred to as a dram shop act). Such dramshop insurance shall have limits of not less than $1,000,000.00 covering the Tenant and naming the Landlord, MOAC Mall Holdings LLC, MOA Management LLC, MOA Entertainment Company LLC, MOA Marketing, Inc. as additional named insureds. The minimum limits of such dramshop insurance shall in no way limit or diminish Tenant's liability under this Section 11.7 or under Section 11.6 above.*

## ARTICLE XII

### OFFSET STATEMENT, ATTORNMENT, SUBORDINATION

Section 12.1.     Offset Statement.
    Within ten (10) days after ~~Landlord's~~ written request *by Landlord or Tenant, the non-requesting party agrees to execute an estoppel certificate ("Estoppel Certificate") in a commercially reasonable form. The Estoppel Certificate may state, without limitation, the following: (a) whether* ~~shall deliver, executed in recordable form, a declaration to any person designated by Landlord an Estoppel Certificate as set forth in Exhibit "D" of this Lease; (a) ratifying this Lease; (b) stating the commencement and termination dates; and (c) certifying (i)~~ that this Lease is in full force and effect; *(b) whether this Lease* ~~and~~ has ~~not~~ been ~~assigned~~, modified *or amended and, if so, identifying and describing any such modification or amendment; (c) the date to which rents and any other charges have been paid; (d) whether such party knows of any default on the part of Landlord or Tenant or has any claim against the non-requesting party and, if so, specifying the nature of such default or claim; and (e) any such other pertinent information as may be* ~~supplemented or amended (except by such writings as shall be stated), (ii) that all conditions under this Lease to be performed by Landlord have been satisfied (stating exceptions, if any), (iii) that no defenses or offsets against the enforcement of this Lease by Landlord exist (or stating those claimed), (iv) as to advance rent, if any, paid by Tenant, (v) the date to which rent has been paid, (vi) as to the amount of security deposited with Landlord, and (vii) such other information as Landlord~~ reasonably *requested.* ~~requires.~~ Persons receiving such statements shall be entitled to rely upon them.

Section 12.2.     Attornment.
    Tenant shall, in the event of a sale or assignment of Landlord's interest in the Premises or the building in which the Premises is located or this Lease or Landlord's Tract, or if the Premises or such building comes into the hands of a mortgagee, ground lessor or any other person whether because of a mortgage foreclosure, exercise of a power of sale

under a mortgage, termination of the ground lease, or otherwise, attorn to the purchaser or such mortgagee or other person and recognize the same as Landlord hereunder *and this Lease shall continue in full force and effect*. Tenant shall execute, at Landlord's request, *a commercially reasonable ~~any~~* attornment agreement *reasonably approved by Tenant*. ~~required by any mortgagee, ground lessor or other such person to be executed, containing such provisions as such mortgagee, ground lessor or other person requires.~~

<u>Section 12.3.</u>     <u>Subordination</u>.
     A.     <u>Mortgage</u>. This Lease shall be secondary, junior and inferior at all times to the lien of any mortgage and to the lien of any deed of trust or other method of financing or refinancing (hereinafter collectively referred to as "mortgage") now or hereafter existing against all or a part of Landlord's Tract, and to all renewals, modifications, replacements, consolidations and extensions thereof, and Tenant shall execute and deliver *a commercially reasonable* ~~all documents requested by any mortgagee or security holder to effect such subordination. Tenant shall execute, at Landlord's request, any~~ subordination agreement *reasonably approved by Tenant*. ~~required by any mortgagee, ground lessor or other such person to be executed, containing such provisions as such mortgagee, ground lessor or other person requires.~~ *Notwithstanding anything to the contrary contained in this Section, Tenant's obligation to subordinate its rights hereunder shall be conditioned upon Landlord obtaining from any party seeking such superior position a non-disturbance agreement ("SNDA") to the effect that so long as Tenant pays the rentals due under this Lease and otherwise complies with the other terms, conditions, covenants and provisions hereof, Tenant's occupancy hereunder shall not be disturbed; provided Tenant agrees to (i) pay the reasonable costs associated with obtaining the initial SNDA, at the time of this Lease not to exceed Three Thousand Dollars ($3,000.00) provided that Tenant shall not have to pay such fee for any SNDA requested by any future lender and (ii) provide timely, reasonable comments to the mortgage holder or ground lessor and work diligently toward execution of the SNDA.*

     B.     <u>Construction, Operation and Reciprocal Easement Agreements</u>. This Lease is subject and subordinate to one (1) or more construction, operation, reciprocal easement or similar agreements (hereinafter referred to as "Operating Agreements") entered into or hereafter to be entered into between Landlord and other owners or lessees of real estate (including but not limited to owners and operators of department stores) within or near the Center (which Operating Agreements have been or will be recorded in the official records of the County wherein the Center is located) and to any and all easements and easement agreements which may be or have been entered into with or granted to any persons heretofore or hereafter, whether such persons are located within or upon the Center or not, and Tenant shall execute such *commercially reasonable* instruments *as reasonably approved by Tenant* as Landlord requests to evidence such subordination. *Landlord hereby represents and warrants that the agreements (or any amendment or modification thereof) referenced in this section (i) do not and shall not materially negatively impact Tenant's use of the Premises for the Permitted Use; and (ii) neither diminish or will diminish Tenant's rights nor increases Tenant's liabilities hereunder in any material manner.*

     C.     <u>Avigation and Clearance Easements Agreement for Mall of America[®]</u>. This Lease is subject to and subordinate to a certain Avigation and Clearance Easements Agreement (the "Avigation Agreement") entered into or hereinafter to be entered into between Landlord (and/or Landlord's predecessor-in-interest) and the Metropolitan Airports Commission (the "MAC"). In accordance with such Avigation Agreement, Tenant shall not permit or cause in, upon or about the Premises or the Center any electronic, visual or other interference with the operation of the Minneapolis-St. Paul Airport including, but not limited to, flight approaches thereto. In addition, Landlord, MAC, their agents and employees, shall not be liable for, and Tenant waives all claims for damage, including but not limited to consequential damages, to person, property or otherwise, sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence arising out of or as the result of such airport operations by MAC. *Landlord hereby represents and warrants that the agreements (or any amendment or modification thereof) referenced in this section (i) do not and shall not materially negatively impact Tenant's use of the Premises for the Permitted Use; and (ii) neither diminishes or will diminish Tenant's rights nor increases Tenant's liabilities hereunder in any material manner.*

     D.     <u>Development Agreement</u>. This Lease is subject to and subordinate to Section 1 of that certain Development Agreement (the "Development Agreement") dated the 4th day of August, 1992 by and between the City of Bloomington and Mall of America Company, including any subsequent amendments thereof. In accordance with the Development Agreement, Tenant shall not permit or cause in, upon or about the Premises or the Center any electronic, visual or other interference with the City of Bloomington's communication system within the Center including, but not limited to, the Retail Space, Parking Space, Hotel Space, amusement park, Major Tenant Spaces, Common Areas, and utility and storage areas. In addition, Landlord, the City of Bloomington, their agents and employees, shall not be liable for, and Tenant waives all claims for damage, including, but not limited to consequential damages, to person, property or otherwise, sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence arising out of or as a result of the City of Bloomington's use and operation of such radio system in the Center. *Landlord hereby represents and warrants that the agreements (or any amendment or modification thereof) referenced in this section (i) do not and shall not materially negatively impact Tenant's use of the Premises for the Permitted Use; and (ii) neither diminishes or will diminish Tenant's rights nor increases Tenant's liabilities hereunder in any material manner.*

<u>Section 12.4.</u>     <u>Failure to Execute Instruments</u>.
     Tenant's failure to execute instruments or certificates provided for in this Article XII within fifteen (15) days after the *Tenant's receipt thereof* ~~mailing by Landlord of a written request~~ shall be a default under this Lease, *provided that such time period shall be extended if Tenant is actively negotiated the form of such agreements with the applicable party.*

1210251-26.68     026767.000127 602929037.2

## ARTICLE XIII

### ASSIGNMENT, SUBLETTING AND CONCESSIONS

Section 13.1.    Consent Required.

*Except with respect to a permitted transfer as provided in 13.4,* Tenant shall not sell, assign or in any manner transfer this Lease or any interest therein, nor sublet all or any part of the Premises, nor license concessions nor lease departments therein, without Landlord's prior written consent in each instance. Under no circumstances shall Tenant mortgage, pledge or otherwise collaterally transfer its interest in this Lease. Consent by Landlord to any assignment or subletting shall not waive the necessity for consent to any subsequent assignment or subletting. This prohibition shall include a prohibition against any subletting or assignment by operation of law. If this Lease is assigned or the Premises or any part sublet or occupied by anybody other than Tenant *(except for a corporate transfer as provided in Section 13.4 herein),* Landlord may collect rent from the assignee, subtenant or occupant and apply the same to the rent herein reserved, but no such assignment, subletting, occupancy or collection of rent shall be deemed a waiver of any restrictive covenant contained in this Section 13.1 or the acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the performance by Tenant of any covenants on the part of Tenant herein contained. Any assignment: (a) as to which Landlord has consented; or (b) which is required by reason of a final nonappealable order of a court of competent jurisdiction; or (c) which is made by reason of and in accordance with the provisions of any law or statute, including, without limitation, the laws governing bankruptcy, insolvency or receivership shall be subject to all terms and conditions of this Lease, and shall not be effective or deemed valid unless, at the time of such assignment:

1. Each assignee or sublessee shall agree, in a written agreement satisfactory to Landlord, to assume and abide by all of the terms and provisions of this Lease, including those which govern the Permitted Uses of the Premises as described in Article I herein;

2. Each assignee or sublessee has submitted a current financial statement, audited by a certified public accountant, showing a net worth and working capital in amounts determined by Landlord to be sufficient to assure the future performance by such assignee or sublessee of Tenant's obligations hereunder;

3. Each assignee or sublessee has submitted, in writing, evidence satisfactory to Landlord of substantial retailing experience in shopping centers of comparable size to the Center and in the sale of merchandise and services permitted under Article I of this Lease;

4. The business reputation of each assignee or sublessee shall meet or exceed generally acceptable commercial standards;

5. The use of the Premises by each assignee or sublessee shall not violate, or create any potential violation of applicable laws, codes or ordinances, nor violate any other agreements affecting the Premises, Landlord or other tenants in the Center; and

6. Tenant shall pay Landlord an Assignment Fee as reimbursement to Landlord for administrative and legal expenses incurred by Landlord in connection with any assignment or subletting. The Assignment Fee initially will be One Thousand and 00/100 Dollars ($1,000.00) and shall increase by One Hundred and 00/100 Dollars ($100.00) at the end of each full Lease Year of the Lease Term.

In the event of any assignment or subletting as provided above, *in the event the rental due and payable by any sublessee excluding a sublease to an affiliate/corporate transfer (or a combination of the rental payable under such sublease plus any bonus or other consideration thereof or incident thereto), exceeds the rent payable under this Lease, or if with respect to a permitted assignment, permitted license or other transfer by Tenant permitted by this Lease, excluding an assignment to an affiliate/corporate transfer, the consideration payable to Tenant by the assignee, licensee or other transferee exceeds the rent payable under this Lease, then Tenant shall be bound and obligated to pay Landlord such excess rental and other excess consideration within thirty (30) days following receipt thereof by Tenant from such sublessee, assignee, licensee or other transferee, as the case may be; provided, however, that Tenant may retain so much of such excess rental or other excess consideration as is necessary to reimburse Tenant for any transactional costs incurred by Tenant in connection with such subletting or assignment, excluding reimbursement for Tenant improvements.* ~~there shall be paid to Landlord, in addition to the Gross Annual Rent and other charges due Landlord pursuant to this Lease, such additional consideration as shall be attributable to the right of use and occupancy of the Premises, whenever the same is receivable by Tenant, together with, as additional rent, the greater of (i) the excess, if any, of the rent and other charges payable by the assignee or sublessee over the Gross Annual Rent and other charges payable under the Lease to Landlord by Tenant pursuant to this Lease, or (ii) the highest Percentage Rent payable under the Lease by Tenant during the three (3) Lease Years immediately preceding such assignment or subletting. Such additional rent shall be paid to Landlord concurrently with the payments of Gross Annual Rent required under this Lease, and Tenant shall remain primarily liable for such payments.~~ Notwithstanding any assignment or subletting, Tenant shall remain fully liable on this Lease and for the performance of all terms, covenants and provisions of this Lease.

Neither Tenant nor any other person having an interest in the possession, use, occupancy or utilization of the Premises shall enter into any lease, sublease, license, concession, assignment or other agreement for use, occupancy or utilization for space in the Premises which provides for rental or other payment for such use, occupancy, or utilization based in whole or in part on the net income or profits derived by any person from the part leased, used, occupied or utilized (other than an amount based on a fixed percentage or percentages of receipts or sales), and that any such proposed lease, sublease, license, concession, assignment or other agreement shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use, occupancy or utilization of any part of the Premises.

- 23 -

Section 13.2.    Change in Ownership. *Intentionally Deleted*

~~If Tenant or the guarantor of this Lease, if any, is a corporation the stock of which is not traded on any national securities exchange (as defined in the Securities Exchange Act of 1934, as amended), then the following shall constitute an assignment of this Lease for all purposes of this Article XIII: (i) the merger, consolidation or reorganization of such corporation; and/or (ii) the sale, issuance, or transfer, cumulatively or in one transaction, of any voting stock, by Tenant or the guarantor of this Lease or the stockholders of record of either as of the date of this Lease, which results in a change in the voting control of Tenant or the guarantor of this Lease, except any such transfer by inheritance or testamentary disposition to Tenant's heirs at law. If Tenant or the guarantor of this Lease, if any, is a joint venture, partnership or other association, then for all purposes of this Article XIII, the sale, issuance or transfer, cumulatively or in one transaction, of either voting control or of a twenty-five percent (25%) interest, or the termination of any joint venture, partnership or other association, shall constitute an assignment, except any such transfer by inheritance or testamentary disposition to Tenant's heirs at law.~~

Section 13.3.    Right of Recapture.

*Except with respect to a permitted transfer as provided in Section 13.4, if* ~~if~~ Tenant agrees to assign this Lease or to sublet all or any portion of the Premises, Tenant shall deliver to Landlord executed counterparts of any such agreement and all ancillary agreements with the proposed assignee or subtenant prior to the effective date thereof (the "Effective Date"). Landlord shall have the right to do any of the following by giving Tenant written notice thereof within thirty (30) days after receiving all of the foregoing documents:

1.    With respect to a proposed assignment of this Lease or a proposed subletting of the entire Premises, Landlord shall have the right to terminate this Lease on the Effective Date as if such date were the expiration date of the Lease Term, *provided that if Landlord elects to terminate this Lease, Tenant may within ten (10) days of Landlord's termination notice rescind the request and continue the Lease;*

2.    With respect to a proposed subletting of less than the entire Premises, Landlord shall have the right to terminate this Lease as to the portion of the Premises affected by such subletting on the Effective Date as if such date were the expiration date of the Lease Term, in which case Tenant shall promptly execute and deliver to Landlord an appropriate amendment of this Lease and other documentation in form satisfactory to Landlord in all respects, *provided that if Landlord elects to terminate this Lease, Tenant may within ten (10) days of Landlord's termination notice rescind the request and continue the Lease.*

If Landlord terminates this Lease as to only a portion of the Premises pursuant to this Section 13.3, then the Gross Annual Rent and additional rent shall be adjusted ~~by Landlord~~ in proportion to the area of the Premises affected by such partial termination. If Landlord exercises any of its rights under this Section 13.3, Landlord may thereafter lease the Premises or any portion thereof to Tenant's proposed assignee or subtenant, as the case may be, without any liability to Tenant. If Landlord does not exercise its rights under this Section 13.3 within such thirty (30) day period, such rights shall be deemed waived, but Tenant shall nevertheless be required to fulfill all of the other requirements of this Lease, including Tenant's obligation to obtain Landlord's consent to such proposed assignment or sublease pursuant to this Article XIII. Landlord's rights under this Section 13.3 shall apply to any further subletting or assignment notwithstanding Landlord's consent to any proposed assignment or sublease. If Tenant subleases or assigns any interest in the Premises without the consent of Landlord as required herein, Landlord shall be entitled, without waiving any of Landlord's other rights or remedies hereunder, to all economic consideration received by Tenant as a result thereof.

**Section 13.4.    *Permitted Transfers.***

*Notwithstanding anything herein to the contrary, Tenant shall have the right, without the consent of Landlord, so long as Tenant is not then in default hereunder beyond any applicable notice and cure period, to assign or transfer this Lease to (i) any successor entity to Tenant by merger, consolidation, non-bankruptcy reorganization, or governmental action or (ii) an entity to which all or substantially all of the assets of Tenant have been sold; provided (i) that in each instance such succeeding entity shall assume all of the obligations of this Lease on the part of Tenant to be performed, and (ii) Tenant shall be and remain liable for the performance of each and every term, covenant, condition and provision of this Lease on Tenant's part to be performed hereunder and Tenant shall not be released from its obligations under this Lease.*

*Tenant shall have the right, without the consent of Landlord, so long as Tenant is not then in default hereunder, to assign this Lease, to sublet the Premises or otherwise transfer this Lease to the parent, wholly-owned subsidiary or affiliate of Tenant; provided that no such assignment or subletting shall relieve Tenant from any obligations to be performed by it hereunder, that in each instance such succeeding entity shall assume in writing all of the obligations of this Lease on the part of Tenant to be performed, and provided further said assignment, sublease or other transfer shall be effective only so long as said parent, subsidiaries and affiliates are the parent, subsidiaries and affiliates of Tenant. "Affiliate" means any person or entity which is controlled by, controls or is under common control with, Tenant (or results from a merger or consolidation with Tenant). "Control" shall mean the ownership, directly or indirectly, of at least fifty-one percent (51%) of the voting securities of, or possession of the right to vote, in the ordinary direction of its affairs, at least fifty-one percent (51%) of the voting interest in, any person or entity, or at least fifty-one percent (51%) of the beneficial ownership of such entity.*

# ARTICLE XIV

## MARKETING FUND AND ADVERTISING

**Section 14.1.    Provisions Relating to Marketing Fund.** *Intentionally Deleted*

~~Landlord may, at its option, create and maintain a marketing fund (hereinafter referred to as the "Fund"), the primary purpose of which is to provide sums necessary for professional marketing services which benefit the tenants in the Center. In the event Landlord does create and maintain the Fund, Tenant agrees to contribute to such Fund, beginning upon the later to occur of (a) the Commencement Date, or (b) the date the Fund is created, the Marketing Fund Charge set forth in Article I, payable in equal monthly installments, in advance, on the first day of each and every month (prorated for partial months). The Marketing Fund Charge shall be increased annually by five percent (5%) commencing on the first day of January immediately following the Commencement Date of the Term and on each subsequent anniversary thereafter. In addition to its other obligations contained herein, Tenant agrees that it shall participate and cooperate in all special sales and promotions sponsored by the Fund. The failure of any other tenant or any Major Tenant to contribute to the Fund shall not effect Tenant's obligations hereunder.~~

**Section 14.2.    Advertising.** *Intentionally Deleted*

~~Tenant shall furnish to Landlord an annual statement at the end of each Lease Year showing the amounts spent by Tenant on white space advertising or other advertising media. Each such annual statement shall be made a part of the Adjusted Gross Sales annual report required to be furnished by Tenant under Section 4.3. If Tenant's annual statement shows that Tenant has expended for such advertising, during the preceding Lease Year, less than three percent (3%) of its Adjusted Gross Sales for said period, Tenant shall within thirty (30) days after the required delivery date of its annual statement contribute to the Media Fund referred to in Section 14.3 below the difference between the amount actually expended for such advertising and three percent (3%) of such Adjusted Gross Sales. Contributions or other payments payable by Tenant to the Marketing Fund and Media Fund shall not be deemed an amount expended for advertising within the meaning of this Section 14.2. All expenditures made by Tenant for advertising in connection with Tenant's other stores, if any, within a fifteen (15) mile radius from the nearest perimeter boundary of the whole Center, may be included by Tenant to comply with this Section 14.2, provided such advertising in all instances includes the Premises and encompasses or is distributed to the geographical trade area in which the whole Center is located.~~

**Section 14.3.    Media Fund.**

~~Landlord may, at its option, create and maintain a Media Fund, the exclusive purpose of which shall be to pay all costs and expenses associated with the purchase of electronic, print or outdoor advertising for the promotion of the Center. In the event Landlord does create and maintain the Media Fund, Tenant agrees to contribute to such Fund, beginning upon the later to occur of (a) the Commencement Date or (b) the date the Media Fund is created, the Media Fund Charge set forth in Article I, payable in equal monthly installments, in advance, on the first day of each and every month (prorated for partial months).~~

~~The Media Fund Charge shall be increased annually by five percent (5%) commencing on the first day of January immediately following the Commencement Date of the Term and on each subsequent anniversary thereafter. Tenant hereby authorizes Landlord to use Tenant's Trade Name and a brief description of Tenant's business in connection with any media advertising purchased pursuant to this Section.~~

*Notwithstanding any provision of the Lease to the contrary, except as may be expressly consented to in writing by Tenant, in Tenant's sole discretion, Landlord hereby acknowledges and agrees that it does not have and shall not have the right to use any signs or other goods or materials containing any trade names and/or trademarks owned by Tenant or its parent or subsidiary corporations, or any franchisor or licensor of Tenant, during the Term of this Lease.*

**Section 14.4.    Mall of America Service Mark.**

*Except as provided in the License Agreement,* Tenant shall not use the term "Mall of America" as a part of any trade name, corporate name, or other business name, as a part of any trademark or service mark, or for any other purpose; provided, however, Tenant may indicate in one or more truthful descriptive statements during the Lease Term that Tenant's store is located in Mall of America. Tenant shall not use, register, or apply for the registration of, any name or mark which incorporates the term "Mall of America" or any other word having a similar sound or appearance including, but not limited to, the term "MOA". If Tenant, in violation of the foregoing, uses the term "Mall of America" in any way other than a truthful descriptive statement regarding the location of Tenant's store, then any such use of the term "Mall of America" shall inure to the benefit of Landlord. Tenant recognizes and acknowledges the validity of the "Mall of America" mark and the value of the "Mall of America" mark to Landlord, and that the "Mall of America" mark and its associated goodwill belong exclusively to Landlord. Tenant shall not at any time represent or claim that Tenant has any ownership interest in the "Mall of America" mark, and Tenant shall not do or cause to be done, or assist others in doing or causing to be done, any act or thing contesting or in any way impairing Landlord's rights to the "Mall of America" mark. Notwithstanding anything contained herein to the contrary, and without limitation to anything contained herein, Tenant may not put the "Mall of America" name, or any variation thereof, on any merchandise, such as (but not limited to) t-shirts, coffee mugs, caps or hats, *except as provided in the License Agreement.*

# ARTICLE XV

## SECURITY DEPOSIT

**Section 15.1.    Amount of Deposit.** *Intentionally Deleted*

~~Tenant shall deposit with Landlord upon Tenant's execution of the Lease, the Security Deposit set forth in Article I, which shall be held by Landlord and, at Landlord's option, commingled with other funds, without liability for interest, as security for the faithful performance by Tenant of all the terms, covenants and conditions of this Lease.~~

1210251.29.68    026767.000127 602929037.2

~~If Tenant commits a default hereunder, Landlord at its option may apply said deposit, or any part thereof, to compensate Landlord for loss, cost, damage or expense sustained due to such default. Upon Landlord's request, Tenant shall forthwith remit to Landlord cash sufficient to restore said sum to the original sum deposited; Tenant's failure to do so within five (5) days after receipt of a demand therefor shall be a default under this Lease. If at the end of the Lease Term Tenant is not in default hereunder, the balance of such security deposit shall be returned to Tenant.~~

~~Landlord may deliver the funds deposited hereunder to any purchaser of or successor to Landlord's interest in this Lease or the Premises, and thereupon Landlord shall be discharged from all liability with respect to such deposit.~~

## ARTICLE XVI

### DAMAGE AND DESTRUCTION

**Section 16.1.    Damage and Destruction of Premises.**
If the Premises are hereafter damaged or destroyed or rendered partially untenantable for their permitted use by fire or other casualty insured under the coverage which Landlord is obligated to carry pursuant to Section 11.1 hereof, Landlord shall promptly *commence, and thereafter proceed with diligence to completion, the repair to completion* ~~repair~~ the same to substantially the condition which they were in immediately prior to the happening of such casualty (excluding *Tenant's* stock in trade, fixtures, furniture, furnishings, carpeting, floor covering, wall covering, drapes and equipment), and from the date of such casualty until the Premises are so repaired and restored, only the Gross Monthly Rent payments payable hereunder shall abate in such proportion as the part of said Premises thus destroyed or rendered untenantable bears to the total Premises *provided that if Tenant cannot reasonably operate in the Premises (and does not operate) during the period of any reconstruction there shall be a complete abatement of the Gross Monthly Rent, and further provided that such abatement shall continue for a period until Tenant reopens for business, but not to exceed ninety (90) days after Landlord completes the restoration activities to allow Tenant to rebuild/restore its fixtures, furniture and improvements;* PROVIDED, HOWEVER, that Landlord shall not be obligated to repair and restore if such casualty is not covered by the insurance which Landlord is obligated to carry pursuant to Section 11.1 hereof. *Further, if such casualty* ~~or~~ is caused directly ~~or indirectly~~ by the *gross negligence or willful misconduct* of Tenant, its agents *(acting at the direction of Tenant), or* ~~and~~ employees ~~and in either of such events,~~ no portion of the Gross Monthly Rent and other payments payable hereunder shall abate, and PROVIDED, FURTHER, that Landlord shall not be obligated to expend for any repair or restoration an amount in excess of the insurance proceeds received by Landlord therefor, and provided, further, that if the Premises are damaged, destroyed or rendered untenantable for their accustomed uses by fire or other casualty to the extent of more than fifty percent (50%) of the cost to replace the Premises during the last three (3) years of the Lease Term, then *either* Landlord *or Tenant* shall have the right to terminate this Lease effective as of the date of such casualty by giving to *the other party,* ~~Tenant,~~ within sixty (60) days after the happening of such casualty, written notice of such termination.  If such notice be given, this Lease shall terminate and Landlord shall promptly repay to Tenant any rent theretofore paid in advance which was not earned at the date of such casualty.  Any time that Landlord repairs or restores the Premises after damage or destruction, then Tenant shall, commence and diligently repair or replace its stock in trade, fixtures, furnishings, furniture, carpeting, wall covering, floor covering, drapes, equipment and Premises to *substantially* the same *quality* ~~condition~~ as they were ~~in~~ immediately prior to the casualty, and if Tenant has closed its business, Tenant shall reopen the whole of the Premises for business within *one hundred fifty (150)* ~~thirty (30)~~ days after receipt of notice that the work for which Landlord is responsible is substantially complete.

**Section 16.2    Damage and Destruction of Center.**
Notwithstanding anything to the contrary set forth herein, in the event (a) all or any portion of the Center shall be damaged or destroyed by fire or other cause (notwithstanding that the Premises may be unaffected thereby), to the extent the cost of restoration thereof would exceed fifteen percent (15%) of the amount it would have cost to replace the Center in its entirety at the time such damage or destruction occurred, or (b) twenty-five percent (25%) or more of either the leasable area of the Center or the area of the Common Areas shall be damaged, whether or not the Premises are affected by such casualty; or (c) the estimated cost of repairing or rebuilding the damage, shall, by Landlord's reasonable estimate, exceed the proceeds of insurance available to Landlord for the purpose; or (d) if any Major Tenant, or their assignees, terminate their respective leases of premises in the Center due to such damage; or (e) if a Mortgagee of the Center refuses to allow insurance proceeds recoverable in the event of such damage to be applied to the repair or rebuilding of the Center; then Landlord may terminate this Lease by giving Tenant thirty (30) days prior notice of Landlord's election to do so, which notice shall be given, if at all, within ninety (90) days following the date of such occurrence, *provided that Landlord may only exercise such right of termination if Landlord terminates all or substantially all of the Leases of the tenants adjacent to Tenant as delineated on Exhibit "A-2".*  In the event of the termination of this Lease as aforesaid, this Lease shall cease thirty (30) days after such notice is given, and the rent and other charges hereunder shall be adjusted as of that date.

*During any period of time that by reason of such damage or destruction, Tenant's operations in the Premises are materially adversely impacted and Tenant is unable to operate, there shall be a fair and equitable abatement of the Gross Monthly Rent, and other charges payable hereunder, until such damage or destruction has been repaired, there shall be a full abatement of Gross Monthly Rent and all other charges payable hereunder until Landlord's completion of the restoration work.*

*Notwithstanding anything to the contrary herein contained, if Landlord shall not commence, in good faith, repair and restoration work: within one (1) year after any damage which Landlord is required to repair pursuant to the terms hereof, or if such restoration cannot be completed by Landlord within two (2) years from the date of the casualty or Landlord shall fail with all due diligence to continue with such repair and restoration work to completion (which completion shall in no event exceed two (2) years from the date of the casualty), then Tenant shall have the right to terminate this Lease by giving written notice of its election so to do to Landlord and the rent and other charges hereunder shall be adjusted as of the date of the casualty.*

1210251.30.68
026767.000127 602929037.2

<u>Section 16.3</u>    <u>Obligations of Landlord to Rebuild Conditional</u>

The obligation of Landlord to repair and rebuild pursuant to this Article is conditional upon the damage arising from a casualty ~~fully~~ insured against by Landlord pursuant to Article XI, and for which Landlord ~~fully~~ recovers from its insurers (subject to any deductible agreed to by Landlord), and upon Landlord obtaining all necessary permits and other regulatory approvals required for such repairing and rebuilding.  Landlord covenants to use reasonable commercial efforts to obtain all such necessary permits and approvals.  In the making of any such repairs and rebuilding Landlord shall be entitled to make changes in the buildings and structures being repaired or rebuilt and shall be entitled not to rebuild portions of the Center.

<div align="center">ARTICLE XVII</div>

<div align="center">EMINENT DOMAIN</div>

<u>Section 17.1</u>.    <u>Condemnation.</u>

If any portion of the Premises or fifteen percent (15%) or more of the Center shall be acquired or condemned by right of eminent domain or transferred by agreement in lieu of condemnation for any public or quasi-public use or purpose, or if an Operating Agreement is terminated as a result of such an acquisition or condemnation, then *either* Landlord *or Tenant* ~~at its election~~ may terminate this Lease by giving notice to *the other party* ~~Tenant~~ of its election, and in such event rentals shall be apportioned and adjusted as of the date of termination, *provided that Landlord may only exercise such right of termination if Landlord terminates all or substantiality all of the Leases of the tenants in the Center adjacent to Tenant according to Exhibit "A-2".*  If the Lease shall not be terminated as aforesaid, then it shall continue in full force and effect, and Landlord shall within a reasonable time after possession is physically taken (subject to delays due to shortage of labor, materials or equipment, labor difficulties, breakdown of equipment, government restrictions, fires, other casualties or other causes beyond the reasonable control of Landlord) repair or rebuild what remains of the Premises for Tenant's occupancy; and a just proportion of the *Gross* ~~Minimum~~ Annual Rent shall be abated, according to the nature and extent of the injury to the Premises until such repairs and rebuilding are completed, and thereafter for the balance of the Lease Term.

*During any period of time that by reason of such condemnation Tenant's operations in the Premises are materially adversely impacted and Tenant is unable to operate, there shall be a fair and equitable abatement of the Gross Monthly Rent, and other charges payable hereunder, taking into account the extent to which Tenant's operations may thereby be materially interfered with; and, if it is impracticable for Tenant to remain open for business and Tenant closes down until the Center has been restored or repaired, there shall be a full abatement of Gross Monthly Rent and all other charges payable hereunder until Landlord's completion of the restoration work. If twenty-five percent (25%) or more of the Premises or thirty-five percent (35%) or more of the Center shall be acquired or condemned by right of eminent domain or transferred by agreement in lieu of condemnation for any public or quasi-public use or purpose, then Tenant, at its election, may terminate this Lease by giving notice to Landlord of its election, and in such event, all Minimum Rent and Additional Rent shall be apportioned and adjusted as of the date of termination.*

<u>Section 17.2</u>    <u>Damages</u>

Landlord reserves and *shall be entitled to* ~~Tenant assigns to Landlord,~~ all rights to damages on account of any taking or condemnation or any act of any public or quasi-public authority for which damages are payable. Tenant shall execute such instruments of assignment as Landlord requires, join with Landlord in any action for the recovery of damages, if requested by Landlord, and turn over to Landlord any damages recovered in any proceeding.  *Tenant's right to receive any amounts separately awarded to Tenant directly from the condemning authority for the taking of its fixtures, personal property, relocation expenses and/or interests in other than the real property taken and/or the leasehold interest shall not be affected in any manner by the provisions of this Section 17.2, provided Tenant's award does not reduce or affect Landlord's award.* ~~If Tenant fails to execute instruments required by Landlord, or undertake such other steps as requested, Landlord shall be deemed the duly authorized irrevocable agent and attorney-in-fact of Tenant to execute such instruments and undertake such steps on behalf of Tenant.  However, Landlord does not reserve any damages payable for trade fixtures installed by Tenant at its own cost which are not part of the realty.~~

<div align="center">ARTICLE XVIII</div>

<div align="center">DEFAULT BY TENANT</div>

<u>Section 18.1</u>.    <u>Right to Re-Enter.</u>

The following shall be considered for all purposes to be defaults under and breaches of this Lease:  (a) any failure of Tenant to pay any rent or any other amount when due hereunder *and which failure continues for a period of ten (10) days after receipt of written notice of such failure from Landlord to Tenant (but in no event shall such notice be required more than two (2) times during any twelve-month period during the Term)*; (b) any failure by Tenant to perform or observe any other of the terms, provisions, conditions and covenants of this Lease for more than *thirty (30)* ~~ten (10)~~ days after written notice of such failure *(unless such failure is of such a nature that it will require more than thirty (30) days to cure, in which case such cure period shall be extended for so long as Tenant shall promptly commence and diligently prosecute the cure of such failure, and while doing so shall continue to perform all of its monetary obligations hereunder)*; (c) failure to take possession of and open for business in the Premises as required hereunder; (d) a *reasonable* determination by Landlord that Tenant has submitted any false report *with respect to a material matter* required to be furnished hereunder *and Landlord and Tenant cannot reasonably resolve such dispute regarding any false report within thirty (30) days*; (e) anything done by Tenant upon or in connection with the Premises or the construction of any part thereof which *is the sole reason and direct reason for* ~~directly or indirectly interferes in any way with, or results in~~ a work stoppage in connection with, construction of any part of the Center or any other tenant's space; (f) the bankruptcy or insolvency of Tenant or the filing by or against Tenant of a petition in bankruptcy or for reorganization or arrangement or for the appointment of a receiver or trustee of all or a portion of Tenant's property, or Tenant's assignment for the benefit of creditors *and the same is not discharged within sixty (60)*

1210251.31.68  026767.000127 602929037.2

*days*; (g) if Tenant abandons or vacates or does not do business in the Premises; (h) this Lease or Tenant's interest herein or in the Premises or any improvements thereon or any property of Tenant are executed upon or attached; (i) the Premises come into the hands of any person other than expressly permitted under this Lease; or (j) any claim or lien is asserted or recorded against the interest of Landlord in the Premises or Center, or any portion thereof, on the account of, or extending from any improvement or work done by or at the instance, or for the benefit of Tenant, or any person claiming by, through or under Tenant or from any improvement or work the cost of which is the responsibility of Tenant *which lien or other claim is not removed within thirty (30) days after notice to Tenant of the filing*. In any such event, *after the expiration of any applicable notice and cure* ~~and without grace period, demand or notice (the same being hereby waived by Tenant)~~, Landlord, in addition to all other rights or remedies it may have, shall have the right, thereupon or at any time thereafter, to terminate this Lease by giving notice to Tenant stating the date upon which such termination shall be effective, and shall have the right, after any such termination, to re-enter and take possession of the Premises, remove all persons and property from the Premises, store such property at Tenant's expense. ~~and sell such property if necessary to satisfy any deficiency in payments by Tenant as required hereunder, all without notice or resort to legal process and without being deemed guilty of trespass or becoming liable for any loss or damage occasioned thereby.~~ Nothing herein shall be construed to require Landlord to give any notice before exercising any of its rights and remedies provided for in Section 3.3 of this Lease. ~~Notwithstanding anything to the contrary herein contained, if Tenant commits any default hereunder for or precedent to which or with respect to which notice is herein required, and commits such defaults within twelve (12) months thereafter, no notice shall thereafter be required to be given by Landlord as to or precedent to any such subsequent default during such twelve (12) month period (as Tenant hereby waiving the same) before exercising any or all remedies available to Landlord.~~

<u>Section 18.2.</u>   <u>Right to Relet.</u>

If Landlord re-enters the Premises as above provided, or if it takes possession pursuant to legal proceedings or otherwise, it may either terminate this Lease, but Tenant shall remain liable for all obligations arising during the balance of the original stated term as hereafter provided as if this Lease had remained in full force and effect, or it may, from time to time, without terminating this Lease, make such alterations and repairs as it deems advisable to relet the Premises, and relet the Premises or any part thereof for such term or terms (which may extend beyond the Lease Term) and at such rentals and upon such other terms and conditions as Landlord in its sole discretion deems advisable; upon each such reletting all rentals received by Landlord therefrom shall be applied, first, to any indebtedness other than rent due hereunder from Tenant to Landlord; second, to pay any costs and expenses of reletting, including brokers and attorneys' fees and costs of alterations and repairs; third, to rent due hereunder, and the residue, if any, shall be held by Landlord and applied in payment of future rent as it becomes due hereunder.

If rentals received from such reletting during any month are less than that to be paid during that month by Tenant hereunder, Tenant shall immediately pay any such deficiency to Landlord. No re-entry or taking possession of the Premises by Landlord shall be construed as an election to terminate this Lease unless a written notice of such termination is given by Landlord.

Notwithstanding any such reletting without termination, Landlord may at any time thereafter terminate this Lease for any prior breach or default. *Should* ~~if~~ Landlord *at any time terminate* ~~terminates~~ this Lease for any breach, or otherwise takes any action on account of Tenant's breach or default hereunder, in addition to any other remedies it may have, it may recover from Tenant all damages incurred by reason of such breach or default, including the cost of recovering the Premises, brokerage fees and expenses of placing the Premises in rentable condition, attorneys' fees, and an amount equal to ~~the difference between~~ the Gross Annual Rent and all items of additional rents reserved hereunder for the period which otherwise would have constituted the balance of the Lease Term, *all of which shall be due and payable in equal monthly installments on the first day of each month which otherwise would have constituted the balance of the Lease Term so long as such monthly payments are received by Landlord no later than the first day of each calendar month during the period that would have constituted the remainder of the Lease Term. If Tenant fails to timely pay any such monthly installment, Landlord, at Landlord's option, shall be entitled to immediately recover the entire unpaid balance.* ~~and the then present rental value of the Premises for such period, both discounted in accordance with accepted financial practice to the then present worth, at the average rate established and announced for United States Treasury Bills, with a maturity of thirteen (13) weeks at the four (4) weekly auctions held immediately prior to the date of such termination [the four (4) week average bill rate], all of which shall immediately be due and payable by Tenant to Landlord. In determining the rental value of the Premises, the rental realized by any reletting, if such reletting be accomplished by Landlord within a reasonable time after the termination of this Lease, shall be deemed prima facie to be the rental value, but if Landlord shall not undertake to relet or having undertaken to relet, has not accomplished reletting, then it will be conclusively presumed that the Minimum Annual Rent and all items of additional rent reserved under this Lease represent the rental value of the Premises for the purpose herein (in which event Landlord may recover from Tenant the full total of all Minimum Annual Rent and all items of additional rent due hereunder, discounted to present value as hereinbefore provided). Landlord shall, however, account to Tenant for the Minimum Annual Rent and additional rents received from persons using or occupying the Premises during the period representing that which would have constituted the balance of the Lease Term, but only at the end of said period, and only if Tenant shall have paid to Landlord its damages as provided herein, and only to the extent of sums recovered from Tenant as Landlord's damages, Tenant waiving any claim to any surplus. Nothing herein contained, however, shall limit or prejudice the right of Landlord to prove and obtain as damages by reason of such termination, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved.~~

Tenant's obligation to reimburse Landlord for *reasonable* attorneys' fees as referred to in this Lease shall include all *reasonable* legal costs, fees and expenses arising out of (i) Tenant's default in the performance or observance of any of the terms, covenants, conditions or obligations contained in this Lease and Landlord places the enforcement of all or any part of this Lease, the collection of any rent due or to become due or the recovery of possession of the Premises in the hands of an attorney or (ii) Landlord's incurring any fees or out of pocket costs in any litigation, negotiation or transaction in which Tenant causes Landlord to be involved or concerned, in either event regardless of whether or not suit is actually filed.

1210251-32.68   026767.000127 602929037.2

*In the event either party hereto shall commence any legal action or proceeding against the other party by reason of the alleged failure of the other party to perform or keep any term, covenant, or condition of this Lease to be performed or kept, the party prevailing in said action or proceeding shall be entitled to recover from the non-prevailing party, in addition to its court costs, a reasonable attorney's fee to be fixed by the court.*

In the event of any breach or threatened breach by Tenant of any of the terms and provisions of this Lease, Landlord shall have the right to injunctive relief as if no other remedies were provided for herein for such breach.

Any rights and remedies reserved by, or granted to, Landlord under this Lease, at law or in equity, are distinct, separate and cumulative, and the exercise of any one of them shall not be deemed to preclude, waive or prejudice Landlord's right to exercise any or all others.

Tenant expressly waives any right to assert a defense based on merger and agrees that neither the commencement of any action or proceeding, nor the settlement thereof, nor the entry of judgment therein, shall bar Landlord from bringing any subsequent actions or proceedings from time to time.

Wherever in this Lease Landlord has reserved or is granted the right of "reentry" into the Premises, the use of such word is not intended, nor shall it be construed, to be limited to its technical legal meaning.

Tenant waives and releases any claim arising out of or related to the payment of Percentage Rent by any successor tenant in the Premises, to whom Landlord may relet the Premises, but nothing contained herein shall obligate Landlord to relet if Tenant shall default hereunder.

~~Except as otherwise specifically required by this Lease, Tenant waives any and all statutory and legal notice requirements.~~

Any action, suit or proceeding relating to, arising out of or in connection with the terms, conditions and covenants of this Lease may be brought by Landlord or ~~against~~ Tenant in the District Court of Hennepin County, Minnesota. *Landlord and* Tenant hereby *waive* ~~waives~~ any objection to jurisdiction or venue in any proceeding before said Court. Nothing contained herein shall affect the right of Landlord *or Tenant* to bring any action, suit or proceeding against ~~Tenant~~ *the other party* in the courts of any other jurisdictions.

Section 18.3.    Default under Another Lease in Center. *Intentionally Deleted*
~~This Section shall apply in the event Tenant has a Lease for another location in the Center in addition to this Lease. As a material consideration of Landlord's agreement to enter into and execute this Lease, Tenant agrees that should Tenant commit a material, monetary default under this Lease which results in a termination of this Lease, then Landlord, at Landlord's option, may deem such default of this Lease as a default of Tenant's other lease in the Center. In such event, and notwithstanding anything in this Lease or in Tenant's other lease which may be to the contrary, Landlord shall have the right to terminate Tenant's other lease upon written notice to Tenant but without any further right by Tenant to cure, correct or remedy the material, monetary default that resulted in the termination of this Lease. The parties acknowledge and agree that the terms, conditions and provisions of this Section 18.3 are deal specific to this Lease and shall not be deemed, construed or interpreted or otherwise serve as a precedent setting basis for conforming language with respect to any other leases by and between Landlord and Tenant or their respective affiliates, subsidiaries or parents.~~

Section 18.4.    Counterclaim.
If Landlord commences any proceedings for non-payment of rent (Gross Annual Rent, Percentage Rent or additional rent), Tenant will interpose any compulsory or mandatory counterclaim required by the applicable procedural rules of the Court. The covenants to pay rent and other amounts hereunder are independent covenants and Tenant shall have no right to hold back, offset or fail to pay any such amounts for default by Landlord or any other reason whatsoever.

Section 18.5.    Waiver of Rights of Redemption *Consequential Damages*.
To the extent permitted by law, Tenant waives any and all rights of redemption granted by or under any present or future laws if Tenant is evicted or dispossessed for any cause, or if Landlord obtains possession of the Premises due to Tenant's default hereunder or otherwise. *Landlord and Tenant agree that as to the other, Landlord and Tenant shall not have any right to sue for or collect, nor any liability whatsoever for, any punitive or consequential damages (including lost profits) due to any default of the other under this Lease or any act, omission or negligence of Tenant and/or Tenant's agents, contractors or employees or of Landlord, its agents, contractors or employees, as the case may be, and Landlord and Tenant hereby waive any and all such rights. Landlord and Tenant acknowledge and agree that collection of Minimum Rent and additional rents, acceleration of such rents (if any), reletting expenses, and cost of incurring fees or out-of-pocket costs with respect to reconstruction or repair of the Premises shall not be deemed punitive or consequential damages.*

Section 18.6.    Waiver of Trial by Jury.
To the extent permitted by applicable law, *Landlord and* Tenant hereby *waive* ~~waives~~ trial by jury in any action, proceeding or counterclaim brought by either party against the other on any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant created hereby, Tenant's use or occupancy of the Premises or any claim or injury or damage.

Section 18.7.    Bankruptcy.
A.    Assumption of Lease. In the event Tenant shall become a Debtor under Chapter 7 of the Bankruptcy Code ("Code") or a petition for reorganization or adjustment of debts is filed concerning Tenant under Chapters 11 or 13 of the Code, or a proceeding is filed under Chapter 7 and is transferred to Chapters 11 or 13, the Trustee or Tenant,

as Debtor and as Debtor-In-Possession, may not elect to assume this Lease unless, at the time of such assumption, the Trustee or Tenant has:

1.  Cured or provided Landlord "Adequate Assurance" (as defined below) that:

    (a)  Within ten (10) days from the date of such assumption the Trustee or Tenant will cure all monetary defaults under this Lease and compensate Landlord for any actual pecuniary loss resulting from any existing default, including without limitation, Landlord's reasonable costs, expenses, accrued interest and attorneys' fees incurred as a result of the default;

    (b)  Within thirty (30) days from the date of such assumption the Trustee or Tenant will cure all non-monetary defaults under this Lease; and

    (c)  The assumption will be subject to all of the provisions of this Lease.

2.  For purposes of this Section 18.7, Landlord and Tenant acknowledge that, in the context of a bankruptcy proceeding of Tenant, at a minimum "Adequate Assurance" shall mean:

    (a)  The Trustee or Tenant has and will continue to have sufficient unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that the Trustee or Tenant will have sufficient funds to fulfill the obligations of Tenant under this Lease, and to keep the Premises stocked with merchandise and properly staffed with sufficient employees to conduct a fully-operational, actively promoted business in the Premises;

    (b)  The Bankruptcy Court shall have entered an Order segregating sufficient cash payable to Landlord and/or the Trustee or Tenant shall have granted a valid and perfected first lien and security interest and/or mortgage in property of Trustee or Tenant acceptable as to value and kind to Landlord, to secure to Landlord the obligation of the Trustee or Tenant to cure the monetary and/or non-monetary defaults under this Lease within the time periods set forth above; and

    (c)  The Trustee or Tenant at the very least shall deposit a sum equal to one (1) month's rent to be held by Landlord (without any allowance for interest thereon) to secure Tenant's future performance under the Lease.

B.   Assignment of Lease.  If the Trustee or Tenant has assumed the Lease pursuant to the provisions of this Section 18.7 for the purpose of assigning Tenant's interest hereunder to any other person or entity, such interest may be assigned only after the Trustee, Tenant or the proposed assignee have complied with all of the terms, covenants and conditions of Section 13.1 herein, including, without limitation, those with respect to additional rent and the use of the Premises only as permitted in Article 1 herein; Landlord and Tenant acknowledging that such terms, covenants and conditions are commercially reasonable in the context of a bankruptcy proceeding of Tenant.  Any person or entity to which this Lease is assigned pursuant to the provisions of the Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment.  Any such assignee shall upon request execute and deliver to Landlord an instrument confirming such assignment.

C.   Adequate Protection.  Upon the filing of a petition by or against Tenant under the Code, Tenant, as Debtor and as Debtor-in-Possession, and any Trustee who may be appointed agree to adequately protect Landlord as follows:

    (1)  To perform each and every obligation of Tenant under this Lease until such time as this Lease is either rejected or assumed by Order of the Bankruptcy Court;

    (2)  To pay all monetary obligations required under this Lease, including without limitation, prorated from the date of filing until the date of rejection or assumption of the Lease or the payment of Gross Monthly Rent, and such other additional rent charges payable hereunder which is considered reasonable compensation for the use and occupancy of the Premises;

    (3)  Provide Landlord a minimum thirty (30) days prior written notice, unless a shorter period is agreed to in writing by the parties, of any proceeding relating to any assumption of this Lease or any intent to abandon the Premises, which abandonment shall be deemed a rejection of this Lease; and

    (4)  To perform to the benefit of Landlord otherwise required under the Code.

The failure of Tenant to comply with the above shall result in an automatic rejection of this Lease.

D.   Accumulative Rights.  The rights, remedies and liabilities of Landlord and Tenant set forth in this Section 18.7 shall be in addition to those which may now or hereafter be accorded, or imposed upon, Landlord and Tenant by the Code.

1210251-34.68      026767.000127 602929037.2

## ARTICLE XIX

### DEFAULT BY LANDLORD

**Section 19.1.**     Default Defined, Notice.
     Landlord shall in no event be charged with default in any of its obligations hereunder unless and until Landlord shall have failed to perform such obligations within thirty (30) days (or such additional time as is reasonably required to correct any such default *provided that Landlord has commenced the cure and thereafter diligently prosecutes the same to completion*) after written notice to Landlord by Tenant, specifically describing such failure.

**Section 19.2.**     Notice to First Mortgagee.
     If the holder of the first mortgage covering the Premises shall have given written notice to Tenant of the address to which notices to such holder are to be sent, Tenant shall give such holder written notice simultaneously with any notice given to Landlord of any default of Landlord, and if Landlord fails to cure any default asserted in said notice within the time provided above, Tenant shall notify such holder in writing of the failure to cure, and said holder shall have the right but not the obligation, within thirty (30) days after receipt of such second notice, to cure such default before Tenant may take any action by reason of such default.

## ARTICLE XX

### TENANT'S PROPERTY

**Section 20.1.**     Taxes on Leasehold.
     Tenant shall be responsible for and shall pay before delinquent all municipal, county, federal or state taxes coming due during or after the Lease Term against Tenant's interest in this Lease or against personal property of any kind owned or placed in, upon or about the Premises by Tenant.

**Section 20.2.**     Assets of Tenant.  *Intentionally Deleted*
~~To secure the performance of Tenant's obligations under this Lease, Tenant hereby grants to Landlord a security interest in and an express contractual lien upon all of Tenant's equipment, furniture, furnishings, appliances, goods, trade fixtures, inventory, chattels and personal property which will be brought upon the Premises by Tenant, and all after-acquired property, replacements and proceeds. Landlord is authorized to prepare and file financing statements signed only by Landlord (as secured party) covering the security described above (but Tenant hereby agrees to sign the same upon request). Upon any default under this Lease by Tenant as defined in Section 18.1 hereof, any or all of Tenant's obligations to Landlord secured hereby shall, at Landlord's option, be immediately due and payable without notice or demand. In addition to all rights or remedies of Landlord under this Lease and the law, including the right to a judicial foreclosure, Landlord shall have all the rights and remedies of a secured party under the Uniform Commercial Code of the State where the Center is located. Landlord's security interest shall be subordinate to the lien or security interest of any vendor or lessor of equipment or chattels upon the Premises or of any lender taking or succeeding to a purchase money security interest thereon, and upon Tenant's written request, if no default exists hereunder, Landlord shall execute Landlord's standard instrument confirming such subordination. Should Tenant or Tenant's lender or equipment lessor require modifications to such instrument, Tenant shall pay a Documentation Fee of One Hundred and 00/100 Dollars ($100.00). This security agreement and the security interest hereby created shall survive the termination of this Lease if such termination results from Tenant's default. The above described security interest and lien are in addition to and cumulative of Landlord's lien provided by the laws of the State where the Center is located.~~

***Section 20.3.***     *Waiver of Lien.*
     *Landlord hereby waives any liens, statutory or otherwise, now or hereafter created, and any rights of distress with respect to the Tenant's business and trade fixtures, equipment, computers, furniture, telecommunications equipment, signs, office equipment and other personal property from time to time located within the Premises. This Lease does not grant a contractual lien or any other security interest to Landlord or in favor of Landlord with respect to the foregoing. Landlord further agrees, without cost to Tenant, to review, and if acceptable, execute and deliver such instruments reasonably requested by Tenant from time to time to evidence the aforesaid waiver of Landlord.*

## ARTICLE XXI

### ACCESS BY LANDLORD

**Section 21.1.**     Right of Entry.
     Landlord, its agents and employees shall have the right to enter the Premises *upon two (2) days prior written notice except in case of an emergency* ~~from time to time or reasonable times~~ to examine the same, show them to prospective purchasers ~~and other persons~~, and make such repairs, alterations, improvements or additions as Landlord deems desirable. Rent shall not abate while any such repairs, alterations, improvements, or additions are being made. During the last six (6) months of the Lease Term, Landlord may exhibit the Premises to prospective tenants, *provided that Landlord shall not place or* ~~and~~ maintain upon *or proximate to* the Premises notices *advertising the Premises for lease* ~~deemed advisable by Landlord~~. In addition, during any apparent emergency, Landlord or its agents may enter the Premises forcibly without liability therefor and without in any manner affecting Tenant's obligations under this Lease. Nothing herein contained, however, shall be deemed to impose upon Landlord any obligation, responsibility or liability whatsoever, for any care, maintenance or repair except as otherwise herein expressly provided.

## ARTICLE XXII

### HOLDING OVER, SUCCESSORS

Section 22.1.    Holding Over.

If Tenant holds over or occupies the Premises beyond the Lease Term (it being agreed there shall be no such holding over or occupancy without Landlord's written consent), no tenancy or interest in the Premises shall result therefrom but such holding over shall be subject to immediate eviction and removal, and Tenant shall pay Landlord for each day of such holding over a sum equal to *150% of* ~~the greater of (a) twice~~ the Gross Monthly Rent prorated for the number of days of such holding over. ~~or (b) Gross Annual Rent plus Percentage Rent prorated for the number of days of such holding over, plus, whichever of (a) or (b) is applicable, a prorata portion of all other amounts which Tenant would have been required to pay hereunder had this Lease been in effect.~~

Section 22.2.    Successors.

All rights and liabilities herein given to or imposed upon the respective parties hereto shall bind and inure to the several respective heirs, successors, administrators, executors and assigns of the parties and if *such party* ~~Tenant~~ is more than one (1) person, they shall be bound jointly and severally by this Lease except that no rights shall inure to the benefit of any assignee or subtenant of Tenant unless the assignment or sublease was approved by Landlord in writing as provided in Section 13.1 hereof. Landlord, at any time and from time to time, may make an assignment of its interest in this Lease and, in the event of such assignment, Landlord and its successors and assigns (other than the assignee of Landlord's interest in this Lease) shall be released from any and all liability thereafter accruing hereunder, *provided, however, that Landlord shall In no event be released or relieved of any obligations under this Lease existing prior to the effective date of such sale or assignment, and the limitation of liability shall not apply to any such obligations which remain outstanding as of the effective date of such sale or assignment*.

## ARTICLE XXIII

### QUIET ENJOYMENT

Section 23.1.    Landlord's Covenant.

If Tenant pays the rents and other amounts herein provided, observes and performs all the covenants, terms and conditions hereof, Tenant shall peaceably and quietly hold and enjoy the Premises for the Lease Term without interruption by Landlord or any person or persons claiming by, through or under Landlord, subject, nevertheless, to the terms and conditions of this Lease.

## ARTICLE XXIV

### MISCELLANEOUS

Section 24.1.    Waiver.

No waiver by Landlord or Tenant of any breach of any term, covenant or condition hereof shall be deemed a waiver of the same or any subsequent breach of the same or any other term, covenant or condition. The acceptance of rent by Landlord shall not be deemed a waiver of any earlier breach by Tenant of any term, covenant or condition hereof, regardless of Landlord's knowledge of such breach when such rent is accepted. No covenant, term or condition of this Lease shall be deemed waived by Landlord or Tenant unless waived in writing.

Section 24.2.    Accord and Satisfaction.

Landlord is entitled to accept, receive and cash or deposit any payment made by Tenant for any reason or purpose or in any amount whatsoever, and apply the same at Landlord's option to any obligation of Tenant and the same shall not constitute payment of any amount owed except that to which Landlord has applied the same. No endorsement or statement on any check or letter of Tenant shall be deemed an accord and satisfaction or otherwise recognized for any purpose whatsoever. The acceptance of any such check or payment shall be without prejudice to Landlord's right to recover any and all amounts owed by Tenant hereunder and Landlord's right to pursue any other available remedy.

Section 24.3.    Entire Agreement.

There are no representations, covenants, warranties, promises, agreements, conditions or undertakings, oral or written, between Landlord and Tenant other than herein set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless in writing and signed by them. Tenant acknowledges that it has independently investigated the potential for the success of its operations in the Center and has not relied upon any inducements or representations on the part of Landlord or Landlord's representatives, other than those contained in the Lease. Tenant also acknowledges and agrees that, to the extent any projections, materials or discussions have related to Tenant's projected or likely sales volume, customer traffic or profitability, Tenant understands that any and all such projections, materials and discussions are based solely upon Landlord's experiences at other properties or upon standardized marketing studies, and that such projections, materials and discussions shall not be construed as a promise or guarantee that Tenant will realize the same or similar results.

Section 24.4.    No Partnership.

Landlord does not, in any way or for any purpose, become a partner, employer, principal, master, agent or joint venturer of or with Tenant.

Section 24.5.    Force Majeure.

If either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure material, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, environmental remediation work whether ordered by any

1210251-36.68        026767.000127 602929037.2

governmental body or voluntarily initiated or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under this Lease, the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. Notwithstanding the foregoing, the provisions of this Section 24.5 shall at no time operate to excuse Tenant from the ~~obligation to open for business on the Commencement Date, except in the event of an industry-wide strike, nor any obligations for~~ payment of Gross Annual Rent, Percentage Rent, additional rent or any other payments required by the terms of this Lease when the same are due, and all such amounts shall be paid when due.

Section 24.6.    Submission of Lease.
    Submission of this Lease to Tenant does not constitute an offer to lease; this Lease shall become effective only upon execution and delivery thereof by Landlord and Tenant. Upon execution of this Lease by Tenant, Landlord is granted an irrevocable option for sixty (60) days to execute this Lease within said period and thereafter return a fully executed copy to Tenant. The Effective Date of this Lease shall be the date filled in on Page 1 hereof by Landlord, which shall be the date of execution by the last of the parties to execute the Lease.

Section 24.7.    Notices.
    All notices to be given hereunder by either party shall be written and sent by registered or certified mail, return receipt requested, postage pre-paid or by an express mail delivery service or by an electronic transmission *with original to follow by mail or express mail pursuant to the foregoing requirements*, addressed to the party intended to be notified at the address set forth in Article I. Either party may, at any time, or from time to time, notify the other in writing of a substitute address for that above set forth, and thereafter notices shall be directed to such substitute address. Notice given as aforesaid shall be sufficient service thereof and shall be deemed given as of the date received or the date on which delivery is first refused, as evidenced by the return receipt of the registered or certified mail or the express mail delivery receipt, as the case may be. A duplicate copy of all notices from Tenant shall be sent to any mortgagee as provided for in Section 19.2.

Section 24.8.    Captions and Section Numbers.
    This Lease shall be construed without reference to titles of Articles and Sections, which are inserted only for convenience of reference.

Section 24.9.    Number and Gender.
    The use herein of a singular term shall include the plural and use of the masculine, feminine or neuter genders shall include all others.

Section 24.10.   Objection to Statements.
    Tenant's failure to object to any statement, invoice or billing rendered by Landlord within a period of *one (1) year* ~~thirty (30) days~~ after receipt thereof shall constitute Tenant's acquiescence with respect thereto.

Section 24.11.   Representations by Tenant *and Landlord*.
    If Tenant is or will be a corporation, the persons executing this Lease on behalf of Tenant hereby covenant and warrant that Tenant is a duly qualified corporation authorized to do business in the State of Minnesota, ~~that all franchise and corporate taxes have been paid to date and all future forms, reports, fees and other documents necessary to comply with applicable laws will be filed when due,~~ and the person signing this Lease on behalf of the corporation is an officer of Tenant, and is duly authorized to sign and execute this Lease.

~~Tenant hereby represents and warrants that: (a) there are no proceedings pending or so far as Tenant knows threatened before any court or administrative agency that would materially adversely affect the financial condition of Tenant, the ability of Tenant to enter into this Lease or the validity or enforceability of this Lease; (b) there is no provision of any existing mortgage, indenture, contract or agreement binding on Tenant which would conflict with or in any way prevent the execution, delivery or performance of the terms of this Lease; (c) the financial statement of Tenant provided to Landlord in connection with this Lease is complete and correct and fairly presents the financial condition of Tenant as of the date and for the period referred to therein and has been prepared in accordance with generally accepted accounting principles consistently applied; and (d) there has been no material adverse change in the financial condition of Tenant since the date of such financial statement and to the knowledge of Tenant, no such material adverse changes are pending or threatened. Tenant acknowledges that Landlord is executing this Lease in reliance upon the foregoing representation and warranty and that such representation and warranty is a material element of the consideration inducing Landlord to enter into and execute this Lease.~~

Section 24.12.   Joint and Several Liability.
    If Tenant is a partnership or other business organization the members of which are subject to personal liability, the liability of each such member shall be deemed to be joint and several.

Section 24.13.   Limitation of Liability.
    Anything to the contrary herein notwithstanding, no general or limited partner of Landlord, or any general or limited partner of any partner of Landlord, or any shareholder of any corporate partner of any partner of Landlord, or any other holder of any equity interest in Landlord, or in any entity comprising Landlord or its partners, shall be personally liable with respect to any of the terms, covenants, conditions and provisions of this Lease, or the performance of Landlord's obligations under this Lease, nor shall Landlord or any of said constituent parties have any liability to Tenant for any consequential damages such as, but not limited to, lost profits. The liability of Landlord for Landlord's obligations under this Lease shall be limited to Landlord's interest in the Center, and Tenant shall look solely to the interest of Landlord, its successors and assigns, in the Center, for the satisfaction of each and every remedy of Tenant against Landlord. Tenant shall not look to any of Landlord's other assets seeking either to enforce Landlord's obligations under this Lease, or to satisfy any money or deficiency judgment for Landlord's failure to perform such obligations, such exculpation of personal liability is and shall be absolute and without any exception whatsoever.

The term "Landlord" shall mean only the owner at the time in question of the present Landlord's interest in the Center. In the event of a sale or transfer of the Center (by operation of law or otherwise) or in the event of the making of a lease of all or substantially all of the Center, or in the event of a sale or transfer (by operation of law or otherwise) of the leasehold estate under any such lease, the grantor, transferor or lessor, as the case may be, shall be and hereby is (to the extent of the interest or portion of the Center or leasehold estate sold, transferred or leased) automatically and entirely released and discharged, from and after the date of such sale, transfer or leasing of all liability with respect to the performance of any of the terms of this Lease on the part of Landlord thereafter to be performed; provided that the purchaser, transferee or lessee (collectively, "Transferee") shall be deemed to have assumed and agreed to perform, subject to the limitations of this Section (and without further agreement between the other parties hereto, or among such parties and the Transferee) and only during and in respect of the Transferee's period of ownership of Landlord's interest under this Lease, all of the terms of this Lease on the part of Landlord to be performed during such period of ownership, it being intended that Landlord's obligations hereunder shall, as limited by this Section, be binding on Landlord, its successors and assigns only during and in respect of their respective, successive periods of ownership; *provided, however, that any such prior Landlord shall in no event be released or relieved of any obligations under this Lease existing prior to the effective date of such sale or assignment, and the limitation of liability shall not apply to any such obligations which remain outstanding as of the effective date of such sale, transfer or assignment.*

Section 24.14.    Broker's Commission.
    *Landlord and Tenant hereby represent and warrant to each other that (i) other than those brokers and fees disclosed below, each has not dealt with any other brokers or agents and that there are no other side letters, contracts or agreements relating to, or entitling others to share or participate in, brokerage fees, commissions, finder's fees or other similar charges, (ii) other than those brokers and fees disclosed below, no other brokerage fees, commissions, finder's fees or other similar charges are owed to any persons, entities or other parties in connection with the Lease, and (iii) the following broker is the only broker involved and brokerage fees due and payable in connection with the Lease (collectively, the "Brokers Fees"): Tenant Broker "Sequoia Restaurant and Entertainment Group". Landlord agrees to pay the Brokers Fees according to a separate agreement between it and Sequoia Restaurant and Entertainment Group and further agrees to defend, indemnify and hold Tenant harmless from any loss, claim, liability or obligations with regard thereto. Tenant agrees to indemnify, defend and hold Landlord harmless from all damages, liability and expense (including reasonable attorneys' fees) arising from any claims or demands of any brokers or finders other than Sequoia Restaurant and Entertainment Group for any commission alleged to be due such brokers or finders in connection with their participation in the negotiation with Tenant of this Lease.*

~~Each party represents and warrants that it has caused no claims for brokerage commissions or finder's fees in connection with the execution of this Lease, and each party shall indemnify and hold the other harmless against and from all liabilities arising from any such claims caused or incurred by it (including without limitation, the cost of attorneys' fees in connection therewith).~~

Section 24.15.    Partial Invalidity.
    If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each provision of this Lease shall be valid and enforceable to the fullest extent permitted by law. ~~provided, however, if Tenant's obligation to pay Percentage Rent or Tenant's obligation to continuously operate its business in the Premises is deemed invalid or unenforceable as determined by Landlord based upon the then applicable statutes or case law, then Landlord may, at any time thereafter, terminate this Lease by giving Tenant notice of its election, and this Lease shall terminate and become null and void thirty (30) days after said notice.~~

Section 24.16.    Recording.
    The parties agree not to place this Lease of record but each party shall, at the request of the other, execute and acknowledge so that the same may be recorded a Short Form Lease or Memorandum of Lease, indicating the Lease Term, but omitting rent and other terms, and an Agreement specifying the date of commencement and termination of the Lease Term; provided, however, that the failure to record said Short Form Lease, Memorandum of Lease or Agreement shall not affect or impair the validity and effectiveness of this Lease. *The party requesting the recording of such document* ~~Tenant~~ shall pay all costs *and* taxes ~~fees and other expenses~~ in connection with *the* ~~or prerequisite to~~ recording.

Section 24.17.    Applicable Law.
    This Lease shall be construed under the laws of the State of Minnesota.

Section 24.18.    Mortgagee's Approval.
    If any mortgagee of the Center requires any modification of the terms and provisions of this Lease as a condition to such financing as Landlord may desire, then Landlord shall have the right to cancel this Lease if Tenant fails or refuses to approve and execute such modification(s) within thirty (30) days after Landlord's request therefor, provided said request is made at least thirty (30) days prior to delivery of possession. Upon such cancellation by Landlord, this Lease shall be null and void and neither party shall have any liability either for damages or otherwise to the other by reason of such cancellation; *provided, however, in the event of any cancellation Landlord shall reimburse Tenant for the costs incurred by Tenant in the preparation of its plans for Tenant's Work, not to exceed thirty thousand and 00/100 Dollars ($30,000.00).* In no event, however, shall Tenant be required to agree, and Landlord shall not have any right of cancellation for Tenant's refusal to agree, to any modification of the provisions of this Lease relating to: the amount of rent or other charges reserved herein; the size and/or location of the Premises; the duration and/or Commencement Date of the Lease Term; *a material increase or decrease in Tenant's rights and obligations under the Lease;* or reducing the improvements to be made by Landlord to the Premises prior to delivery of possession.

Section 24.19.    Reservation of Air Rights.
        *Except as expressly set forth herein, there* ~~There~~ has been no representation or warranty by Landlord and Tenant acknowledges that there is no inducement or reliance to lease the Premises on the basis that the existing access to light, air and views from the Premises would continue unabated.  Tenant acknowledges and understands that it shall have no rights to the airspace above the Retail Space and those rights shall be the sole property of Landlord.

Section 24.20.    Unrelated Business Taxable Income.
        A.        If at any time and from time to time during the Lease Term, Landlord is advised by its counsel or counsel to a tax exempt partner of the managing partner of Landlord that any provision of this Lease, including without limitation the provisions relating to the payment of rent and additional rent, or the absence of any provision might give rise to unrelated business taxable income within the meaning of section 512 of the Internal Revenue Code of 1986, as amended, or the regulations issued thereunder, or may jeopardize the tax-exempt status of any partner in Landlord or any partner in a partnership that is a partner in Landlord, or may prevent any such partner from obtaining such tax-exempt status, then *Landlord and Tenant shall enter into an amendment to this Lease which shall be mutually acceptable to both parties to address Landlord's requirements,* ~~this Lease may be unilaterally amended by Landlord in such manner as shall meet the requirements specified by counsel for Landlord and Tenant agrees that it will execute all documents or instruments necessary to effect such amendments,~~ provided that no such amendment shall result on an estimated basis in Tenant having to pay in the aggregate more on account of its occupancy of the Premises than it would be required to pay under the terms of this Lease, ~~or~~ having to receive fewer services or services of lesser quality than it is presently entitled to receive under this Lease *or change the characterization of 'rent' paid by Tenant , which shall continue to be characterized as 'rent' for Tenant's accounting purposes.*

        B.        Any services which Landlord is required to furnish pursuant to the provisions of this Lease may, at Landlord's option, be furnished from time to time, in whole or in part, by employees of Landlord or the managing agent of the Center or its employees or by one or more third persons hired by Landlord or the managing agent of the Center, *provided that Landlord shall remain responsible for the performance of such items.*  Tenant agrees that upon Landlord's written request it will enter into direct agreements with the managing agent of the Center or other parties designated by Landlord for the furnishing of any such services required to be furnished by Landlord herein, in form and content approved by Landlord *and Tenant,* provided, however, that no such contract shall result ~~on an estimated basis~~ in Tenant having to pay in the aggregate more money on account of its occupancy of the Premises under the terms of this Lease, or having to receive fewer services or services of a lesser quality than it is presently entitled to receive under this Lease.

Section 24.21.    Anti-Terrorism Law.
        A.        Tenant represents and warrants to Landlord as follows:

        (1)    *To Tenant's knowledge, neither Tenant, nor any person for whom Tenant is acting as agent or nominee, nor any person providing funds to Tenant in connection with this Lease* ~~Neither Tenant, its constituents or affiliates nor any of their respective agents~~ (collectively, the "Tenant Parties") is in violation of any law relating to terrorism or money laundering, including, but not limited to, Executive Order No. 13224 on Terrorist Financing, the U.S Bank Secrecy Act, as amended by the Patriot Act, the Trading with the Enemy Act, the International Emergency Economic Powers Act and all regulations promulgated thereunder, all as amended from time to time (collectively, "Anti-Terrorism Law").

        (2)    *To Tenant's knowledge, no* action, proceeding, investigation, charge, claim, report, or notice has been filed, commenced, or threatened against any of the Tenant Parties alleging any violation of any Anti-Terrorism Law.

        (3)    *To Tenant's knowledge,* none of the Tenant Parties has *actual* ~~after due inquiry,~~ knowledge of any fact, event, circumstance, situation or condition which could reasonably be expected to result in any action, proceeding, investigation, charge, claim, report, notice or penalty being filed, commenced, threatened or imposed against any of them relating to any violation of or failure to comply with any Anti-Terrorism Law.

        (4)    *To Tenant's knowledge,* none of the Tenant Parties is a "Prohibited Person".  A Prohibited Person means any of the following:

                (a)    A person or entity that is "specially designated" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control or which is owned, controlled by or acting for or on behalf of any such person or entity;

                (b)    A person or entity with whom Landlord is prohibited from dealing by any Anti-Terrorism Law;

                (c)    A person or entity that commits, threatens, or conspires to commit or supports "terrorism", as defined in any Anti-Terrorism Law.

        (5)    *To Tenant's knowledge,* none of the Tenant Parties:

                (a)    Conducts any business or transactions or makes or receives any contribution of funds, goods, or services in violation of any Anti-Terrorism Law;

                (b)    Engages in or conspires to engage in any transaction that evades or avoids, has the purpose of evading or avoiding or attempts to violate any of the prohibitions of any Anti-Terrorism Law.

B.    Tenant covenants that it shall:

(1)    Not *knowingly* conduct any business or transaction or make or receive any contribution of funds, goods, or services in violation of any Anti-Terrorism Law;

(2)    Not *knowingly* engage in or conspire to engage in any transaction that evades or avoids, has the purpose of evading or avoiding or attempts to violate any of the prohibitions of any Anti-Terrorism Law.

(3)    Tenant agrees promptly to deliver to Landlord (but in any event within ten (10) days of Landlord's written request) any certification or other evidence requested from time to time by Landlord, in its reasonable discretion, confirming Tenant's compliance with the foregoing.

**Section 24.22.    Certificates. *Intentionally Deleted***
~~A certificate procured by Landlord from an architect, engineer, accountant or other professional as applicable, shall be conclusive and binding upon the parties hereto in respect of any question of fact arising under this Lease including, without limitation, a question of fact concerning the completion of any work that has been delayed by Force Majeure, whether the Center or the Premises or any part thereof is being kept in good repair, order and condition and in compliance with the provisions of this Lease, the cause of any destruction or damage, the extent to which any leased or leasable space or the Premises are rendered unfit for use and occupancy by reason of any destruction or damage and the time necessary to complete any repairs, or as to any question of fact or opinion concerning the computation of Percentage Rent, the proper amount of any payment to Landlord on account of Additional Rent, and any adjustments with respect thereto.~~

**Section 24.23.    Time of Essence.**
Time shall be of the essence in this Lease.

**Section 24.24.    Parties To Have No Liability If Center Not Open.**
If the Center is not open within two (2) years after the Effective Date of this Lease, this Lease shall thereupon cease and terminate and the parties shall be released and discharged from any and all liability hereunder.

***Section 24.25.    Improvement Allowance.***
*In connection with Tenant's Work, Landlord agrees to pay to the Tenant the amount of One Hundred Twenty Five and 00/100 Dollars ($125.00) per Store Floor Area (10,000 square feet for purposes of this Section 24.25) of the Premises (the "Improvement Allowance"), which amount will be payable as follows:*

*(i) fifty percent (50%) by way of a credit against Gross Rent falling due under the Lease, such credit to commence upon the later of: (a) completion of Tenant's Work pursuant to the terms and conditions of the Lease; (b) receipt of final lien waivers from Tenant's general contractor and subcontractors providing labor and/or materials in an amount in excess of Thirty Thousand and 00/100 Dollars ($30,000.00) in connection with Tenant's Work; (c) Certificate of Occupancy and other approvals required by local government; and (d) Tenant has fully opened for business in the Premises; and*

*(ii) fifty percent (50%) to be paid to Tenant within Sixty (60) days after the later of: (a) completion of Tenant's Work pursuant to the terms and conditions of the Lease; (b) receipt of final lien waivers from Tenant's general contractor and subcontractors providing labor and/or materials in an amount in excess of Thirty Thousand and 00/100 Dollars ($30,000.00) in connection with Tenant's Work; (c) Certificate of Occupancy and other approvals required by local government; and (d) Tenant has fully opened for business in the Premises.*

*It is understood and agreed that the following items are specifically excluded from the Advance: (a) any moveable fixtures; (b) inventory; and (c) telephone, security and sound systems.*

*It is further understood and agreed that if Tenant is placed in default and the Lease is terminated during the Lease Term, then the unamortized amounts advanced or credited to Tenant under this provision shall immediately be repaid by Tenant to Landlord and may be collected as Rent due and owing.*

***Section 24.26.    Operating Co-Tenancy.***
*Notwithstanding anything to the contrary in this Lease, and provided Tenant is not in default under the terms of the Lease beyond any applicable notice and cure periods, if following the fifth (5th) Lease Year of the Term, (i) fewer than sixty percent (60%) of the gross leasable floor area of the first (1st) level of the Center is open and occupied with tenants open during regular business hours doing business in the Center (hereinafter referred to as the "Co-Tenancy Condition"), then Tenant may commencing with the month immediately after the occurrence of the Co-Tenancy Condition and continuing during the Co-Tenancy Condition elect to pay "Alternate Rent" in an amount equal to the lesser of (i) the applicable Gross Monthly Rent, or (ii) five percent (5%) of its Adjusted Gross Sales monthly, twenty (20) days in arrears, in lieu of Gross Monthly Rent and Percentage Rent. Despite Tenant's right to pay Alternate Rent pursuant to this Section, Tenant shall continue to pay all Additional Rent charges payable hereunder as and when due. If such Co-Tenancy Condition continues for an additional period of twelve (12) consecutive months, then Tenant shall thereafter have the right to terminate this Lease by notice to Landlord given no more than sixty (60) days after the expiration of said twelve (12) consecutive month period, and this Lease shall terminate as of the ninetieth (90th) day after Landlord's receipt of Tenant's termination notice. Despite any such election to terminate this Lease pursuant to this Section, Tenant shall be and remain liable for the performance of each and every term, covenant, condition and provision of this Lease through and including the effective date of termination except as otherwise herein specified. If Tenant is entitled to so terminate this Lease pursuant to this Section and fails to notify Landlord of its election to terminate this Lease within said sixty (60) day period, then*

*Tenant shall be deemed to have waived such right of terminations to such specific occurrence of the Co-Tenancy Condition and Tenant's obligation to pay Gross Rent and Percentage Rent shall recommence on the first (1st) day of the first (1st) full calendar month following the expiration of said sixty (60) day period.*

<u>Section 24.27.</u>   <u>Option to Renew.</u>
*Landlord hereby grants to Tenant the option to renew this Lease for two (2) additional term(s) of five (5) years each ("Renewal Terms"), which shall commence upon the expiration of the Initial Lease Term or the first Renewal Term as the case may be, provided Tenant is not in default under any provision of this Lease beyond any applicable notice and cure period. Such option, with respect to any Renewal Term, shall only be exercised by Tenant mailing to Landlord (ATTN: Leasing Director), at Landlord's Notice Address, by nationally recognized overnight courier or United States mail, postage prepaid, certified or registered, return receipt requested, with a copy to the attention of Corporate Counsel, notice of the exercise of such option, not later than three hundred sixty five (365) days prior to the expiration of the then current term. No exercise of any option herein granted shall be effective if any default under or breach of this Lease, beyond applicable notice and cure periods, exists either at the time of exercise or on the expiration of the term during which it was exercised. In the event such notice is not received by Landlord within the time period provided above, said option to renew shall be null and void.*

*In the event any such option is effectively exercised with respect to any Renewal Term, all terms and conditions of this Lease shall be applicable to such renewal term, including the Gross Annual Rent and the Sales Breakpoints during the Renewal Term shall be shall be increased at Two and One-Half Percent (2.5%) per annum and shall continue to increase annually on a compounded basis at Two and One-Half Percent (2.5%) on each subsequent anniversary thereafter throughout the Renewal Term.*

*If this Lease is assigned to any individual or entity (a) unless pursuant to a permitted assignment under Section 13.4 herein, or (b) unless consented to by Landlord to the contrary, the foregoing provision regarding this option to renew this Lease shall be null and void. Notwithstanding anything to the contrary in this Lease contained, the term "Lease Term" whenever used in this Lease, shall be defined to include the original term and all renewals and extensions thereof.*

<u>Section 24.28.</u>   <u>Exclusive Use.</u>
*So long as Tenant is operating a Hard Rock Café in accordance with the Permitted Use set forth in Section 1.1(o), and not in default of its Lease, Landlord agrees that it will not sell, lease, license or sublease space within the theme park currently operated as "Nickelodeon Universe" and located on the first level of the Center to another full-service, sit-down restaurant whose primary use is a music-themed or music-memorabilia-themed restaurant. This Section 24.28 shall not apply if Tenant is not operating as a typical Hard Rock Café, unless Tenant is not operating as permitted herein (such casualty, remodel, etc.). Furthermore, the foregoing shall not apply to (i) restaurant tenants located in the Center and outside of the theme park currently operated as "Nickelodeon Universe"; or (ii) existing tenants with fully-executed leases as of the date of this Lease where such leases currently expressly provide for such use, provided to the extent that Landlord has the right to withhold its consent based on the below use by the sublessee or assignee, it will not consent to an assignment or sublease of space within the theme park to a music-themed or music-memorabilia-themed restaurant. For purposes of this Section, Landlord shall include, but shall not be limited to, any other person, corporation, partnership, or legal entity in which Landlord has, or subsequently acquires, an interest.*

*If at any time there is a violation of the Tenant Exclusive, beginning with the month in which such violation began, Tenant shall be permitted to pay, in lieu of the in lieu of Gross Monthly Rent and Percentage Rent set forth herein, a monthly rental equal to the lesser of (i) five percent (5%) of Adjusted Gross Sales for such month, or (ii) the applicable Gross Monthly Rent. If such violation is not cured within ninety (90) days from the date Tenant notified Landlord of the violation, then at any time thereafter upon at least thirty (30) days written notice, Tenant shall have the right to terminate this Lease (provided such violation is not cured within such thirty (30) day period. Unless this Lease has been sooner terminated, if any violation of the Tenant Exclusive has been cured by Landlord, beginning with the next month following such cure, Tenant shall return to paying Gross Monthly Rent in the full amount required hereunder. Notwithstanding any contrary provision herein, Tenant shall not be permitted to pay such reduced Monthly Gross Rent for more than twelve (12) consecutive months, and thereafter if Tenant has not elected any termination right provided herein, Tenant shall return to paying the full amount of Gross Monthly Rent.*

1210251-41.68   026767.000127 602929037.2

IN WITNESS WHEREOF, Landlord and Tenant have signed and sealed this Lease as of the day and year first above written.

(LANDLORD)

**MOAC MALL HOLDINGS LLC,**
a Delaware limited liability company

By: _____

Its: _____

(TENANT)

**HARD ROCK CAFÉ INTERNATIONAL** *(USA)*, INC.,
a *Florida* corporation
d/b/a: Hard Rock Café

By: _____

Its: _____

Attest: _____

- 38 -



HARD ROCK CAFE

5115
12,166

CARIBOU COFFEE

SOUTH TICKETS

MECH. ROOM

ELEC

59.57
39.71
12.21
29.95
51.5'
30.53
5.39
4.84
11.94
27.68
18.25'
19.6'
11.92
27.25'
40.80
0'
20'

# LEVEL 1 PLAN



MALL OF AMERICA

60 EAST BROADWAY
BLOOMINGTON, MN 55425

The information in this document is confidential and a proprietary trade secret of the Landlord and may not be copied, distributed, published or disclosed without prior written permission.  Landlord retains the right to design, change, alter or modify (without prior written notice) the size and configuration of any or all of the Center or any of the buildings, premises, hallways, malls, corridors, kiosks, tenant spaces or common areas contained therein, including, but not limited to, the identity, size, configuration, location or arrangement of any of the foregoing.  This document does not constitute any contract or obligation by the Landlord.  Landlord makes no representations or warranties regarding the Center, any premises contained therein, or the accuracy of the information contained in this document.  It is the responsibility of Tenant or Tenant's contractor to field verify existing site conditions and dimensions.

| DBA Name: | HARD ROCK CAFE | Requested by: HB |
|---|---|---|
| Unit No. | 5115, LEVEL 1 | Phone: |
| Scale: | 1:30 | Date:        2-18-14 |

1210251-43.68



12.81'
6.30'
12.38'
14.19'
5.31'
18.84'
49.53'
5.98'
17.87'
9.79'
24.73'
9.93'
7.47'
5115
4.726'
54.28'
31.87'
41.92'
11.87'

HARD ROCK CAFE

## LEVEL 2 PLAN



MALL OF AMERICA

60 EAST BROADWAY
BLOOMINGTON, MN 55425

The information in this document is confidential and a proprietary trade secret of the Landlord and may not be copied, distributed, published or disclosed without prior written permission. Landlord retains the right to design, change, alter or modify (without prior written notice) the size and configuration of any or all of the Center or any of the buildings, premises, hallways, malls, corridors, kiosks, tenant spaces or common areas contained therein, including, but not limited to, the identity, size, configuration, location or arrangement of any of the foregoing. This document does not constitute any contract or obligation by the Landlord. Landlord makes no representations or warranties regarding the Center, any premises contained therein, or the accuracy of the information contained in this document. It is the responsibility of Tenant or Tenant's contractor to field verify existing site conditions and dimensions.

| DBA Name: | HARD ROCK CAFE | Requested by: | HB |
|---|---|---|---|
| Unit No. | 5115, LEVEL 2 | Phone: | |
| Scale: | 1:20 | Date: | 2-18-2014 |

1210251-44.68

EXHIBIT "A-1"

LOCATION OF TRASH CHUTE

60 EAST BROADWAY
BLOOMINGTON, MN 55425

☐ PROPOSED HARD ROCK CAFE FIRST FLOOR LOCATION

■ LANDLORD PROVIDED TRASH CHUTE LOCATION

[illegible]

| | | | |
|---|---|---|---|
| DBA Name:<br>Unit No. | HARD ROCK CAFE<br>5115 Center Court | Exhibit "A-1" | Date: 01.15.2014<br>Scale: NTS |

1210251-45.68

026767.000127 602929037.2




EXHIBIT "A-2"

DAMAGE AND DESTRUCTION - FLOOR PLAN OF ADJACENT AREAS

60 EAST BROADWAY
BLOOMINGTON, MN 55425

DAMAGE AND DESTRUCTION - FLOOR PLAN OF ADJACENT AREAS

The information in this document is confidential and a proprietary trade secret of the Landlord and may not be copied, distributed, published or disclosed without prior written permission. Landlord retains the right to design, change, alter or modify (without prior written notice) the size and configuration of any or all of the Center or any of the buildings, premises, hallways, malls, corridors, kiosks, tenant spaces or common areas contained therein, including, but not limited to, the identity, size, configuration, location or arrangement of any of the foregoing. This document does not constitute any covenant or obligation by the Landlord. Landlord makes no representations or warranties regarding the Center, any premises contained therein, or the accuracy of the information contained in this document. It is the responsibility of Tenant or Tenant's contractor to field verify existing site conditions and dimensions.

| | | | |
|---|---|---|---|
| DBA Name:<br>Unit No. | HARD ROCK CAFE<br>5115 Center Court | Exhibit "A-2" | Date: 01.15.2014<br>Scale: NTS |

1210251-46.68

026767.000127 602929037.2

**EXHIBIT "B"**

**DESCRIPTION OF TENANT'S WORK**

I.   TENANT'S WORK – Unless otherwise specifically identified as Landlord's Work, Tenant shall complete all work required to place the Premises in a finished condition ready to open for business at Tenant's own expense. Tenant's Work includes, but is not limited to, the following:

    A.   GENERAL PROVISIONS: All work done by Tenant shall be governed in all respects by, and be subject to the following:

        1.   Payment ~~and Performance Bonds~~. ~~Landlord shall have the right to require Tenant to furnish payment and performance bonds or other security in form satisfactory to Landlord for the prompt and faithful performance of Tenant's Work, assuring completion of Tenant's Work and conditioned that Landlord will be held harmless from payment of any claim either by way of damages or liens on account of bills for labor or material in connection with Tenant's Work.~~ Tenant's Work shall at all times be conducted consistent with the Project Labor Agreement for the Center and in such manner so that Tenant shall not be in violation of Section 18.1 of the Lease.

        2.   Tenant's Work Standards. All Tenant's Work shall conform to the more stringent of applicable statutes, ordinances, regulations, codes, all requirements of Landlord's insurance carrier, ~~all rating bureaus~~, and the Tenant Information Package (Exhibit "B-1") which contains the basic architectural, electrical and mechanical information necessary for the preparation of Tenant's Plans, and which by this reference is incorporated into and made a part of this Lease. Landlord reserves the right to require changes in Tenant's Work when necessary by reason of the aforementioned standards. No approval by Landlord shall be deemed valid unless in writing and signed by Landlord. *In the event of a conflict between the Lease and the Landlord approved Tenant's Plans, the Landlord approved Tenant's Plans shall prevail.*

        3.   Insurance Requirements. Prior to commencement of Tenant's Work and until completion thereof, or commencement of the Lease Term, whichever is the last to occur, Tenant shall effect Builder's Risk Insurance covering Landlord, Landlord's general contractor, Tenant, Tenant's contractors and Tenant's subcontractors, as their interest may appear against loss or damage by fire, vandalism and malicious mischief and such other risks as are customarily covered by a standard "All Risk" policy of insurance protecting against all risk of physical loss or damage to all Tenant's Work in place and all materials stored at the site of Tenant's Work, iind all materials, equipment, supplies and temporary structures of all kinds incidental to Tenant's Work, and equipment, all while forming a part of or contained in such improvements or temporary structures, or while on the Premises or within the Center, all to the ~~actual replacement cost~~ *insurable value* thereof ~~at all times on a completed value basis~~. In addition, Tenant agrees to indemnify and hold Landlord harmless against any and all claims for injury to persons or damage to property by reason of the use of the Premises for the performance of Tenant's Work, and claims, fines, and penalties arising out of any failure of Tenant or its agents, ~~contractors and employees~~ *acting at the direction of Tenant* to comply with any law, ordinance, code requirement, regulations or other requirement applicable to Tenant's Work and Tenant agrees to require all contractors and subcontractors engaged in the performance of Tenant's Work to effect and maintain and deliver to Tenant and Landlord, certificates evidencing the existence of, and covering Landlord, MOA Management LLC, MOAC Mall Holdings LLC, MOA Entertainment Company LLC, MOA Marketing, Inc., Landlord's mortgage company, City of Bloomington, Minnesota, Port Authority of the City of Bloomington, Tenant and Tenant's contractors, prior to commencement of Tenant's Work and until completion thereof, the following insurance coverages:

           a.   Workmen's Compensation and Occupational Disease insurance in accordance with laws of the State of Minnesota and Employer's Liability Insurance with limits of not less than $1,000,000.00 per occurrence.

           b.   Commercial General Liability Insurance affording protection for bodily injury, death, personal injury and property damage, and including coverage for contractual liability, independent contractors, completed operations and products liability with limits of not less than $3,000,000.00 combined single limit per occurrence.

           c.   Comprehensive Automobile Liability Insurance, including coverage for "non-owned" automobiles, for property damage, bodily injury, including death resulting therefrom with limits of not less than $1,000,000.00 for any one occurrence combined single limit.

           d.   Owners and contractors protective liability coverage for an amount not less than $3,000,000.00.

4.  **Reasonable Easement**. Landlord specifically reserves the right (and Tenant shall permit Landlord or its employees, agents or contractors reasonable access to the Premises for the purpose of exercising such rights) *as provided and further described in Section 2.2 of the Lease* ~~, to install, maintain, repair and replace in the ceiling space and/or under the concrete slab in the Premises, all such electrical, plumbing, HVAC and other system components that may be required to service the Common Areas or other tenants in the Center. Adequate access panels or doors shall be incorporated into Tenant Work for inspection, service and replacement of both Landlord and Tenant equipment.~~

5.  Tenant agrees that the contract ~~of every contractor, subcontractor, mechanic, journeyman, laborer, material supplier or other person or entity performing labor upon, or furnishing materials or equipment to, the Premises~~ *with Tenant's general contractor* in connection with Tenant's Work shall contain the following provision:

    "Contractor acknowledges that this provision is required under Tenant's lease of the premises to be improved under this Contract ("Premises") from MOAC Mall Holdings LLC (Lease). In consideration of Tenant's engagement of Contractor to perform the work hereunder, and as an inducement to Tenant to enter into this Contract with Contractor, Contractor acknowledges, covenants and agrees that any mechanic's lien which it may hereafter file, claim, hold or assert with respect to the work hereunder (i) shall attach only to Tenant's interest in the Premises under the Lease and (ii) shall be subject, subordinate and inferior to the lien of any mortgage(s) now or hereafter held upon and against the Mall of America by any lender(s) now or hereafter providing funds for the financing for the Mall of America, notwithstanding that any such mortgage(s) may be recorded after the commencement of the work hereunder and that Contractor's mechanic's lien otherwise might be entitled to priority over any such mortgage(s). For such purposes, Contractor also shall execute, acknowledge and deliver a separate subordination agreement upon request by Tenant, MOAC Mall Holdings LLC, or any such lender(s), prior to making any application or request for payment hereunder and as a condition precedent to Contractor's right to receive any payment hereunder. Contractor likewise shall cause the liens and lien rights of all subcontractors, sub-subcontractors, materialmen, suppliers, laborers and all other persons furnishing work, labor, materials, equipment and services on or in connection with the Premises to be limited to Tenant's interest in the Premises under the Lease and to be subordinated to such mortgage(s), and Contractor shall obtain and deliver to Tenant a similar subordination agreement duly executed and acknowledged by each such subcontractor, sub-subcontractor, materialman, supplier, laborer and other person prior to making any application or request for payment hereunder and as a condition precedent to Contractor's right to receive any payment hereunder. Contractor shall indemnify, defend and hold harmless Tenant, MOAC Mall Holdings LLC, and such lender(s) from and against any and all loss, costs, damage, expense (including, without limitation, reasonable attorney fees), liability, suits, actions and judgments arising or resulting from Contractor's failure to cause all such mechanic's and materialmen's liens to be limited to Tenant's interest in the Premises under the Lease and to be subordinated to said mortgage(s) as herein provided, in addition to all other indemnities contained herein with respect to such liens."

    Tenant shall indemnify, defend and hold harmless Landlord and such lender(s) from and against any and all loss, costs, damage, expense (including, without limitation, reasonable attorney fees), liability, suits, action and judgments arising or resulting from Tenant's failure to cause all such mechanic's and materialmen's liens to be limited to Tenant's interest in the Premises under this Lease and to be subordinated to said mortgage(s) as herein provided, in addition to all other indemnities contained herein with respect to such liens.

    ~~From the commencement of Tenant's Work through the date Tenant obtains its certificate of occupancy, Tenant shall submit and Landlord shall receive lien waivers no later than the fifth (5th) day of each month for all work, material, services or machinery furnished by Tenant's general contractor, subcontractors, materialmen or suppliers in connection with Tenant's Work during the preceding month. The failure of Tenant to submit such lien waivers in accordance with this provision shall constitute a default under Section 18.1 of this Lease.~~

B.  **TENANT'S PLANS**. Tenant shall, at Tenant's expense, prepare and submit to Landlord for Landlord's approval, *not to be unreasonably withheld or delayed*, all drawings required (including signage) for the completion of the Premises as provided for herein ("Tenant's Plans"). Tenant's Plans shall indicate all proposed demolition, modification or reuse of existing improvements or equipment (if applicable), delineate all proposed new improvements or equipment, delineate a minimum of one (1) toilet room if required by applicable building codes, be to scale, be prepared, stamped and signed by an architect or engineer licensed to do business in the state in which the Center is located and be in accordance with: the Federal Occupational Safety and Health Act (OSHA) and regulations promulgated thereunder; all laws, ordinances and regulations of governing authorities having jurisdiction over the premises and utility companies; the overall design and construction standards of the Center contained in Exhibit "B-1"; and the requirements of Landlord's fire and casualty insurer, *(Tenant is required to use the subcontractor*

1210251-48.68    026767.000127 602929037.2

*Simplex Grinnel which shall ensure compliance with the fire and casualty insurer requirements),* and/or the criteria of this Exhibit, whichever is more stringent.

Tenant shall not submit plans, shop drawings or specifications which have been prepared by contractors, subcontractors or suppliers (unless otherwise specifically required in Exhibit "B-1") as such plans, shop drawings or specifications shall not be given consideration by Landlord and shall not serve to satisfy the obligations of Tenant provided for herein.

1.  Landlord's Approval of Tenant's Plans.
    a.  Approval of plans and specifications by Landlord shall not constitute the assumption of any responsibility by Landlord for their accuracy or sufficiency or conformity with applicable laws (including but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act), and Tenant shall be solely responsible for such plans and specifications. ~~Tenant shall indemnify and hold Landlord harmless from and against any and all errors and omissions contained in Tenant's Plans, and any losses, costs, damages or claims of whatever nature (including, but not limited to attorneys' fees and costs of any kind), arising out of or in connection with such compliance.~~ Landlord shall not be liable for any loss to Tenant's property or the property of any other person during construction.

    b.  Should any conflict arise between any of Tenant's Plans and the Lease such that, in Landlord's ~~sole~~ *reasonable* opinion, the integrity or code compliance of any existing Landlord or adjacent tenant improvements and construction is jeopardized, the applicable portion(s) of the Lease shall be determinative. Any modification of such existing improvements or construction must receive the prior written approval of Landlord and all work shall be specifically stated in writing. Landlord's approval of Tenant's Plans will in no way alter, amend or waive the requirements or criteria of this Exhibit.

2.  Existing Conditions.
    a.  Prior to the preparation of Tenant's Plans, Tenant shall visit the Premises to verify existing conditions and construction to ensure that none of Tenant's Work shall be in conflict with any existing Landlord or adjacent tenant improvements and construction. ~~In addition, if the Premises' concrete slab is not on grade (compacted soil), Tenant shall remove all previous floor penetrations not intended to be re-used and patch and repair the floor to original condition and re-seal all floor penetrations to be re-used utilizing Landlord's waterproofing specifications.~~

    b.  In the event Tenant's store design requires revisions to Landlord's building, mechanical, electrical or HVAC system(s), Tenant shall request, in writing, approval for such revision(s) and, if approved by Landlord, Landlord shall perform the necessary work to accommodate Tenant's request. Tenant shall reimburse Landlord for the cost of such work as provided herein.

3.  Utility Services. All utility services are subject to the limitation and capacities of existing Center facilities and equipment and the availability of service from the local serving utilities. Tenant shall, at Tenant's expense and subject to Landlord's prior written approval, provide and install any equipment necessary to adapt such existing services to Tenant's requirements.

4.  Roof. Tenant shall provide any required supports, blocking, temporary flashing, counterflashing or other work necessary to complete installation of Tenant's equipment on Landlord's roof. Cant strips and weatherproofing shall be done only by contractor designated by Landlord. Tenant will be required to supplement existing construction to achieve assembly ratings, thermal values or additional criteria as required by Tenant's Work.

5.  Fire Protection. Modifications to Tenant's automatic fire sprinkler system shall be performed by a contractor designated by Landlord. The work shall conform to Landlord's requirements and may include, but not be limited to, the cost of preparing engineered sprinkler shop drawings and the submission of such drawings to Landlord's fire insurance underwriter for approval, the relocating, re-sizing, and adding sprinkler piping or heads, draining the system and fire watch during system down-time.

6.  HVAC Criteria.
    a.  Restaurants, food service, pet shops, beauty salons, barber shops and any other occupancies which, in the *reasonable* ~~sole~~ opinion of Landlord, produce odors or produce a high level of humidity, shall provide an exhaust system which will prevent such odors or moisture from entering the enclosed mall, other tenant spaces or any other portion of the Center. If, in the sole opinion of Landlord, any of Tenant's roof mounted equipment accumulates grease, Tenant shall, at Tenant's expense, furnish and install grease collection and elimination facilities in accordance with Landlord's requirements (which may include the use of a Grease Guard collection pan).

Exhibit "B"
Page -3-



b.  In the event that Tenant elects to reuse all or a portion of any existing HVAC system(s), Tenant shall indicate same on Tenant's drawings for Landlord's review. In the event Landlord permits Tenant to reuse said systems, Tenant shall employ a qualified contractor to verify, by written confirmation to Landlord, that such HVAC system(s) is fully operable and in conformance with Landlord's design criteria as provided in Landlord's drawings (said written confirmation shall include, but not be limited to, an air balance report completed by an AABC certified air balance contractor and shall indicate, at a minimum, any discrepancies between design quantities and tested quantities). If any portion of Tenant's HVAC system(s) is not fully operable or does not conform to Landlord's design criteria, Tenant shall, at Tenant's expense, have its contractor repair or replace same to comply therewith and thereafter provide Landlord with written confirmation thereof.

7.  <u>Construction Deposit.</u>  Prior to commencement of construction in the Premises, Tenant's contractor shall deliver a damage deposit in the form of a cashier's check in the amount of $2,000.00 made payable to Landlord. Landlord shall have the right to use all or any part of said damage deposit as reimbursement for any debris clean-up or damage caused by Tenant's contractor(s) to any Common Areas.

8.  <u>Materials and Services</u>:  Prior to commencement of construction in the Premises, Tenant's contractor shall deliver a cashier's check, made payable to Landlord, as payment for materials issued to or services provided for Tenant's contractor by Landlord or for work performed by Landlord for Tenant's contractor at the request of Tenant's contractor. Such items are itemized in the Tenant Information Package and may include (but not be limited to): temporary utilities; temporary sprinkler system (standard existing grid); temporary toilets; dumpster and trash removal; dock usage; housekeeping; security; facility maintenance; and testing of Landlord's fire system.

9.  <u>Construction Rules.</u>  Tenant will abide by and cause its contractors, subcontractors, agents and employees to abide by *reasonable* rules and regulations published by Landlord from time to time, including, but not limited to, those pertaining to parking, toilet facilities, safety conduct, delivery of materials and supplies, employee egress to the Center, trash storage or collection or removal, and cooperation with Landlord's architect, general contractor and subcontractors or other agents.

10.  <u>Storefront Barricade.</u>  If, in the sole opinion of Landlord, a temporary storefront barricade is required for the Premises, Landlord shall install same at Tenant's expense.

11.  <u>Signage.</u> Tenant shall provide and install a storefront identification sign for the Premises which may include, at Landlord's discretion, multiple signs (depending upon Tenant's storefront configuration) and Tenant's established national logo or insignia, if any. Storefront identification signs shall be limited to Tenant's Trade Name as approved in this Lease or as otherwise approved in writing by Landlord. The storefront sign shall be illuminated (unless otherwise specifically approved, in writing, by Landlord). Landlord's approval of Tenant's storefront signage shall be based on the size and style of the sign and lettering, the location of the sign within the storefront, and the cohesive integration of the sign into the overall storefront design. Prohibited storefront signage includes, but is not limited to, signage which advertises or describes products, services, vendors, or departments or is informational or directional in nature, regardless if such signage is attached as a tagline to, or is included as part of, Tenant's Trade Name.

12.  <u>Waterproofing.</u>  If the Premises' concrete slab is not on grade (compacted soil), Tenant shall install a waterproofing barrier membrane, in accordance with Landlord's specifications, in all areas that may be exposed to fluids or liquids including, but not limited to, restrooms, food preparation and service areas, shampoo and wash areas, laundry and dry cleaning areas, and photo processing areas.

C.  **CLOSE-OUT REQUIREMENTS.**  Tenant's Work shall be deemed completed at such time as Tenant, at its sole expense and without cost to Landlord, shall provide:

1.  <u>Proof of Payment.</u>  Furnish evidence satisfactory to Landlord that all of Tenant's Work has been completed and paid for in full (and that such work has been accepted by Landlord), including the costs for Tenant's Work that may have been done by Landlord and the costs for any other work done by Landlord which Landlord may be entitled to payment in accordance with the provisions of this Exhibit "B", the Tenant Information Package, or elsewhere in the Lease, that any and all liens therefor that have been or might be filed have been discharged of record or waived, and that no security interests relating thereto are outstanding.

2.  <u>Tenant's Affidavit.</u>  Furnish an affidavit from Tenant listing all contractors and any material suppliers in the employ of said Tenant who have provided goods or services for the completion of Tenant's Work in the Premises.

3.   Tenant Contractor's Affidavit.   Furnish an affidavit from Tenant's general contractor listing all parties who have furnished materials or labor or services to that contractor for completion of Tenant's Work in the Premises.

4.   Certificate of Occupancy.   Furnish all certificates and other approvals with respect to Tenant's Work that may be required from any governmental authority and any board of fire underwriter's or similar body for the use and occupancy of the Premises.

5.   Record Drawings.   Furnish Landlord with one set of reproducible record drawings of the Premises showing any changes made during construction.

6.   ~~Estoppel Certificate.   Furnish a Tenant-executed estoppel certificate as may be required by Landlord or Landlord's mortgagee.~~

D.   CONSTRUCTION ACTIVITIES

1.   During Premises interior construction, Tenant shall use rear opening to Premises for moving in/out of materials, for those premises that contain a rear door.

2.   If any roof cuts or penetrations are required by Tenant, all curbs, supports, blocking, temporary flashing, counterflashing or other work necessary for installation shall be provided and installed by Tenant at its expense.  Tenant shall promptly notify Landlord, in advance, of the need for such cuts or penetrations and shall utilize Landlord's designated roofing contractor for this work.  Tenant's contractor shall be responsible for contracting with Landlord's roofing contractor to perform this work.

3.   During construction, Tenant's use of the service elevators shall be at Tenant's expense.

4.   Tenant acknowledges that its construction activities in the Premises and the Center are subject to a certain Project Labor Agreement for Construction of the Mall of America executed on or about the 19th day of November, 1985, by and among Triple Five Corporation, P.C.L. Construction Services, Inc., and The Minneapolis Building and Construction Trades Council.  Such Project Labor Agreement is fully incorporated herein by reference.  As a material consideration of Landlord entering into and executing this Lease with Tenant, Tenant agrees to abide by the terms, conditions and provisions of the Project Labor Agreement as such Project Labor Agreement affects Tenant's construction activities in the Premises and the Center.  Tenant's failure to abide by the same may be deemed a default of this Lease if such failure *directly* results~~, either directly or indirectly,~~ in a work stoppage or interference or the threat of the same in the construction activities in the Center or any other tenant's space.  Landlord or Landlord's authorized representative may take such action as Landlord or its authorized representative deems necessary in order to immediately enforce the terms of the Project Labor Agreement and in order to prevent, avoid or terminate any interference or work stoppage (or the threat thereof) in connection with the construction of any part of the Center or any other tenant's space.  Such action may include, but shall not be limited to, the issuance of a cease and desist directive to Tenant.  ~~Tenant shall reimburse Landlord or any other tenant in the Center for any losses, fees, expenses or damages suffered or incurred by Landlord or such other tenant in the Center as a result of Tenant's failure to comply with the Project Labor Agreement.~~

1210251-51.68   026767.000127 602929037.2

**EXHIBIT "B-3"**

**LANDLORD'S WORK**

**General**

1. Landlord acknowledges the national market theme of rock'n'roll music and entertainment played and promoted in and through "Hard Rock Cafes" throughout the country and the world. Landlord further acknowledges and agrees that Landlord shall not prohibit Tenant's use of the Premises in furtherance of its rock'n'roll music and entertainment theme provided Tenant's playing and promotion of its rock'n'roll music and entertainment theme complies with applicable laws, and provided further that the restaurant's environment and operations shall still be required to be consistent with the Center's family friendly environment. **To this end, Tenant shall be permitted to broadcast music audible from the exterior of the Premises in areas adjacent to the main entrances of the Premises (subject to compliance with applicable code requirements, if any) provided (i) the sound systems are independent zones, and when required can be turned down on a zone basis; (ii)Tenant maintains the volume thereof at a level not to exceed eighty (80) decibels outside of a ten foot (10') radius from the boundaries of the main entrances so as not to disturb other tenants or occupants or customers of the Center, including the guests to the theme park and the adjacent Lego Land; and (iii) Tenant agrees to reduce the volume of such music or sound to a reasonable level upon Landlord's commercially reasonable request if Landlord or Landlord's Center Manager receives reasonable complaints with respect to Tenant's music or sound in the Premises. Further, upon Landlord's request, Tenant agrees to cease playing music audible from the entrances of the Premises during the nightly theme park light show, special events or other promotional events then being conducted at the Center or in the Theme Park.**

2. **Landlord shall provide a lease area that is free from any hazardous substances or materials. Landlord shall provide any and all certificates that may be required by the local jurisdiction or any other governing agency. Landlord represents and warrants that the Leased Premises will be delivered to Tenant free of all hazardous materials. In the event of the discovery of hazardous materials in the Leased Premises not installed by Tenant, then Landlord at Landlord's sole expense shall cause the removal, abatement, encapsulation or other remediation thereof as is required by law. In addition, the Commencement Date shall be delayed on a day-for-day basis, or if discovered after the Commencement Date, there shall be a full abatement of all rent and charges pending full removal and restoration.**

3. Landlord shall provide access to all adjacent and remote spaces as required for the completion of the Hard Rock Café tenant build out.

4. Landlord shall deliver concrete floor slab in as is condition. Tenant responsible for any and all modifications per Tenant's design.

5. Tenant has the responsibility within its own premise regarding adhering to requirements of local jurisdiction. Landlord has a shared loading dock facility for Tenant's use for delivery.

6. Landlord shall provide adequate refuse disposal facilities for the removal of all trash and waste generated by the Hard Rock Café. However, Tenant is responsible to porter from the premise to the central facility.

7. Landlord shall provide every available assistance in obtaining all required local jurisdiction and any other governing agency approvals necessary for the construction and operation of the Hard Rock Café.

8. Mall exterior signage will not be allowed.

9. N/A. Construction within an enclosed shopping center.

**Shell Specification**

1. N/A. Construction within an enclosed shopping center.

2. Landlord to provide all fire separations between the Hard Rock Café and all adjacent areas as required by the local jurisdiction and any other governing agency. Tenant shall maintain fire separation throughout construction process.

3. N/A. It is the Tenant's responsibility to design.

4. N/A.

5. N/A.

6. N/A. Tenant to design its own exit study within the premise to connect to. Landlord to provide exit passage way.

7. Landlord shall have a structural engineer registered in the state in which the project is located certify that the existing floor's structural system is adequate to support a live load of 100 lbs. per square foot and an additional dead load of 20 lbs. per square foot.

1210251-52.68    026767.000127 602929037.2

8.  For new construction, a full investigation into the existing ground conditions is to be undertaken by Landlord, a copy of which shall be supplied to Hard Rock Cafe Intl.

9.  To the extent that the Project is located in a multi-tenant or multi-purpose development, Landlord shall, at its expense, include Hard Rock Café signage in all public tenant directories located within the Mall interior.

10. Tenant is responsible as utilities specifications serve the space.

11. N/A. As is.

**Services**

1.  Landlord shall provide as is potable water supply at adequate PSI in compliance with the local jurisdiction's requirements or any other governing agency to the Hard Rock Café leased premises.

2.  Landlord shall provide an as is metered natural gas supply within the premises at a location coordinated with Hard Rock's design. All work shall be in compliance with the local jurisdiction's requirements or any other governing agency. The gas supply shall be accurate per Tenant's design needs.

3.  Landlord to provide an as is sanitary sewer line in compliance with the local jurisdiction's requirements or any other governing agency.

4.  Landlord has central grease system with collection.

5.  Landlord shall provide fire protection service to the Hard Rock Café lease space. Service shall be sized in accordance with NFPA 13 and Factory Mutual Standards for proper flow at required pressure to accommodate total fire protection coverage of the Hard Rock Café leased space. Hard Rock to make adjustments to the fire protection system as required coordinating with its design.

6.  Landlord shall provide an as is rooftop or central HVAC equipment to meet Hard Rock's specifications and all required structural supports and ducting to the Premises. Landlord shall provide refrigeration equipment and exhaust fans. Tenant is responsible to modify per their design.

7.  Based on a premise area of 8,000 NSF, Landlord shall provide.

8.  Landlord shall provide conduit for phone cables and fiber optic to the premises.

9.  Grease, Thermal and Dishwasher Exhaust Systems
    Landlord agrees to transfer ownership of these systems to the Tenant as is. Tenant at its sole cost and expense shall make all necessary mechanical modifications of these systems per Tenant's design, Tenant shall also make electrical modifications to ensure power feeds are relocated to Tenant's electrical gear. Tenant will be responsible for the on-going operation, maintenance, necessary scheduled cleaning, repair and replacement of mechanical system KN3 (grease exhaust) and KN2(thermal exhaust). These costs shall include scheduled quarterly grease cleaning of hoods, and vertical/horizontal duct and exhaust fans from Tenant's Premises to the Landlord's roof. If through the design process it is determined that there is a system that needs to remain connected for the Landlord's use, the Landlord will compensate Tenant based on a percentage of balanced exhaust volume between Landlord/Tenant as per the mechanical design.

10. Existing Mechanical and Kitchen Equipment
    Landlord agrees to transfer the ownership of all existing mechanical refrigeration and kitchen equipment to the Tenant as is. Tenant will be responsible for all future costs associated with ownership of this equipment.

Landlord shall allow for the installation of a satellite dish (complete with all necessary planning consents) at a technically suitable location at roof level. A dedicated and fully accessible cable riser shall be provided to link between the roof mounted dish and the electrical switch room.

**EXHIBIT "C-1"**

*INTENTIONALLY DELETED*

~~FOOD COURT - MALL OF AMERICA~~

~~Bloomington, Minnesota~~

~~This Exhibit "C-1" is hereby attached to and incorporated by reference into the Lease.  Whenever there is a conflict between the provisions of this Exhibit "C-1" and the remainder of the Lease, the parties hereto agree that the provisions of Exhibit "C-1" shall control.~~

~~I.     LANDLORD'S WORK AT LANDLORD'S EXPENSE.  In addition to, or in lieu of, any other work which Landlord is obligated to perform under this Lease, Landlord shall perform the following work at its sole expense:~~

~~A.     Food Court Seating Area.  Landlord will furnish, decorate and install an area of seating and tables (hereinafter called "Food Court Seating Area"), the size, design and location of which shall be determined solely by Landlord.  Landlord reserves the right to rename, change the size, design, shape or location of the Food Court Seating Area, or the model, number or style of any furnishing, fixtures or other property located within the Food Court Seating Area and may designate other portions of the Center as part of the Food Courts and may designate other portions of the Center as separate and distinct Food Courts.~~

~~II.     COST AND EXPENSE OF FOOD COURT.~~

~~A.     Landlord's Food Court Costs.  Landlord will operate, maintain and repair, or cause to be operated, maintained or repaired the Mall of America Food Court, including the Food Court Seating Area.~~

~~B.     Tenant's Share of Landlord's Food Court Costs.  As Tenant's share of Landlord's Food Court Costs, Tenant shall pay to Landlord Tenant's share of Landlord's Common Area Costs as set forth in Article 1 Fixed Rate Charge - Section 1.1(I).~~

~~C.     Allocation of Food Court Costs to Specific Tenants.  Notwithstanding anything herein to the contrary, Landlord may, on such basis as Landlord shall in its reasonable discretion determine equitable, allocate and attribute certain components comprising Food Court Costs, to Specific Food Court Tenants.  In doing so Landlord may have regard to, amongst other things, the various uses of Food Court Tenants, the location of individual Premises, and the probable or apparent use made of various portions of the Food Court by specific tenants and their invitees and customers.~~

~~Tenant shall pay to Landlord any costs so allocated or attributed to the Premises or Tenant and Landlord shall credit that portion of Tenant's Food Court Proportionate Share of Food Court Costs which relates to the component or components so allocated or attributed with such payment.~~

~~III.     TENANT OPERATION.  Landlord and Tenant agree that in the interests of creating an atmosphere in the Food Court which will seek to maximize Tenant's gross sales, as well as the gross sales of other Food Court tenants, and which will further the objective of providing the public with a unified, convenient food-service facility, Landlord may promulgate and enforce rules and regulations governing the conduct of Tenant's operation, which may include, but not be limited to, the following areas:~~

~~A.     Tenant agrees, prior to the execution of this Lease, to submit to Landlord for Landlord's approval a complete list of menu items which Tenant intends to sell from its premises.  Such menu, as approved by Landlord, shall become a part of this Lease and be incorporated herein as Exhibit "C-1".  Tenant shall display a picture of each menu item on its signboard, and any variation by Tenant from this menu shall require Landlord's prior written approval.  Upon Landlord's demand, Tenant will immediately remove from sale any items which do not have Landlord's prior written approval or which, in Landlord's judgment, do not meet minimum merchandising standards established by Landlord and applicable to all tenants in the Food Court.  Landlord shall have the right to obtain specific performance by Tenant upon Tenant's failure to comply with the provisions of this paragraph.~~

~~B.     Landlord may establish rules and regulations regarding minimum dress and conduct requirements for Tenant's employment.  In any event, Tenant shall require its employees to wear uniforms, the style and design of which are at Tenant's sole discretion.~~

EXHIBIT "C-1"
Page -1-

C.   All complaints against Tenant received by Landlord shall be immediately and properly adjusted to the satisfaction of Tenant's customer or Landlord's authorized agent or employee.

D.   Tenant shall, at its sole expense, obtain and conspicuously display any and all permits, licenses or approvals required for the operation of its business by any applicable governmental authority.

E.   Tenant shall pay for any extraordinary utility costs and fees associated with Tenant's use of the premises, including, but not limited to, any sewer and water charges and fees imposed upon food service establishments.

F.   Tenant shall carry, at its sole cost and expense, a products liability insurance policy in a form satisfactory to Landlord, and shall provide Landlord with a copy of the policy or certificate evidencing that such insurance is in full force and effect and citing the terms thereof.

G.   Tenant shall store its garbage, trash and other refuse in rat-proof and insect-proof containers inside the Premises, and remove the same frequently and regularly and, if directed by Landlord, by such means and methods and at such times and intervals as are designated by Landlord, all at Tenant's sole cost and expense.

H.   Tenant shall at all times keep the Premises, including the mall frontage thereof, in good order, condition and repair and clean, orderly, sanitary and safe, damage by unavoidable casualty excepted.   If Tenant fails to perform this obligation, Landlord without notice may, but shall not be obligated to, perform such work on behalf of Tenant and add the cost of the same to the next installment of Gross Monthly Rent due hereunder.

I.   Tenant's failure to abide by the rules and regulations promulgated by Landlord shall be considered a default under the terms of this Lease and shall give rise to the remedies afforded Landlord elsewhere in this Lease, and specifically including the remedies found in Article XVIII herein.

**EXHIBIT "C-2"**

*INTENTIONALLY DELETED*

**APPROVED MENU**

EXHIBIT "D"

*INTENTIONALLY DELETED*

FORM OF TENANT ESTOPPEL LETTER

1210251.57.68          026767.000127 602929037.2

**EXHIBIT "E"**

**LICENSE AGREEMENT**

This License Agreement (the "Agreement") is made and entered into as of the _____ day of _____, 2014 (the "Effective Date") by and between MOAC Mall Holdings LLC, a Delaware limited liability company (the "LICENSOR") and HARD ROCK CAFÉ INTERNATIONAL (USA), INC., a Florida corporation (the "LICENSEE"). LICENSOR and LICENSEE are sometimes referred to individually herein as a "Party" and collectively as the "Parties".

WHEREAS, LICENSOR is the owner of certain trademarks, designs and copyrights associated with "Mall of America", also known as "MOA", that it uses in connection with apparel, accessories and other products offered by it to the public; and

WHEREAS, LICENSEE is engaged in business of the operation of a Hard Rock Café, which includes a retail component, and is also engaged in the custom manufacture, marketing, advertising and promoting, distribution and sale of LICENSEE'S accessories, apparel and product for sale; and

WHEREAS, LICENSEE desires to manufacture and distribute various certain items of clothing such as t-shirts, sweatshirts, coffee mugs, caps, hats, glassware, jewelry, and other items ("LICENSED PRODUCTS") and to use in connection therewith certain of LICENSOR's trademarks, designs and copyrights; and

WHEREAS, LICENSOR will receive promotional exposure, advertising or other benefits from LICENSEE distribution of such LICENSED PRODUCTS; and

WHEREAS, LICENSOR is willing to license LICENSEE to use certain trademarks, designs and copyrights on or in connection with the manufacturing, marketing, advertising, promoting, selling and distributing of its LICENSED PRODUCTS and LICENSEE is desirous of obtaining such a license, on the terms and conditions hereinafter set forth.

NOW, THEREFORE, for and in consideration of the mutual agreements and covenants contained herein and other good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the Parties agree as follows:

1. **License.**   Subject to the provisions of this Agreement:

(a)   LICENSOR hereby grants to LICENSEE during the term a non-exclusive worldwide license on a royalty-free basis to use its trademarks, designs, trade names, copyrights and logos shown on the attached Exhibit A  and incorporated herein by this reference, as the same may be modified in writing by the Parties from time-to-time ("LICENSED PROPERTY") in conjunction with the custom manufacture, marketing, advertising and promoting, distribution and sale of LICENSEE's LICENSED PRODUCTS for sale only at its Mall of America retail store (hereinafter collectively referred to as the "MOA/HARD ROCK CAFÉ MERCHANDISE").   Such use shall be consistent with the terms herein.   Other than the authorized use of the LICENSED PROPERTY by and through the license granted to LICENSEE, LICENSOR will not use the LICENSED PROPERTY.

(b) LICENSEE acknowledges and agrees that, in addition to LICENSOR's own use of its LICENSED PROPERTY on t-shirts, coffee mugs, caps or hats, LICENSOR licenses the LICENSED PROPERTY to other entities and/or persons for use in connection with t-shirts, coffee mugs, caps or hats worldwide during the term of this Agreement, and there shall be no exclusivity as to merchandise or product using the LICENSED PROPERTY.

(c) LICENSEE has the right to authorize third party manufacturers, wherever located, to use the LICENSED PROPERTY in the manufacture and creation of the MOA/HARD ROCK CAFE MERCHANDISE and components and packaging therefore provided such authorization is limited to producing the MOA/HARD ROCK CAFÉ MERCHANDISE for LICENSEE for LICENSEE's permitted uses under this Agreement.

(d) LICENSEE and LICENSOR may not assign this Agreement or each Party's rights or obligations under this Agreement to any person or entity without first obtaining the other Party's written permission. LICENSEE may not grant any sub-license of its rights under this agreement without first obtaining LICENSOR's written permission.

**2. Ownership.**

(a) LICENSEE acknowledges that LICENSOR is the owner of the LICENSED PROPERTY. LICENSEE agrees that nothing in this Agreement and no use of the LICENSED PROPERTY by LICENSEE pursuant to this Agreement shall vest in LICENSEE, or shall be construed to vest in LICENSEE, any right, ownership or interest in or to the LICENSED PROPERTY, other than the right to use the LICENSED PROPERTY for the MOA/ HARD ROCK CAFÉ MERCHANDISE in accordance with this Agreement. All intellectual property rights (including trademarks and copyrights) that come into existence in connection with the MOA/ HARD ROCK CAFÉ MERCHANDISE and the LICENSED PROPERTY to the extent they continue to use or derive from the LICENSED PROPERTY, shall be owned by LICENSOR, except for any trademarks and copyrights theretofore owned by LICENSEE or any third party in a licensing agreement with LICENSEE or as hereinafter provided. This Section shall survive the termination or expiration of this Agreement.

(b) LICENSOR understands, acknowledges and agrees that LICENSEE owns, and shall continue to own, all right, title and interest in, to and under any and all designs, discoveries, innovations, product designs, product configuration, design patents, trade secrets, copyrights, copyright registrations, derivative works, business information, technical information and the like, developed, generated, created, acquired or otherwise produced by and/or for LICENSEE relating to the design, manufacturing, marketing, distribution and sale of Hard Rock Café clothing and accessories ("LICENSEE's Intellectual Property"), some of which may be used in the manufacturing, marketing, distribution and offer for sale of MOA/ HARD ROCK CAFÉ MERCHANDISE containing the LICENSED PROPERTY. LICENSOR shall acquire no rights, title or interest of any kind or nature, in or to any of LICENSEE's Intellectual Property. This Section shall survive the termination or expiration of this Agreement.

(c) In using the LICENSED PROPERTY in accordance with the limited license granted herein, LICENSEE shall include in any and all uses and depictions of the LICENSED PROPERTY, adequate trademark/service marks/copyright notices, as may reasonably be specified by LICENSOR, which identify LICENSOR or any of its affiliates or properties as the owner of the LICENSED PROPERTY. In the event that any of the parties hereto becomes

aware of any improper use of the LICENSED PROPERTY by LICENSEE, its employees, agents or contractors, LICENSEE agrees, as a material obligation of this Agreement, to take all reasonable necessary steps to stop all improper uses, promptly after becoming aware of such improper uses, which may include, but not limited to, destruction of any and all materials with improper uses of the LICENSED PROPERTY if alternative methods of correction are not available.

3.    **Maintaining the LICENSED PROPERTY.**   LICENSOR will maintain and renew any registrations of the LICENSED PROPERTY at LICENSOR's expense.

4.    **Quality Control.**   In order to preserve the inherent value of the LICENSED PROPERTY, LICENSEE agrees to use its best efforts to ensure that all aspects of the LICENSED PROPERTY, sale, promotion and distribution of the products sold bearing the LICENSED PROPERTY pursuant to this Agreement shall be at least of a standard of quality substantially equal to the quality of other goods or services currently provided by LICENSEE which LICENSOR recognizes as being of a high standard of quality as of the date of this Agreement.

5.    **Approval Rights/Inspection.**   In connection with the limited license granted herein, neither LICENSEE nor its agents shall make any use of the LICENSED PROPERTY without the prior, express written approval of LICENSOR, which approval shall not be unreasonably withheld. In this regard, LICENSEE's obligations shall include, but not be limited to: obtaining the prior written approval of LICENSOR for all advertising material, including all copy (such as television and radio commercials, print advertising, direct mail, brochures, press releases, sales materials and press events) to the extent such materials use or are derived from the LICENSED PROPERTY; providing LICENSOR with samples of all final artwork, advertising, etc. to the extent the artwork uses or is derived from the LICENSED PROPERTY; and submitting to LICENSOR all proposed uses of the LICENSED PROPERTY for LICENSEE's public relations purposes. Any and all MOA/ HARD ROCK CAFÉ MERCHANDISE proposed by LICENSEE shall be subject to LICENSOR's prior written approval, which approval shall not be unreasonably withheld, in advance of any development or manufacture thereof, as well as LICENSOR's prior written approval of the proposed design of any and all such proposed MOA/ HARD ROCK CAFÉ MERCHANDISE, which approval shall not be unreasonably withheld. LICENSOR agrees to use commercially reasonable efforts to exercise its right of approval in this regard within ten (10) calendar days of its receipt of such item and in the case of any disapproval, agrees to provide LICENSEE with detailed reasons for its disapproval, but in no event shall its failure to respond to a request by LICENSEE for approval of LICENSEE's use of any and all of the LICENSED PROPERTY be deemed to constitute LICENSOR's approval of such proposed uses by LICENSEE. Upon the written request of LICENSOR, which request shall not be made more than once quarterly, LICENSEE shall submit to LICENSOR representative samples of any merchandise, signage, promotional materials, advertisements and other materials bearing or used in connection with the LICENSED PROPERTY.

6.    **Term.** This Agreement and the license granted herein shall commence on the Effective Date and, unless extended or terminated as provided herein, shall continue for ten (10) years.  In the event LICENSEE exercises its option to extend the lease agreement dated _____ between LICENSOR and LICENSEE, this Agreement shall also be extended for a corresponding five (5) year renewal period. Either Party may terminate this Agreement if the

other Party breaches a material term of this Agreement and the breach continue unabated for a period of thirty (30) calendar days after the non-breaching Party provides written notice of the breach to the other Party. Upon the termination of this Agreement for any cause, neither Party shall have any further obligation to the other except for obligations that by their terms are to be performed after termination of this Agreement, and any obligations or liabilities arising prior to or in connection with such termination, including the right to damages for breach. Upon expiration or earlier termination of this Agreement, LICENSEE agrees to discontinue all use of the LICENSED PROPERTY, except that LICENSEE shall have the right, for a period of twelve (12) months thereafter, to sell of the existing inventory bearing the LICENSED PROPERTY, whether completed or in the process of manufacture.

7.    **Compliance with Standards and Laws.**  LICENSEE shall comply and shall cause its contractors and manufacturers to comply with all applicable laws, statutes, regulations, codes, ordinances and orders in connection with its obligation under this Agreement and involving the use of the LICENSED PROPERTY as permitted hereunder and the conduct of LICENSEE's business in connection therewith, including but not limited to applicable health and safety standards and labor laws.

8.    **Indemnification.**    LICENSEE shall be solely responsible for and hereby agrees to indemnify, defend LICENSOR, its affiliates, respective officers, directors, shareholders, employees and agents, and to hold each of them harmless from any and all claims, demands, causes of action, or damages, including reasonable attorney's fees, arising out of or in connection with any breach of this agreement by LICENSEE. including without limitation, claims relating to or based upon:    (i) unauthorized use of any patent, trademark, design, copyright or other proprietary right of any third party by LICENSEE;  (ii) defects in any component of the custom MOA/ HARD ROCK CAFÉ MERCHANDISE, it being further understood and agreed that any governmental order of recall or injunction against distribution and/or sale shall be deemed conclusive proof of such defect; and (iii)  breach of any agreements or alleged agreements made or entered into by LICENSEE to effectuate the terms of this Agreement.  LICENSEE shall give LICENSOR prompt written notice of the institution of any action or the making of any claim alleging a breach hereunder.

LICENSOR shall be solely responsible for and hereby agrees to indemnify, defend LICENSEE, its affiliates, respective officers, directors, shareholders, employees and agents, and to hold each of them harmless from any and all claims, demands, causes of action, or damages, including reasonable attorney's fees, arising out of or in connection with any breach of this agreement by LICENSOR.

This Section shall survive the termination or expiration of this Agreement.

9.    **Insurance.**    LICENSEE shall obtain and maintain throughout the Term, at its sole expense, standard Personal Injury Insurance, Product Liability Insurance and Advertiser's Liability Insurance from a reputable insurance company, qualified to do business in the United States, naming LICENSOR, and its respective officers, directors, employees, agents and representatives as additional insureds.  Coverage under each policy will be a minimum of One Million Dollars ($1,000,000) for each instance and Two Million Dollars ($2,000,000) in the aggregate.  Each such policy shall require that LICENSOR receives at least thirty (30) days written notice of the cancellation, amendment or endorsement thereof.  LICENSEE shall furnish

EXHIBIT "E"
Page -4-

LICENSOR upon execution of this Agreement with certificates of insurance evidencing that the insurance coverage is in full force and effect.

10.     **Representations.**  LICENSOR represents and warrants to LICENSEE that: (a) it has the right to license the LICENSED PROPERTY to LICENSEE in accordance with the terms and provisions of this Agreement, and (b) it has the full power and authority to enter into this Agreement, and (c) to LICENSOR's knowledge, the use and/or employment of any of the LICENSED PROPERTY in the design, manufacture, advertising, marketing, distribution, offer for sale, sale and promotion of MOA/ HARD ROCK CAFÉ MERCHANDISE with the LICENSED PROPERTY will not violate and/or infringe any intellectual property or any other rights of any other third parties.  LICENSEE represents and warrants to LICENSOR that: (a) it has the full power and authority to enter into this Agreement, and (b) to LICENSEE's knowledge, the use and/or employment of any of the LICENSED PROPERTY in the design, manufacture, advertising, marketing, distribution, offer for sale, sale and promotion of MOA/ HARD ROCK CAFÉ MERCHANDISE with the LICENSED PROPERTY will not violate and/or infringe any intellectual property or any other rights of any other third parties.

11.     **Artwork.**  Pursuant to the provisions of Section 5 above, LICENSOR agrees to timely furnish LICENSEE with a reasonable number of samples and camera ready artwork via email, with PMS or other color call-outs, embroidery designs and other materials LICENSEE may reasonably request to ensure accurate reproduction of the LICENSED PROPERTY, samples of which are attached hereto as Exhibit A-1.   LICENSOR recognizes that LICENSEE may need to alter certain aspects of the designs in order for the design to fit and work with certain LICENSED PRODUCTS or if necessary, LICENSEE may need to use other colors or decoration schemes for LICENSEE other production runs, provided however, that all of the foregoing shall be subject to the prior consent of LICENSOR, not to be unreasonably withheld, conditioned or delayed, and the provisions of Section 5.   LICENSEE shall comply with the trademark guidelines established by LICENSOR.

12.     **General.**     The following provisions shall apply to this Agreement:

(a)     This Agreement constitutes the entire agreement between the Parties concerning the subject matter hereof.  This Agreement may not be modified or amended except by a written instrument executed by duly authorized officers of both Parties.

(b)     This Agreement and the license granted hereunder shall be governed by and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of Minnesota applicable to contracts made in that state, without giving effect to any choice of law or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Minnesota and the federal trademark laws.

(c)     Intentionally Deleted.

(d)     The prevailing Party of any dispute shall be entitled to recover all reasonable attorneys' fees from the other Party, regardless of whether the payment of such fees have been ordered.

(e)     Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law, such invalidity, illegality or unenforceability shall not affect any other provision and such provision or

portion thereof shall be struck from the remainder of this Agreement, which shall remain in full force and effect. This Agreement shall be reformed, construed and enforced in such jurisdiction so as to best give effect to the intent of the Parties.

(f)     All notices required or permitted to be given hereunder shall be in writing and may be delivered by hand, by facsimile, by nationally recognized private courier, or by United States mail. Notices delivered by mail shall be deemed duly given (i) when delivered in person, (ii) upon receipt of electronic confirmation when dispatched by electronic facsimile transfer, (iii) three (3) Business Days after being deposited in the United States mail, postage prepaid, registered or certified mail, return receipt requested with proof of acceptance or refusal by the addressee or (iv) one (1) Business Day after having been deposited with a recognized overnight courier service with proof of receipt or refusal. All notices shall be addressed as follows:

| | |
|---|---|
| If to LICENSEE: | HARD ROCK CAFÉ INTERNATIONAL (USA), INC.<br>6100 Old Park Lane<br>Orlando, Florida 32835<br>Attn: Jay A. Wolszczak, Esq. |
| With a Copy To: | Baker & Hostetler LLP<br>200 South Orange Avenue<br>Suite 2300<br>Orlando, Florida 33801<br>Attn: Michael C. Wilde, Esq. |
| If to LICENSOR: | MOAC Mall Holdings LLC<br>Attention: Legal Department<br>60 East Broadway<br>Bloomington, MN 55425 |
| With a Copy to: | MOAC Mall Holdings LLC<br>Attention: Maureen Bausch – EVP Business Development<br>60 East Broadway<br>Bloomington, MN 55425 |

or to such other addresses as may be designated by notice given in accordance with the provisions hereof.

(g)     The headings of each section contained herein are provided only for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

(h)     The failure in any one or more instances of a Party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said Party of any breach of any of the terms or covenants of this Agreement, shall not be construed as a subsequent waiver of any such terms or covenants, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving Party.

(i) This Agreement may be executed in multiple counterparts, each of which will be deemed an original, but which together will constitute one and the same instrument.

(j) Each Party hereto, its affiliates and their respective directors, officers, employees and agents agrees to keep confidential and not disclose to any third party the terms of negotiation, terms of this Agreement and all proprietary confidential information it receives from the other Party. Neither Party will have an obligation with respect to any information furnished by the other party which the Party can establish:

(i)    was in the Party's possession prior to any disclosure by the other Party;

(ii)   is or becomes public knowledge through no fault of the receiving Party or was public knowledge;

(iii)  the information becomes available to a Party directly or indirectly from a source (who is under no legal or fiduciary obligation to withhold such information) other than from the other Party;

(iv)   the information is independently developed by a Party without access to confidential information received from the other Party; or

(v)    the confidential information is required by a court, government authority, statute or law to be disclosed, provided that the disclosing party gives the other Party at least thirty (30) calendar days' notice (unless prohibited by law, in which case notice must be given for the maximum time permitted by law) so the other Party has the opportunity to intervene or otherwise protect the confidential information.

(k)    Nothing herein shall be construed to constitute a partnership or joint venture between the Parties hereto and neither LICENSOR and LICENSEE shall become bound by any representation, act or omission of the other.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date first set forth above.

**LICENSOR:**                                          **LICENSEE:**

**MOAC MALL HOLDINGS LLC**                 **HARD ROCK CAFÉ**
                                                        **INTERNATIONAL (USA), INC.,**
a Delaware limited liability company          a Florida corporation

By: _____            By: _____

Name: _____            Name: _____

Title: _____           Title: _____

Exhibit A

Mall of America

MALL OF AMERICA



Exhibit "A-1"



Mall of America

Product: 80mm Water (Snow) Globe

Mall of America Water (Snow) Globe - OPTION 2

Work Order: S48943
Date: 6/29/13
Name Drop: Minnesota

This artwork is copyrighted by ACE USA. It may not be reproduced without the written consent and approval of ACE USA.



**PERRIN**   ART FOR APPROVAL   MOA Cure   L0950

This digital representation is for content, image and spelling approval only.
Actual garment, ink and thread colors may vary. Graphic size and placement are approximate.

MALL OF AMERICA.

RUN WALK.

12" W x 3" H Back Screen Print

12" W x 3" H Back Screen Print

12" W x 1.5" H Back Screen Print

6" W x 7.375" H Center Chest Screen Print

3010

3001

PACIFIC BLUE   CHARCOAL   OVERDYED BLUE   TROPIC BLUE

1210251-67.68

EXHIBIT "E"
Page -2-









## ASSIGNMENT OF LEASE

THIS ASSIGNMENT OF LEASE is made on this 28th day of July, 2014 (the "**Effective Date**"), by and between MOAC MALL HOLDINGS LLC, a Delaware limited liability company, having a business address of 60 East Broadway, Bloomington, MN 55425-5550 (the "**Assignor**"), and **MOA ENTERTAINMENT COMPANY LLC**, a Delaware limited liability company, having a business address of 60 East Broadway, Bloomington, MN 55425-5550 (the "**Assignee**").

### WITNESSETH:

WHEREAS, by a Lease dated February 19, 2014, as amended by the Lease Amendment Agreement dated April 24, 2014 (hereinafter collectively referred to as the "**Lease**"), by and between MOAC Mall Holdings LLC as Assignor and Landlord, and Hard Rock Café International (USA), Inc., as Tenant, Assignor leased to Tenant certain premises being identified in said Lease as Space No. 5115 (the "**Premises**"), located in the Mall of America, Bloomington, Minnesota;

WHEREAS, Assignor desires to assign its interest as Landlord in the Lease to Assignee, and Assignee is willing to accept an assignment of said Lease.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration received by Assignor from Assignee, the receipt and sufficiency of which is hereby acknowledged. Assignor does hereby assign, transfer and convey to Assignee all of its right, title and interest as Landlord in and to the Lease as hereinabove described.

Commencing upon the Effective Date, Assignee hereby expressly assumes and agrees to be liable for all financial obligations of Landlord as required by the terms of the Lease and to the perform all other terms, covenants and conditions stated in said Lease to be performed by Landlord for the remainder of the term in the same manner as if Assignee had been designated as Landlord therein.

IN WITNESS WHEREOF, the parties hereto have signed and sealed this Assignment as of the day and year first above written

LANDLORD/ASSIGNOR:

MOAC MALL HOLDINGS LLC,
a Delaware limited liability company

By: _____
Name:   Don Ghermezian
Title:   President

ASSIGNEE:

MOA ENTERTAINMENT COMPANY LLC,
a Delaware limited liability company

By: _____
Name:   Don Ghermezian
Title:   President

1



MALL OF AMERICA.

### NOTICE OF ANTICIPATORY DEFAULT

June 8, 2020
*Via UPS and*
*Via Email*

Hard Rock Café International (USA), Inc.          Baker & Hostetler LLP
Attn: Vice President Business Affairs             Attn: Michael C. Wilde, Esq.
5701 Stirling Road                                200 S. Orange Ave., Suite 2300
Davie, FL 33314                                   Orlando, FL 32801-3432
                                                  mwilde@bakerlaw.com

RE:     Hard Rock Café – Space No. 5115
        Mall of America, Bloomington, Minnesota

Dear Sir or Madam and Mr. Wilde:

Reference is made to that certain Lease dated February 19, 2014, by and between MOA ENTERTAINMENT COMPANY LLC, a Delaware limited liability company, as successor-in-interest to MOAC MALL HOLDINGS LLC, as Landlord, and HARD ROCK CAFÉ INTERNATIONAL (USA), INC., a Florida corporation, as Tenant, as amended by the Lease Amendment Agreement dated April 24, 2014, the Assignment of Lease dated July 28, 2014 and the Tenant Change of Address Letter dated April 24, 2018 (hereinafter collectively referred to as the "Lease"), and specifically to Article XVIII therein which outlines the remedies available to Landlord in the event of default by Tenant.

Inasmuch as your rental account is presently delinquent in the aggregate sum of $236,140.52, please be advised this letter shall serve as notice that you may be placed in default of your Lease.  Your failure to pay the above stated sum **including any and all late fees** within ten (10) days of your receipt of this letter shall force Landlord to take such steps deemed necessary to protect its interest when Tenant has been placed in default. These steps may include but are not limited to a suit for collection of unpaid rents, together with interest therein, attorneys' fees and court costs incurred in any such action. These actions shall not be construed as an election to terminate the Lease. Further, you are hereby put on notice that Landlord does not accept surrender of the Premises and intends to hold Tenant responsible for all obligations under the lease.

To avoid further legal recourse by the Landlord, remit full payment of all delinquent sums to the undersigned within said demand period.

Sincerely,

Kathleen J. Allen
Corporate Counsel
kathleen.allen@moa.net
952-883-8815

KJA:alg

cc:     Heather Brechbill Swilley
        Al Hines
        Nate Klutz
        Dan Spa

**EXHIBIT**

**B**



**MALL OF AMERICA.**

## NOTICE OF CONTINUING DEFAULT

July 21, 2020
*Via UPS and*
*Via Email*

Ms. Candice Pinares-Baez
Attn: Director of Business Affairs
Hard Rock Café International (USA), Inc.
5701 Stirling Road
Davie, FL 33314
Candice.Pinares-Baez@hardrock.com

RE:    Hard Rock Café – Space No. 5115
       Mall of America, Bloomington, Minnesota

Ms. Pinares-Baez:

Reference is made to that certain Lease dated February 19, 2014, by and between MOA ENTERTAINMENT COMPANY LLC ("Landlord") and HARD ROCK CAFÉ INTERNATIONAL (USA), INC. ("Tenant"), as amended (collectively the "Lease"), and specifically to the default letter dated June 8, 2020 and Tenant's response letter dated June 25, 2020.

A Notice of Default was sent to you on June 8, 2020, at which time your rental account was delinquent in the aggregate sum of $236,140.52. Tenant failed to pay the outstanding amounts as requested by Landlord and required by the Lease. This letter shall serve as notice that your rental account remains continually delinquent in the aggregate sum of $318,172.51.

In addition, this letter shall serve as notice that Tenant is in default for failure to open and operate in the Premises as required by the Lease. Mall of America ("MOA") reopened to the public on June 10, 2020. Restaurants, including Hard Rock Café, were permitted to open and operate as of June 10, 2020. All restaurant openings are subject to Covid Preparedness Plans ("Plans"), which Plans help ensure safety precautions are in place for Tenant's employees and guests and help facilitate procedures. Despite these openings and guidelines, Tenant has failed to reopen its business and resume operations in Mall of America.

Tenant's continuing failure to timely pay rent and reopen for business will not be tolerated by Landlord. The time, effort and commitment of Landlord's resources in attempting to timely collect rent and work with Tenant to reopen is also unacceptable. As a result, we are providing you notice that this matter is being referred to our outside counsel for collection and to enforce the operating and rent obligations of Tenant under the Lease.

In response to Tenant's letter dated June 25, 2020, Landlord rejects Tenant's assertion that they are excused from the payment of Rent on the basis that the temporary closure and operating requirements constitute a condemnation. This argument is without legal merit. There has not been a taking - Mall of America is open for business, there is not a government requirement that Tenant remain closed, and Tenant can operate in its premises subject to the temporary capacity requirements. Restaurants within and outside of Mall of America are operating daily under these requirements and they do not prohibit Tenant from operating a restaurant in the Premises.

Nor is Tenant excused from payment of its rental obligations due to force majeure and the government-ordered temporary closure. Pursuant to the terms of the Lease, Section 24.5 states:

> **EXHIBIT**
>
> **C**

Notwithstanding the foregoing, the provisions of this Section 24.5 shall at no time operate to excuse Tenant from ~~the obligation to open for business on the Commencement Date, except in the event of an industry-wide strike, nor any obligations for~~ payment of Minimum Annual Rent, Percentage Rent, additional rent or any other payments required by the terms of this Lease when the same are due, and all such amounts shall be paid when due.

In order to avoid the commencement of a collections action and additional steps by Landlord in conjunction with our outside counsel, please pay the delinquent amount of $318,172.51 immediately upon receipt of this letter and notify Landlord of your intended opening date, which should be a date in the immediate future. A failure to comply will result in Landlord taking the steps deemed necessary to protect its interest. These steps will include, but are not limited to, a suit for collection of unpaid rents, together with interest and late fees therein, attorneys' fees and court costs incurred in any such action. Further, you are hereby put on notice that Landlord does not accept surrender of the Premises and intends to hold Tenant responsible for all obligations under the lease.

To avoid further legal recourse by the Landlord, remit full payment of all delinquent sums to the undersigned within said demand period.

Sincerely,

Kathleen J. Allen
Corporate Counsel
kathleen.allen@moa.net
952-883-8815

cc:     Heather Brechbill Swilley
        Al Hines
        Brad Hauswirth / Aaron Ferguson Law, PLLC